UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITEDHEALTH GROUP, INC., a Minnesota corporation,<br><br>Plaintiff,<br><br>v.<br><br>LEXINGTON INSURANCE COMPANY, a Delaware corporation, and COLUMBIA CASUALTY COMPANY, an Illinois corporation,<br><br>Defendants. | Civil No. 05-1289 (PJS/JJG)<br><br>ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND STAYING PROCEEDINGS |

---

Jeffrey J. Bouslog, Andrew S. Hansen, and Heidi A.O. Fisher, OPPENHEIMER, WOLFF & DONNELLY LLP, 45 South Seventh Street, Suite 3300, Minneapolis, MN 55402, for plaintiff.

Charles E. Spevacek, MEAGHER & GEER, PLLP, 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402, for defendant Lexington Insurance Company.

This matter is before the Court on a motion for partial summary judgment brought by plaintiff UnitedHealth Group, Inc. ("United") against defendant Lexington Insurance Company ("Lexington").

Only a few facts are necessary to understand this motion: Lexington provided $60 million in insurance coverage to United under a managed care professional liability policy that was in effect from December 1, 1998 to December 1, 2000. United got sued a lot, and Lexington ended up paying almost $60 million to United under the policy. United argues that Lexington

must pay another $2 million or so in order to exhaust the policy limits; Lexington responds that the amount is more like $300,000. Everyone agrees that this Court will have to settle that dispute.

What is important for present purposes is that Lexington has conceded — plainly and repeatedly — that United is entitled to recover every penny of the $60 million in coverage that Lexington provided under the policy. There is no doubt that the amounts already paid by Lexington plus the amounts not yet paid but incurred by United on claims that Lexington concedes are covered will far exceed $60 million. At oral argument, Lexington stipulated that, as soon as this Court resolves the dispute over how much Lexington has already paid to United, Lexington will pay the remainder to United, thus exhausting the policy limits. If, for example, this Court decides that Lexington has already paid $58.7 million on United claims, and that determination is either not appealed or upheld on appeal, then Lexington will promptly cut a check to United in the amount of $1.3 million.

Oddly, though, United refuses to take "yes" for an answer. Instead, United complains that Lexington denied coverage on 35 claims that United submitted. United now wants to force Lexington — and this Court — to litigate those 35 coverage disputes, even though the policy limits have almost been exhausted, and even though the policy limits will be exhausted the moment that this Court determines how much Lexington has remaining to pay.

United bases its demand on § 4.7(c) of the Lexington policy, which provides:

> The Company shall advance defense costs as incurred, subject to the applicable Self-Insured Retention. The Protected Person agrees to repay such Defense Costs to the Company in the event and to the extent it is ultimately determined that such Protected Person is not entitled to payment of such Defense Costs under this Policy.

Lexington's interpretation of this language is straightforward: If the insured tenders a claim to the insurer, and the insurer agrees to defend the claim (with or without a reservation of rights), then the insurer must pay the defense costs as they are incurred. The insurer cannot wait until the litigation is concluded and only then pay the bills of defense counsel. If the insurer declines to defend a claim, then it has no duty to pay defense costs. The insured can litigate the denial, and, if successful, can recover its defense costs — unless, of course, the policy limits have been exhausted in the meantime.

United puts forward a competing interpretation — an interpretation that was not clearly described in its written submissions, but that was elicited from United, with some difficulty, at oral argument. In United's view, the "as incurred" language requires the insurer to advance defense costs not merely on the claims that it agrees to defend, but on *all* claims, including those that, in the insurer's view, clearly fall outside of the coverage of the policy. The insurer must pay defense costs on uncovered (as well as covered) claims as those costs are incurred and sue the insured to recover any costs that are outside the policy's coverage. Thus, if a policy covered claims that arose in 1999, and the insured tendered 100 claims that arose in 2004, the insurer would have no alternative but to pay the fees and expenses of 100 sets of lawyers, bring 100 declaratory judgment actions, and then, after waiting two or three years in each case for a judgment, try to recover the fees and expenses that it advanced to the lawyers.

United reads even more into the "as incurred" language. Under that clause, according to United, the insurer becomes obligated to pay defense costs (on both covered and uncovered claims) the moment those costs are incurred. Suppose, for example, that United tenders five claims to Lexington. Lexington agrees to defend the first, third, and fifth claims, but not the

second and fourth.  Suppose further that, on September 1, a defense attorney devotes an hour to the first claim; on September 3, another defense lawyer devotes an hour to the fourth claim; and on September 5, yet another defense lawyer devotes an hour to the third claim.  According to United, Lexington becomes obligated to pay for each hour as that hour is devoted to a claim, no matter when the time is billed, and no matter when the dispute over the coverage of the fourth claim is resolved.

Suppose, then, that Lexington receives a bill from the attorney who worked on September 5, Lexington pays the bill, and, in so doing, Lexington exhausts its policy limits.  Suppose further that, a few weeks later, Lexington receives a bill from the attorney who worked on September 1.  In United's view, Lexington must now pay the "September 1 bill" and sue the attorney who submitted the "September 5 bill" to recover the payment, because the "September 1 bill" had priority over the "September 5 bill," even though the "September 5 bill" was submitted long before the "September 1 bill."

