UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITEDHEALTH GROUP
INCORPORATED, a Minnesota corporation,

           Plaintiff,

v.

COLUMBIA CASUALTY COMPANY, an
Illinois corporation; FIREMAN'S FUND
INSURANCE COMPANY; AMERICAN
ALTERNATIVE INSURANCE
CORPORATION; EXECUTIVE RISK
SPECIALTY INSURANCE COMPANY;
FIRST SPECIALTY INSURANCE
CORPORATION; STARR EXCESS
LIABILITY INSURANCE
INTERNATIONAL LIMITED; LIBERTY
MUTUAL INSURANCE COMPANY;
STEADFAST INSURANCE COMPANY; and
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA;

           Defendants.

Case No. 05-CV-1289 (PJS/SRN)

MEMORANDUM OPINION AND ORDER

Jeffrey J. Bouslog, Christine L. Nessa, and Katherine M. Wilhoit, OPPENHEIMER
WOLFF & DONNELLY LLP; and David B. Goodwin and Michael S. Greenberg,
COVINGTON & BURLING, LLP, for plaintiff.

Michael M. Marick and Rebecca R. Haller, MECKLER BULGER TILSON MARICK &
PEARSON LLP; and Charles E. Spevacek, Tiffany M. Brown, and Katrina M. Giedt,
MEAGHER & GEER, P.L.L.P.

Plaintiff UnitedHealth Group Incorporated ("United") brings this action against defendant

Columbia Casualty Company ("Columbia"), an excess insurance carrier, seeking coverage for

some seventeen claims made by third parties against United.[1]  The Court appointed a Special

---

[1]On February 27, 2009, United filed a First Amended Supplemental Complaint naming
(continued...)

Master to help manage the litigation and make recommendations regarding dispositive motions. Docket Nos. 193, 199, 205. United filed a motion for partial summary judgment with respect to two of the claims at issue,[2] and the Special Master recommended granting United's motion in Special Master Reports 4 and 4A. *See* Docket Nos. 266, 377. Columbia objected to the Special Master's recommendation.

The Court has conducted a de novo review of Special Master Reports 4 and 4A. *See* Fed. R. Civ. P. 53(f); Docket Nos. 193, 199, 205. Based on that review, the Court respectfully disagrees with the Special Master and denies United's motion for partial summary judgment.

## I. BACKGROUND

The relevant facts are set forth in detail in the Special Master's reports. Familiarity with those facts is presumed. The Court provides only a brief summary here.

In its motion for partial summary judgment, United seeks coverage under its excess policy with Columbia[3] for two claims: (1) the *Samuelson* claim, which arose out of a lawsuit captioned *Samuelson v. United Healthcare of Texas, Inc.*, No. 236-179453-99 (Tex. Dist. Ct. filed July 21, 1999) [Docket No. 289], and (2) the *McRaney/Murphy* claim, which arose out of

---

[1](...continued)
additional defendants. *See* Docket No. 336. United's claims against the additional defendants are not addressed in this order.

[2]Columbia opposed the motions and also moved under Rule 56(f) for more time to take discovery. That motion is denied as moot in light of the Court's denial of United's motion for partial summary judgment.

[3]Lexington Insurance Company ("Lexington"), which was formerly a defendant in this action, provided primary coverage under Managed Care Professional Liability Policy No. 563-3385 ("the Policy"). *See* Hansen Aff. Ex. A, Apr. 2, 2008 [hereinafter "Policy § ___"]. Columbia's policy follows form to Lexington's policy. For that reason, the Court's analysis of Columbia's liability focuses on the language of the Lexington policy.

two lawsuits (*McRaney* and *Murphy*) that were made part of a Multidistrict Litigation ("MDL") case in the United States District Court for the Southern District of Florida, *see In re Managed Care Litigation*, MDL No. 00-1334 (S.D. Fla. Apr. 17, 2000) (original transfer order from the Judicial Panel on Multidistrict Litigation). The Court will refer to that MDL as "MDL 1334."

In *Samuelson*, a doctor and a professional association sued United, claiming that United had illegally changed the reimbursement formula that it used to calculate payments to medical providers for services covered under United's health-insurance policies. Specifically, the *Samuelson* plaintiffs alleged that United had promised to pay the lesser of (1) 100% of the provider's actual charge or (2) the maximum allowable fee, but United instead paid the lesser of (1) 80% of the provider's actual charge or (2) the maximum allowable fee. Docket No. 289 ¶ 10. The *Samuelson* lawsuit was dismissed without payment of damages.

In both *McRaney* and *Murphy*, the plaintiffs were subscribers to United healthcare plans. The subscribers sued United, claiming that the company misrepresented and concealed the standards by which it made coverage determinations. As noted, *McRaney* and *Murphy* were both transferred to MDL 1334, which involved claims against numerous large health insurers. MDL 1334 was later divided into a "subscriber" track (involving claims by patients) and a "provider" track (involving claims by doctors and other healthcare providers). *McRaney* and *Murphy* were assigned to the subscriber track, and the cases were eventually consolidated. United settled *McRaney/Murphy* for a nominal amount. United now seeks to force Columbia to indemnify it for the considerable attorney's fees and costs that United incurred in defending the *Samuelson* and *McRaney/Murphy* claims.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.