United goes even further.  According to United, *even after the policy limits are exhausted*, the "as incurred" language gives the insured the right to litigate over how much of the policy limits should have been "attributed" to each claim.  Suppose, using the facts above, that Lexington refuses to pay defense costs on the second and fourth claims, but then exhausts its policy limits defending and settling the first, third, and fifth claims.  United argues that, under the "as incurred" clause, it would have the right to force Lexington to litigate — and this Court to decide — whether the second claim was really covered and thus whether some of the defense costs spent on the third or fifth claims should instead have been spent on the second claim.

United's interpretation of the "as incurred" clause is strained (to put it charitably).  Not surprisingly, it does not appear that any federal or state court has ever agreed with United's interpretation.  United's is also an interpretation that, in the real world, would make it difficult for insurance companies to function.  Insurers would face a host of practical problems, litigation would expand exponentially, and the costs of that litigation would, of course, be reflected in increased premiums.  Lexington's interpretation of the clause, by contrast, is consistent with the language of the clause and utterly sensible in light of the day-to-day realities faced by insurers.

Even if the Court agreed with United's interpretation, though, it could not do what United asks it to do — that is, force Lexington to defend 35 coverage actions.  The reason is simple: Lexington would have no stake whatsoever in the outcome of those actions.  If Lexington won all of those actions, it would owe United $60 million, minus the payments already made.  If Lexington won some of those actions, it would owe United $60 million, minus the payments already made.  If Lexington won none of those actions, it would owe United $60 million, minus the payments already made.  Lexington would not have one penny at stake.  Win, lose, or draw, Lexington would owe precisely the same amount to United: $60 million, minus the payments already made.

Even though United is anxious to force Lexington to defend these 35 coverage actions, the Court cannot figure out why.  Win, lose, or draw, United would *recover* precisely the same amount: $60 million, minus the payments already made. When pressed on this question at oral argument, United's attorney vaguely alluded to United's position vis-a-vis Reliance Insurance Company of Illinois ("Reliance") and Columbia Casualty Company ("Casualty"), two excess insurers that issued "follow-form" policies to United.  Apparently, Reliance and Columbia also

denied coverage of the 35 disputed claims, citing Lexington's position.  And apparently, United believes that forcing Lexington to admit that it was "wrong" will somehow change the minds of Reliance and Columbia.

The problem is that any judgment entered in litigation between United and Lexington would not bind Reliance, Columbia, or anyone else.  United would still have to litigate coverage (and other questions) with its excess insurers.  In other words, as things stand, United is entitled to recover $60 million from Lexington (minus the payments already received), and United will have to go after the excess insurers for losses not covered.  If this Court were to litigate the 35 coverage actions, United would stand in the exact same position at the end of the day:  It would recover $60 million from Lexington (minus the payments already received), and it would have to go after the excess insurers for losses not covered.

The Court cannot understand why United wants to pay its lawyers to litigate 35 meaningless coverage actions.  But that is beside the point.  For purposes of United's summary judgment motion, what is important is that, in such coverage actions, Lexington would have absolutely nothing at stake.  Those actions would not present "Cases" or "Controversies" for purposes of Article III, § 2 of the U.S. Constitution, nor would they present "actual controvers[ies]" for purposes of the Declaratory Judgment Act (28 U.S.C. § 2201(a)).  The Court would have no jurisdiction over those actions.

The Court intends to handle the dispute between United and Lexington as follows:

First, the Court will deny United's motion for summary judgment, for the reasons described above.

Second, the Court will stay all proceedings between United and Lexington, except that the Court will permit discovery to take place on the question of how much Lexington must pay to exhaust the $60 million in policy limits — a dispute that was defined by Judge Jeanne Graham as "a dispute between the approximately $57.8 million in payments asserted by United and the approximately $59.7 million claimed by Lexington." Magistrate Judge Graham's Order 5, Sept. 7, 2006.

Third, the Court will order that the parties, after concluding that discovery, appear before Judge Graham for a status conference. At that status conference, Judge Graham and the parties should consider various options for disposing of the dispute over how much of the $60 million in policy limits remains to be paid. The parties might decide to arbitrate their dispute. The parties might consent to have Judge Graham try their dispute under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Judge Graham might take evidence and hear arguments regarding the dispute and prepare a recommended disposition under 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b). Or the dispute may be referred to a special master under Fed. R. Civ. P. 53(a)(1)(B)(ii). After consulting with the parties, Judge Graham should recommend one of these alternatives to the Court.

Fourth, after the dispute over the amount remaining under the policy limits is decided in some way, the Court will enter judgment against Lexington under Fed. R. Civ. P. 54(b). The Court will continue to stay all proceedings between United and Lexington until that judgment is satisfied.

Finally, after that judgment is satisfied, the Court will dismiss all remaining claims against Lexington on grounds of mootness.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. United's motion for summary judgment [Docket No. 102] is DENIED.

2. All proceedings relating to United's claims against Lexington are STAYED pending further order of this Court, except that the parties may proceed with the discovery ordered by Judge Graham on September 7, 2006, as well as any additional discovery that Judge Graham permits on the question of how much Lexington has remaining to pay under its policy limits.

3. Following completion of the discovery described in the preceding paragraph, the parties are ORDERED to schedule a status conference before Judge Graham and discuss options for resolving their dispute over how much Lexington must pay to exhaust its policy limits.

Dated:  September  12 , 2006                                s/Patrick J. Schiltz
                                                            Patrick J. Schiltz
                                                            United States District Judge