### B.  Governing Law

The Policy provides, and the parties agree, that Minnesota law governs the interpretation of the Policy.  Policy § 2.11.  Under Minnesota law, an insurance contract is subject to general principles of contract law. *Murray v. Greenwich Ins. Co.*, 533 F.3d 644, 648 (8th Cir. 2008).  In particular, when the language of the contract is clear, that language is given its usual and accepted meaning, and the Court does not consider extrinsic evidence. *Progressive Specialty Ins. Co. v. Widness ex rel. Widness*, 635 N.W.2d 516, 518 (Minn. 2001).

Ordinarily, where the language of an insurance policy is ambiguous, courts apply the doctrine of *contra proferentem*, under which any ambiguity in the policy is construed in favor of coverage. *Id.*; *General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 151 (Minn. Ct. App. 2001).  In this case, however, the Special Master recommended that the rule of *contra proferentem* not apply.  The Special Master pointed out that it makes sense to impose the risk of

ambiguity on the insurer when the insurer drafts the policy. Here, though, the terms of the Policy were negotiated by United and its insurer. In such circumstances, the Special Master reasoned, the doctrine of *contra proferentem* should not apply.

United did not initially object to this conclusion — either in the lengthy briefs it filed in support of Special Master Reports 4 and 4A or at the three-hour hearing that the Court held to consider Columbia's objection to those reports. Following that hearing, however, the Court asked the parties to provide supplemental briefing on the Special Master's conclusions regarding the "Blanket Billing" and "Failure to Pay" exclusions.[4] *See* Docket No. 431. In that supplemental briefing, United muddled its position on the Special Master's recommendation regarding the doctrine of *contra proferentem*. On the one hand, United argued, in a footnote, that the rule of *contra proferentem* should apply to the Blanket Billing exclusion because the insurer drafted that particular exclusion. Docket No. 439 at 7 n.2. On the other hand, United did *not* ask the Court to resolve ambiguities in its favor, as the Court would be required to do under the rule of *contra proferentem*. Instead, United argued that the ambiguities in the Blanket Billing and Failure to Pay exclusions must be resolved at trial. Docket No. 439 at 2.

---

[4]United disagreed with the Special Master's conclusion that, when viewed in isolation, the Blanket Billing and Failure to Pay exclusions eliminate any coverage for the *Samuelson* claim. But United did not object to Special Master Reports 4 and 4A because, as explained below, the Special Master found that the second clause of § 9.10 of the Policy is an affirmative grant of coverage that overrides the Blanket Billing and Failure to Pay exclusions. Because the Special Master ultimately found coverage and recommended that United's summary-judgment motion be granted, United had no reason to object to his reports or to dispute his construction of the two exclusions. Following oral argument, however, the Court was doubtful that § 9.10 overrides the Blanket Billing and Failure to Pay exclusions, and thus the Court gave United a chance to object to the Special Master's conclusions about the scope of those exclusions.

Although United's position is unclear, the Court rejects any notion that the Court must pick through the Policy word-by-word, determine who drafted each word, and, if the word is ambiguous, apply *contra proferentem* against the party who drafted it. This would be an exceedingly strange, not to mention exceedingly burdensome, procedure. United has cited no court that has gone about construing an insurance policy in this manner, and United's failure to find support for its position (if, in fact, this is its position) is not surprising.

The *contra proferentem* rule applies when one party — the party with superior bargaining power — exercises total control over the language of the contract and presents the contract to the other party on a take-it-or-leave-it basis. *See Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 277 (Minn. 1985) ("Where there is unequal bargaining power between the parties so that one party controls all of the terms and offers the contract on a take-it-or-leave-it basis, the contract will be strictly construed against the party who drafted it.").[5] In that situation, it makes sense to place the risk of ambiguity on the party who drafted the contract. In this case, however, two large corporations — neither of which, as far as the record reflects, had superior bargaining power — painstakingly negotiated a unique insurance policy with the assistance of experienced counsel. The Policy was jointly negotiated, and thus the risk of ambiguity should be

---

[5] *See also Marso v. Mankato Clinic, Ltd.*, 153 N.W.2d 281, 289 (Minn. 1967) ("Where one of the parties draws a contract and the other must accept or reject but cannot vary the terms, the burden is upon the party drawing the contract to make the meaning plain. Where meaning is thus uncertain . . . the ambiguities and doubts must be resolved against the party who prepared the contract." (citation and quotations omitted)); *Glarner v. Time Ins. Co.*, 465 N.W.2d 591, 596 (Minn. Ct. App. 1991) (because insurance policies are contracts of adhesion, restrictive language is construed against the drafter); *see also Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009) ("Because most insurance policies are preprinted forms drafted solely by insurance companies — basically contracts of adhesion — policy words of inclusion will be broadly construed, and words of exclusion are narrowly considered.").

jointly shared. *Cf. Northfield Telecomm., Inc. v. Maplewood Mall Assocs., Ltd. P'ship*, No. A07-0687, 2008 WL 853537, at *7 (Minn. Ct. App. Apr. 1, 2008) (declining to apply *contra proferentem* where the contract was heavily negotiated and both parties were represented by counsel). The Court adopts the conclusion of the Special Master that the rule of *contra proferentem* has no place in this case.

### *C. Issues Common to* Samuelson *and* McRaney/Murphy

The Policy's insuring clause provides as follows:

> We will pay amounts any **Protected Person** is required to pay as **damages** and **claim expenses**, including **Damages** assumed under contract and related **claim expenses** assumed under contract, for **claims** that directly or indirectly result from or are related to the **Operations**, including but not limited to any **Wrongful Act** committed or allegedly committed by you or another party for whom you are alleged to be liable, in the rendering or failure to render **Services**.

Policy § 3.1. Columbia contends that both the *Samuelson* claim and the *McRaney/Murphy* claim are not within this grant of coverage because (1) the underlying cases did not seek "damages"; (2) the underlying cases did not result from or relate to "Operations . . . in the rendering or failure to render Services"; and (3) the "business risk" doctrine precludes coverage for breach-of-contract claims.

Columbia's arguments are without merit. As the Special Master explained, the definitions of "Damages," "Operations," and "Services" are extremely broad and easily encompass both *Samuelson* and *McRaney/Murphy*. In particular, the definition of "Damages" includes more than just compensatory damages; it expressly includes, among other things, equitable and punitive damages. Policy § 4.5. Similarly, the definitions of "Operations" and

"Services" are drafted to cover essentially everything that United does, including "the design, marketing and administration of benefit plans," "claim handling, reviewing and adjusting," "insurance operations," and "development, maintenance and credentialing of provider networks." Policy § 4.13; *see also* Policy § 4.18. Finally, as the Special Master found, the business-risk doctrine does not override unambiguous policy language. An insurer can elect to cover breach-of-contract claims. *See Wanzek Constr., Inc. v. Employers Ins. of Wausau*, 679 N.W.2d 322, 326-27 (Minn. 2004). The Court therefore adopts the Special Master's conclusion that both *Samuelson* and *McRaney/Murphy* are within the Policy's initial grant of coverage.

### D. Issues Specific to Samuelson

The Special Master concluded that the *Samuelson* claim was initially within the Policy's insuring clause, as discussed above. The Special Master further found that the *Samuelson* claim was excluded from coverage by two of the Policy's exclusions: the Blanket Billing exclusion and the Failure to Pay exclusion. That was not the end of the matter, however. Although none of the parties had argued the point, the Special Master suggested, *sua sponte*, that the second clause of *another* exclusion in the Policy — the exclusion found at § 9.10 — might be an affirmative grant of coverage that overrode the Blanket Billing, Failure to Pay, and other exclusions with which it was inconsistent. United agreed, and it now defends the Special Master's conclusion, although during the nine-year period from the filing of the *Samuelson* claim in July 1999 to the filing of Special Master Report 4 in October 2008, United never once suggested that § 9.10 represents an affirmative grant of coverage.

Section 9.10 of the Policy provides as follows:

> **9.10  Benefits.**  We will not cover **claims** or **suits** for any amounts
> or limits payable under any insurance policy or benefits contract;
> however, we will pay the **claim expenses** incurred by a **Protected
> Person** in the defense of a **claim** for liability that results from the
> activity of administrating benefit claims.

As noted, the Special Master found that the second clause of § 9.10 was not merely a

"carveback" — that is, a narrowing of the exclusion found in the first clause of § 9.10.  Rather,

the Special Master found that the second clause of § 9.10 was an affirmative grant of coverage

that overrode not only the exclusion in the first clause of § 9.10, but all other exclusions in the

Policy.  The Special Master rested his conclusion almost entirely on the use of the phrase "we

will pay."  This positive affirmation, the Special Master noted, is quite different from the

language of other carvebacks in the Policy, which typically provide that the exclusion "shall not

apply" or "does not apply" in certain circumstances.  *See, e.g.*, Policy §§ 9.4-9.7.

Even on first glance, the notion that the second clause of § 9.10 of the Policy represents

an affirmative grant of coverage is difficult to accept.  It would be odd — not unprecedented, but

odd — to bury an affirmative grant of coverage in the middle of a list of exclusions.  Morever,

given that the second clause of § 9.10 would not extend coverage to any claim that is not already

covered by the main insuring clause (§ 3.1), it is hard to know what would be the point of such a

superfluous grant of coverage.  Why would the drafters, in the middle of the exclusions section,

include a grant of coverage that merely "re-grants" some (although not all) of the coverage

already granted in the main insuring clause?  Finally, the second clause of § 9.10 follows

immediately after a semicolon that separates it from the first clause, and the second clause begins

with the word "however."  Beginning the clause with "however" strongly suggests that it is

meant to narrow the exclusion that appears in the preceding clause.

The main problem with the Special Master's reasoning, though, is that the Policy is governed by Minnesota law, and focusing only on the wording of the carveback ("we will pay") is at odds with Minnesota law as expressed in *Moorhead Machinery & Boiler Co. v. Employers Commercial Union Insurance Co.*, 285 N.W.2d 465 (Minn. 1979). In *Moorhead*, the Minnesota Supreme Court canvassed the case law analyzing when a carveback may be considered an affirmative grant of coverage rather than simply a limitation on an exclusion. The court both rejected cases holding that carvebacks can *never* override other exclusions in a policy and rejected cases holding that carvebacks *always* grant coverage that overrides other exclusions. *Id.* at 466-67. Instead, the court adopted a "middle-ground" approach under which the court must examine the policy as a whole to determine whether it is ambiguous. *Id.* at 467-68. Under *Moorhead*, a carveback will be considered a grant of coverage only when, "'taking the insurance policy as a whole, a reasonable person could believe that certain occurrences were covered by the insurance policy, notwithstanding that the insurance company intended and considered them to be excluded.'" *Id.* at 467 (quoting *Commercial Union Assurance Cos. v. Gollan*, 394 A.2d 839, 842-43 (N.H. 1978)).

Importantly, nothing in *Moorhead* suggests that its analysis depended in any way on the specific phrasing of the carveback at issue. Indeed, *Moorhead* expressly adopted and relied on the reasoning in *Commercial Union Assurance Cos. v. Gollan*, 394 A.2d 839 (N.H. 1978), in which the New Hampshire Supreme Court found that a carveback using the negative phrase "this exclusion does not apply" was actually an affirmative grant of coverage. *Id.* at 841-42. Similarly, in *Auto-Owners Insurance Co. v. Evergreen, Inc.*, 608 N.W.2d 900 (Minn. Ct. App.

2000), the Minnesota Court of Appeals applied *Moorhead* to find that a carveback using the positive phrase "[w]e will cover" was *not* an affirmative grant of coverage. *Id.* at 902-03.

Clearly, then, whether a carveback is a grant of coverage does not turn on whether the carveback uses positive phrasing (such as "we will pay" or "we will cover") or negative phrasing (such as "this exclusion does not apply"). Instead, what matters is whether the policy as a whole is ambiguous such that a reasonable person could conclude that the coverage saved by the carveback overrides any exclusionary language in the policy. In particular, if the coverage that is saved by the carveback is completely eliminated by another exclusion in the policy, the policy as a whole is ambiguous, for what would be the point of saving certain coverage from one exclusion only to see that same coverage wiped out by a second exclusion? *See In re SRC Holding Corp.*, 545 F.3d 661, 670 (8th Cir. 2008) (recognizing that "if coverage for all of the claims saved by the Management Carveback is precluded by Endorsement 3, then this Carveback may be sufficient to create contractual ambiguity difficult to reconcile on the basis of the policy language alone"); *Rusthoven v. Commercial Standard Ins. Co.*, 387 N.W.2d 642, 644-45 (Minn. 1986) (where provisions in policy are in irreconcilable conflict, the policy is ambiguous). And if such an ambiguity exists, a natural way to resolve it would be to read the carveback to provide affirmative coverage that trumps the second exclusion.

In relevant part, the Blanket Billing exclusion provides as follows:

> In consideration of the premium charged, it is hereby understood and agreed that this policy shall not apply to **claims** based upon, arising out of or attributable to disputes involving negotiated discounts, co-payment percentages paid, or any **claims** alleging discounting or failure to disclose how discounts are calculated.

Policy § 10.4.  The parties disagree about the meaning of this exclusion.  United argues that the exclusion is narrowly targeted at a specific group of lawsuits that were pending or anticipated at the time the Blanket Billing exclusion was negotiated.  In these lawsuits, subscribers alleged that United charged them excessive co-payments by calculating their co-payments based on their healthcare providers' "usual, customary, and reasonable" charges rather than based on the discounted charges that the providers had agreed to accept from United.  United argues that the Blanket Billing exclusion is meant to exclude only those specific claims and no others. Columbia disagrees, contending that the language of the exclusion extends far beyond this group of lawsuits to cover any claim alleging wrongful discounting.  In Columbia's eyes, because the medical-provider plaintiffs in *Samuelson* alleged that United wrongfully discounted — that is, wrongfully paid them 80% of their actual charges rather than 100% of their actual charges — *Samuelson* is a "claim[] alleging discounting" and falls within the Blanket Billing exclusion.

Before addressing the meaning of the Blanket Billing exclusion, the Court notes that neither party's interpretation of the exclusion would create an irreconcilable conflict between the exclusion and the carveback in § 9.10.  In other words, under either party's interpretation, the Blanket Billing exclusion would not wipe out all of the coverage that is saved by the carveback. The carveback saves coverage for "claim expenses" (that is, defense costs) incurred in defending "a claim for liability that results from the activity of administrating benefit claims."  The phrase "activity of administrating benefit claims" clearly encompasses a much broader range of activity than the Blanket Billing exclusion, whether that activity is defined as wrongfully inflating co-payments in a particular manner (as United would have it) or as wrongful discounting (as Columbia would have it).  Either way, the Blanket Billing exclusion applies to only a small

subset of the claims that would be saved under the carveback in § 9.10.  Consequently, the two

Policy provisions, read together, do not conflict, and therefore do not create an ambiguity for the

Court to resolve.  *See In re SRC*, 545 F.3d at 670 (rejecting argument that a carveback conflicted

with an exclusion because several types of claims saved by the carveback would not be subject to

the exclusion).  If the *Samuelson* claim falls within Blanket Billing exclusion, then coverage is

precluded, notwithstanding the terms of the carveback in § 9.10.

United's argument that the *Samuelson* claim does not fall within the Blanket Billing

exclusion — because the Blanket Billing exclusion covers only a specific group of lawsuits in

which subscribers alleged that United charged them excessive co-payments by calculating their

co-payments based on their healthcare providers' customary charges, rather than discounted

charges — is impossible to square with the language of the Blanket Billing exclusion.  Had the

parties meant to exclude only this one narrow category of lawsuits, they could have easily done

so.  Instead, the parties agreed on an exclusion that broadly covers "*any* claims alleging

discounting or failure to disclose how discounts are calculated."  This choice of words would

have been irrational if the exclusion were meant to apply as narrowly as United claims.

For obvious reasons, United does not really argue that its position is compelled by the

language of the Blanket Billing exclusion; rather, United argues that the exclusion is ambiguous,

and that its position is supported by extrinsic evidence regarding the intent of those who

negotiated this ambiguous exclusion.  Minnesota law is emphatic, however, that the Court cannot

consider extrinsic evidence concerning the meaning of an exclusion unless the Court first finds

that the exclusion is ambiguous.  *In re SRC*, 545 F.3d at 666 ("Extrinsic evidence of the parties'

subjective intent cannot be used to create contractual ambiguity where none exists on the face of

the policy."). Whether an insurance contract is ambiguous is a question of law. *Id.* "Under

Minnesota law, a policy provision is ambiguous if it can reasonably be given more than one

meaning on the basis of its language alone." *Id.*

This is not a question that the Court asks in the abstract. A party to a coverage action

involving one set of facts will often try to argue that the policy's application to *another* set of

facts would be ambiguous, and therefore the policy is ambiguous, and therefore the party should

be able to introduce extrinsic evidence about the policy's meaning. But contract interpretation

does not work that way. Suppose, for example, that an insurance policy excluded coverage for

injuries caused by "a long, pointed weapon." In a case involving an injury caused by a spear, the

application of the exclusion would be clear, and the Court would not consider extrinsic evidence.

That is true even though in *another* case — say, a case involving an injury caused by a dagger —

application of the exclusion might be ambiguous, and extrinsic evidence might be considered.

Applying these principles, the Court concludes that the Blanket Billing exclusion

unambiguously precludes coverage for the *Samuelson* claim. United's reading of the exclusion

simply cannot be reconciled with the plain language of the exclusion. Although United focuses

on the phrases "negotiated discounts" and "co-payment percentages paid" — contending that

they have a specialized meaning in the health-insurance industry — United ignores the fact that

the exclusion goes on to apply broadly to "*any* claims alleging discounting" (emphasis added).

United's contention that the phrase "any claims alleging discounting" refers only to a specialized

type of claim is untenable. The verb "discount" — like the words "any," "claims," and

"alleging" — has a readily understood, ordinary meaning: to reduce or deduct from the full or

standard amount of a price. *American Heritage Dictionary of the English Language* 285 (4th ed.

2000).  A provision that broadly excludes "*any* claims alleging discounting" cannot reasonably be read to exclude only "*some* claims alleging a *particular type* of discounting."  If the parties intended for the phrase "any claims alleging discounting" to have such an unusual and limited meaning, it was incumbent on them to make that clear in the Policy.

Under the plain and ordinary meaning of the phrase "any claims alleging discounting," the *Samuelson* claim is excluded because the plaintiffs in *Samuelson* alleged that, rather than paying providers the lesser of (1) 100% of the provider's actual charge or (2) the maximum allowable fee, United instead paid providers the lesser of (1) 80% of the provider's actual charge or (2) the maximum allowable fee.  Docket No. 289 ¶ 10.  The allegation that United unlawfully applied an across-the-board 20% reduction to providers' actual charges is clearly an allegation of "discounting."  Coverage for *Samuelson* is therefore precluded by the Blanket Billing exclusion.[6]

To say that the Blanket Billing exclusion clearly excludes the *Samuelson* claim is not to say that the Blanket Billing exclusion will always be clear in its application to *other* claims.  It is surely true, as United argues, that the exclusion is not necessarily triggered just because United is accused of failing to pay someone the full amount that is due under a contract.  Because a "discount" presupposes an initial cost or price from which some amount is deducted, a "claim alleging discounting" would not, for example, encompass a straightforward dispute over the proper amount of the initial cost or price.  But the Blanket Billing exclusion is clearly triggered when, as in *Samuelson*, United is alleged to have paid providers only a fixed percentage of the

_____

[6]As noted earlier, United contends that any ambiguity in the Blanket Billing exclusion should be construed against Columbia.  Although the Court has rejected United's argument that the rule of *contra proferentem* should apply, the Court notes that it makes no difference because the Blanket Billing exclusion unambiguously precludes coverage for *Samuelson*.

-15-

amounts that were due under the providers' contracts. If that is not "discounting," then it is hard to know what is.

Because the Blanket Billing exclusion precludes coverage for the *Samuelson* claim — and because there is no reason to read the carveback in § 9.10 as overriding the Blanket Billing exclusion (given that the two are not in conflict) — United is not entitled to summary judgment on the *Samuelson* claim. In view of this holding, the Court need not construe the Failure to Pay exclusion nor address the question whether the carveback in § 9.10 conflicts with (and therefore possibly overrides) that particular exclusion.

### E.  McRaney/Murphy

As noted earlier, the Court agrees with the Special Master that *McRaney/Murphy* is within the Policy's grant of coverage. The key issue that remains is whether *McRaney/Murphy* is interrelated — that is, part of the same "claim" — as *Shane v. Humana, Inc.*, a lawsuit that was part of the same MDL as *McRaney/Murphy*. Columbia provided coverage for *Shane* and paid the full per-claim limit of its Policy. If *McRaney/Murphy* and *Shane* are interrelated within the meaning of the Policy — this is, if *McRaney/Murphy* and *Shane* are part of the same "claim" — then coverage for *McRaney/Murphy* was exhausted when Columbia paid the full per-claim limit on *Shane*.[7]  *See* Policy § 8.1 (the "each claim" limit is "the most we will pay" for "all claims that result from a single Wrongful Act or from interrelated Wrongful Acts").[8]

---

[7]Columbia originally argued that coverage for *McRaney/Murphy* is also barred by the "Premiums or commission" exclusion.  *See* Policy § 9.15. The Special Master concluded that this exclusion is inapplicable to *McRaney/Murphy*.  Columbia did not object to this conclusion, and the Court adopts it.

[8]The primary Lexington Policy imposes a liability limit on "each claim," whereas Columbia's follow-form policy imposes a liability limit on "each incident."  *Compare* Policy

(continued...)

-16-

As noted earlier, MDL 1334 was divided into a subscriber track and a provider track. *Shane* was the lead case on the provider track. As reflected in the third amended consolidated class action complaint, the *Shane* plaintiffs, who were doctors and medical associations, sued United and a number of other large health insurers under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. *See* Hansen Aff. Ex. AA, Apr. 2, 2008 [hereinafter "*Shane* Compl."]. The *Shane* plaintiffs alleged that the defendant health insurers systematically denied valid claims by conspiring to use cost-based criteria, rather than medical necessity, to decide which claims to pay. *Shane* Compl. ¶¶ 6, 63-64, 92(a), 117(j). The *Shane* plaintiffs claimed that the health insurers paid consulting firms — specifically Milliman & Robertson and InterQual — to develop these unlawful (and secret) cost-based criteria. *Shane* Compl. ¶¶ 82(a), 92(a).

The *Shane* plaintiffs also alleged that the health insurers secretly implemented automated processes to deny or diminish claims. Specifically, the *Shane* plaintiffs alleged that the health insurers used computer software that would (1) "downcode" claims — that is, arbitrarily change a claim's billing code to a less-expensive code; (2) "bundle" claims — that is, combine codes for two or more procedures into one; and (3) refuse to recognize code modifiers, which are used to indicate a higher-than-normal degree of difficulty or complexity of a medical procedure (thus justifying a higher reimbursement rate). *Shane* Compl. ¶¶ 65-71.

The *McRaney/Murphy* case involved many of the same factual allegations as *Shane* — which is to be expected, given that a prerequisite to an MDL is that the cases involve "one or

---

[8](...continued)
§ 8.1 *with* Hansen Aff. Ex. C at 1, Apr. 2, 2008. Neither side contends that this difference in language has any practical effect.

more common questions of fact . . . ."  28 U.S.C. § 1407(a); *see* Hansen Aff. Ex. V, Apr. 2, 2008

(the subscriber track second consolidated amended class-action complaint) [hereinafter

"*McRaney/Murphy* Compl."].  As in *Shane*, the central allegation in *McRaney/Murphy* was that

United based its coverage determinations on financial criteria rather than on medical necessity.

*McRaney/Murphy* Compl. ¶¶ 4, 10, 62, 79(a), 109(a).  The *McRaney/Murphy* plaintiffs similarly

alleged that United used cost-based criteria developed by Milliman & Robertson and InterQual.

*McRaney/Murphy* Compl. ¶¶ 6, 62(a), 63(b), 79(a), 79(c)(ii).  Likewise, the *McRaney/Murphy*

plaintiffs alleged that United engaged in arbitrary "downcoding."  *McRaney/Murphy* Compl.

¶¶ 62(e)(iii), 63(e)(iii).  The allegations in *McRaney/Murphy* and *Shane* also overlapped in time.

The *Shane* plaintiffs sought certification of a class of medical providers who provided services to

the defendants' insureds from August 14, 1996 to September 30, 2002.  *Shane* Compl. ¶ 111.

The *McRaney/Murphy* plaintiffs sought certification of an overall class of those insured by

United from February 8, 1996 through the date of certification, as well as certification of a

subclass of people who were members of an ERISA plan from February 8, 1994 through the date

of certification.[9]  *McRaney/Murphy* Compl. ¶ 31.

 Under the heading "Claims Arising Out of Interrelated Wrongful Acts," the Policy states,

in relevant part:

  Any **damages** or **claim expenses** incurred because of: . . .

  — a **Wrongful Act**; or

---

 [9]*McRaney/Murphy* was never certified.  *See In re Managed Care Litig.*, 209 F.R.D. 678
(S.D. Fla. 2002), *rev'd in part on other grounds by Klay v. Humana, Inc.*, 382 F.3d 1241 (11th
Cir. 2004).  The pleading to which the Court is referring was filed on June 29, 2001.  *See*
MDL 1334, Docket No. 1310.

—　　a series of **Wrongful Acts** that have as a common nexus, any true facts, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes shall constitute a single claim.

Policy § 5.2.  The Policy likewise provides that the limit of liability for "each claim" is "the most we will pay" for "all claims that result from a single Wrongful Act or from interrelated Wrongful Acts."  Policy § 8.1.

　　　　If it were not for the odd use of the word "true" in § 5.2, the Court would not hesitate to find that *McRaney/Murphy* and *Shane* constitute "a single claim" under the Policy.  As discussed above, *McRaney/Murphy* and *Shane* were part of the same MDL — which, standing alone, is compelling evidence that the two claims were interrelated.  Moreover, a careful examination of the complaints filed in *McRaney/Murphy* and *Shane* reveals that the two lawsuits involved numerous common allegations of facts, circumstances, events, and transactions.  For example, both actions alleged that United arbitrarily "downcoded" claims and secretly used cost-based criteria developed by Milliman & Robertson and InterQual to deny otherwise valid claims that would meet United's purported "medical necessity" standard.  Not surprisingly, then, *United itself* initially took the position — and maintained the position for three years — that *McRaney/Murphy* and *Shane* should be considered a single claim for purposes of satisfying the Policy's per-claim self-insured retention.  *See* Special Master Report 4 at 43-44.

　　　　United subsequently (and opportunistically) changed its mind, however, and now argues that *McRaney/Murphy* and *Shane* are not, in fact, interrelated.  In making this argument, United does not rely — or rely primarily — on § 5.2's use of the word "true."  As noted, § 5.2 provides that "a series of Wrongful Acts" are to be deemed part of the same claim only if they "have as a common nexus, any *true* facts, circumstance, situation, event, transaction, cause or series of

causally connected facts, circumstances, situations, events, transactions or causes."[10]  Although

United highlights the unusual requirement that the common fact or circumstance be "true,"

United does not specifically argue (or offer evidence) that all of the factual allegations that

*McRaney/Murphy* and *Shane* had in common were false.  And, indeed, United would presumably

admit that *something* alleged by both the *McRaney/Murphy* plaintiffs and the *Shane* plaintiffs —

such as the fact that United is a corporation — was a "true fact."[11]

United nevertheless argues that *McRaney/Murphy* and *Shane* are not interrelated under

the factors identified in *American Commerce Insurance Brokers, Inc. v. Minnesota Mutual Fire

& Casualty Co.*, 551 N.W.2d 224 (Minn. 1996).  In *American Commerce*, the policy at issue

provided that a "series of related acts" constituted one "occurrence."  *Am. Commerce*, 551

N.W.2d at 226.  The Minnesota Supreme Court held that the phrase "series of related acts" is

unambiguous and identified the following factors for courts to consider in determining whether a

series of acts are "related":  "whether the acts are connected by time, place, opportunity, pattern,

and, *most importantly*, method or modus operandi."  *Id.* at 231 (emphasis added).  The court

---

[10]The Special Master found that "true" modifies both "facts, circumstance, situation, event, transaction, [or] cause" *and* "series of causally connected facts, circumstances, situations, events, transactions or causes."  Neither party has objected to this conclusion, and the Court adopts it for the reasons given by the Special Master.

[11]In proceedings before the Special Master, United argued that a fact or circumstance can be "true" for purposes of the Policy only if United admitted it or a judge or jury found it to be true in the course of adjudicating the underlying action.  Docket No. 209 at 22.  As neither *McRaney/Murphy* nor *Shane* were ever fully adjudicated, United contended that the Special Master was limited to considering allegations admitted by United in the course of defending those two actions.  Docket No. 209 at 23.  The Special Master rejected this argument, and United did not renew the argument before this Court in its response to Columbia's objection.  The Court agrees with the Special Master that United's argument is plainly meritless.  As the Special Master explained, "true" describes what is real, not what United *admits* is real.  Thus, Columbia will have the opportunity to prove that at least one of the allegations that *McRaney/Murphy* and *Shane* had in common was true, whether or not United admitted the allegation.

applied these factors to find that a series of wrongful acts committed by an employee who repeatedly embezzled money from her insurance-company employer via two distinct methods (stealing premium payments directly and issuing unauthorized checks to herself) gave rise to two different "occurrences" within the meaning of the policy.  *Id.*

Notably, however, the court found that the wrongful acts committed by the employee gave rise to *only* two occurrences.  The court ignored minor differences among the acts within each of the two schemes.  For example, the Court did not treat stealing by accepting cash from insureds for premiums as giving rise to a different "occurrence" than stealing by instructing insureds to leave the payee line blank when writing checks for premiums.  *Id.* at 230.  The court explained that "this type of micro-distinguishing of related acts subverts the purpose of the phrase 'series of related acts,'" which the court had earlier explained "covers a very broad range of connections, both logical and causal."  *Id.* at 230, 228.

Assuming that the factors from *American Commerce* apply in this case despite the difference in policy language, the Court has no trouble concluding that the factual allegations that *McRaney/Murphy* and *Shane* have in common render them interrelated.  (The Court is setting aside the question whether the common allegations are "true.")  United is accused in both *McRaney/Murphy* and *Shane* of repeatedly engaging in the same acts (denying and diminishing claims) using the same methods (downcoding and undisclosed use of cost-based, rather than medical, criteria) developed in part by the same outside consulting firms (Milliman & Robertson and InterQual).  *McRaney/Murphy* and *Shane* thus share a common method or modus operandi, which *American Commerce* described as the "most important[]" factor.  *Am. Commerce*, 551 N.W.2d at 231.  Aside from the identity of method, the alleged acts are also temporally

connected and form a consistent pattern.[12]  *American Commerce* thus supports a finding that

*McRaney/Murphy* and *Shane* are interrelated.

It is also worth noting that the Minnesota Court of Appeals has applied the *American*

*Commerce* factors in a case involving a definition of "interrelated" that was very close to the

definition in this case.  *See Foster v. Summit Med. Sys., Inc.*, 610 N.W.2d 350, 353 (Minn. Ct.

App. 2000).  In *Foster*, the insured sought coverage for a number of securities-fraud lawsuits

accusing it of intentionally disseminating inflated revenue figures.  *Id.* at 352.  The insurer

disclaimed coverage on the basis that the allegedly fraudulent misstatements were interrelated

with the insured's earlier improper revenue recognition, coverage for which was barred by a

retroactive-date provision.  *Id.* at 353.  Using the *American Commerce* factors, the Minnesota

Court of Appeals found that the later misstatements about revenue were interrelated with the

earlier improper revenue recognition because "[t]he improper revenue recognition was the very

reason that the statements about revenue and sales were false and misleading."  *Id.* at 354.

Likewise, although the subscribers in *McRaney/Murphy* and the providers in *Shane* advanced

different legal theories and suffered different alleged damages, United's alleged "downcoding"

and secret use of cost-based criteria rather than medical necessity in deciding whether to pay

claims were the central acts underlying both lawsuits and the "very reason" why both the

---

[12]The acts would also seem to be connected by place and opportunity insofar as United is the accused wrongdoer and presumably accomplished its alleged wrongful acts at its place of business and during business hours.  *See American Commerce*, 551 N.W.2d at 231 (noting that the employee's acts were connected by place and opportunity because they occurred at her workplace during business hours).  But as this case (unlike *American Commerce*) involves a liability policy, these factors have little significance because they would almost always be present.

subscribers and the providers suffered their alleged damages.  *Foster* thus also supports a finding that *McRaney/Murphy* and *Shane* are interrelated.

Finally, United points to *Aetna, Inc. v. Lexington Insurance Co.*, No. 1487 EDA 2006 (Pa. Super. Ct. Apr. 11, 2008), *vacated in part on other grounds*, 968 A.2d 229 (Pa. 2009) (per curiam), to argue that *McRaney/Murphy* and *Shane* are not interrelated.  *Aetna* coincidentally involved the question whether *Shane* was interrelated with several other actions, one of which was also a part of the subscriber track in MDL 1334.  *Compare Aetna*, No. 1487 EDA 2006, slip op. at 12 n.8 (noting that *O'Neil v. Aetna, Inc.*, No. 99-284 (S.D. Miss. Oct. 7, 1999) was one of the allegedly related actions) *and* MDL 1334, Docket No. 723 (letter from Judicial Panel on Multidistrict Litigation directing transfer of *O'Neil* to the MDL).

In *Aetna*, the policy at issue provided that "[a]ll claims of all persons arising out of the same act, error or omission or series of related acts, errors or omissions resulting from the same loss shall be one claim . . . ."  *Aetna*, No. 1487 EDA 2006, slip op. at 11.  Thus, the language in *Aetna* was similar to the language in *American Commerce* in that both policies used the phrase "series of related acts."  The language in the *Aetna* policy, however, was more restrictive in that it required the claims to "result[] from the same loss . . . ."  *Aetna* analyzed whether the claims were related using various factors, including: "(1) whether the identity of the parties is the same; (2) whether the claims arise from the same transaction(s); (3) whether the acts complained of occurred contemporaneously; and (4) whether there is a common scheme or plan."  *Id.* at 15. Applying these factors, the Pennsylvania Superior Court found that *Shane* was not interrelated with the other actions at issue, including the action consolidated in the same MDL.  *Id.* at 20.

Relying on *Aetna*, the Special Master found that *McRaney/Murphy* and *Shane* are not interrelated.  The Court respectfully disagrees.  To begin with, the factors used in *Aetna* are different from, and more limited than, the factors used in *American Commerce*.  To the extent that the reasoning of either decision applies here notwithstanding the differences in policy language, *American Commerce* (and not *Aetna*) is controlling.  As the Court has already found, the *American Commerce* factors dictate a finding that *McRaney/Murphy* and *Shane* are interrelated (assuming, as the Court does, that Columbia will be able to show that one or more of the common facts and circumstances are "true").

Even if *American Commerce* were not controlling, the Court would not apply *Aetna*, as the factors identified in *Aetna* are too limited to do justice to the broad language of the interrelated-acts provision at issue here.  The *Aetna* factors focus on the degree of relationship between "the acts complained of" and the "transactions" from which "the claims arise."  Here, however, the interrelated-acts provision is not so narrow.  The Policy provides that claims are interrelated if they have as a common nexus "any" — that is, *even one* — "true fact[],
circumstance, situation, event, transaction, [or] cause" or "series of causally connected facts, circumstances, situations, events, transactions or causes."  This language is exceptionally broad, and its breadth is not captured by the factors considered in *Aetna*.

Indeed, the language of the Policy is so broad that, if read literally, every claim against United would likely be considered interrelated with every other claim.  Almost surely, all claims for which United seeks indemnity from an insurer involve at least one common "true" fact or circumstance — such as the "true fact" that United was named as a defendant in the underlying action or the "true fact" that, in the underlying action, United was alleged to be a Minnesota

corporation or to have entered into a contract to make payments to healthcare providers. For that reason, one could argue that the interrelated-acts provision might be ambiguous as applied to some underlying actions. But in this case — given that *McRaney/Murphy* and *Shane* share numerous important allegations that, if true, would render the actions interrelated under any possible construction of the interrelated-acts provision — the application of that provision is not in doubt, and the Court need not consider extrinsic evidence[13] to determine whether *McRaney/Murphy* and *Shane* are interrelated. United's motion for summary judgment with respect to the *McRaney/Murphy* claim is therefore denied.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, the Court ADOPTS IN PART Special Master Reports 4 and 4A [Docket Nos. 266, 377], as more fully set forth in the text of this opinion. IT IS HEREBY ORDERED THAT:

1.  Plaintiff's motion for partial summary judgment [Docket No. 214] is DENIED.

2.  Defendant Columbia Casualty Company's motion to continue summary-judgment briefing [Docket No. 218] is DENIED AS MOOT.

Dated: January 19, 2010

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge

---

[13]If the Court did find the provision ambiguous, the most important extrinsic evidence that the Court would likely consider would be United's insistence over a three-year period that *McRaney/Murphy* and *Shane* were indeed interrelated — extrinsic evidence that would obviously not help United.