## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITEDHEALTH GROUP INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>COLUMBIA CASUALTY COMPANY, FIREMAN'S FUND INSURANCE COMPANY, AMERICAN ALTERNATIVE INSURANCE CORPORATION, EXECUTIVE RISK SPECIALTY INSURANCE COMPANY, FIRST SPECIALTY INSURANCE CORPORATION, STARR EXCESS LIABILITY INSURANCE INTERNATIONAL LIMITED, LIBERTY MUTUAL INSURANCE COMPANY, STEADFAST INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>Defendants. | **Court File No. 05-CV-01289 (PJS/SRN)**<br><br><br>**PLAINTIFF UNITEDHEALTH GROUP'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO INSURERS' MOTION TO COMPEL DISCOVERY**<br><br>**Hearing:  October 20, 2010<br>Time:  9:00 a.m.** |

David B. Goodwin (*pro hac vice*)
Michael S. Greenberg (*pro hac vice*)
Covington & Burling LLP
One Front Street
San Francisco, California  94111-5356
Telephone:  (415) 591-6000

Jeffrey J. Bouslog (No. 174671)
Christine L. Lindblad (No. 277666)
Oppenheimer, Wolff & Donnelly LLP
45 South Seventh Street
Minneapolis, Minnesota 55402-1609
Telephone:  (612) 607-7000

Attorneys for Plaintiff
UNITEDHEALTH GROUP INCORPORATED

## I.   INTRODUCTION

In their motion to compel responses to discovery that United answered a year ago and the Insurers then ignored for ten months, the Insurers seek to expand exponentially the scope of discovery in this case.  They ask the Court to order United to undertake thousands of hours of additional discovery work at a cost that could easily run into the millions of dollars.  And they do so based on nothing more than speculation that they may find something possibly relevant that they do not already have from the massive discovery United already is in the process of giving them.

*First*, the Insurers move to compel production in response to Document Request No. 28, which seeks *all* documents related to the nearly *900* claims listed on United's loss run for the 1998-2000 policy period.  Why?  Because in addition to litigating whether their policies cover the *AMA* Claim, the *NYAG* Claim, the Denied Claims, and even the *Shane* litigation, the Insurers say they plan, as part of their "exhaustion" argument, to litigate coverage and the reasonableness of defense costs for each of those other 900 claims.  They cite no apposite authority supporting this extraordinary argument, and none exists.  Instead, the Insurers are making an untimely, broadside attack on Special Master Fraser's Report No. 5, which set reasonable limits on the scope of discovery with respect to the "other claims" on the 1998-2000 loss run (and are effectively attacking Magistrate Graham's even earlier ruling in this case denying United's request for substantially more modest "other claims" discovery from Lexington).

The Insurers offer no reasonable grounds for this Court to alter its view, stated during a discovery conference, that it was strongly inclined to follow the reasoning and

limitations of Report No. 5.  Indeed, despite hearing the Court's initial views on this very request, the Insurers did not even try to show that they have reviewed the documents that United already produced in response to Report No. 5 (at great cost, as is described in the Affidavit of Katherine Wilhoit), let alone that they found something in those documents that could possibly justify even broader discovery into this peripheral area.  The Insurers argue instead that they need documents regarding these 900 claims because United's "recently filed Second Amended Supplemental Complaint" alleges that the self-insured retention, the primary Lexington policy, and the first layer excess Reliance policy have been exhausted.  (Insurers' Br. at 4, 10-11.)  But this is not a newly added allegation – it appeared verbatim in United's prior complaint, filed in early 2009.  (*Compare* First Am. Supp. Compl. (Dkt. Entry No. 336) ¶¶ 22-25, 41-43 *with* Second Am. Supp. Compl. (Dkt. Entry No. 556) ¶¶ 22-25, 41-43.)  The Insurers merely decided to wait until now to pursue this discovery, in the hope that a massive increase in the scope of discovery will not only burden United but provide support for their companion motion to continue the discovery deadlines by half a year.

**Second**, the Insurers move to compel with respect to Document Request No. 42, which seeks *all* documents related to *any* investigation of United or *any* of its numerous subsidiaries, by *any* governmental entity, at *any* time, that had *anything at all* to do with two Ingenix databases that United used to determine usual, customary and reasonable ("UCR") health care provider charges or with United's determination of such charges. As we show below, and as we previously explained to the Insurers, United operates in a heavily regulated industry and thus is subject to myriad routine "investigations,"

including countless "market conduct examinations."  The burden of searching for and reviewing the files for hundreds of such exams (if records reflecting them can even be found) to look for a needle in a haystack is wholly unwarranted.  This too is nothing more than an expensive fishing expedition.

*Third*, after receiving redacted documents from United for the better part of a year without comment, the Insurers decide that now is the time to complain about the way that United redacted privileged information.  They ask the Court to order United to move its resources away from  the rest of the discovery that the Insurers are constantly demanding and instead redo thousands of redactions to already produced documents.  Not only is this unduly burdensome, but it is a thinly veiled end run around this Court's August 10, 2010 Order, which held that United need not undertake the burden of producing a document-by-document privilege log that separately identifies such information as the subject matter, senders, recipients and dates of privileged documents.  The Insurers now ask the Court to order United to provide the very same information for the redacted privileged documents, not on a log, but by physically inserting that information into each document itself.  Moreover, as we explain below, the Insurers already have much of the information they seek from the documents and the metadata already provided.

*Fourth*, the year-long delay in filing the Insurers' motion is not the fault of United, as the Insurers suggest.  Their papers ignore the fact that *in early October 2009*, *before* United served its responses to the document production requests, United wrote to this Court, with a copy to every Insurer, detailing some of United's concerns with the extraordinarily overbroad and unduly burdensome requests and inviting the Insurers to

meet and confer right away.  United's responses to the document requests also invited the Insurers to meet and confer about the two specific requests in issue here (and others); and United, at other times in October, again sought to meet and confer.  The Insurers never mention that they failed to accept these repeated invitations to meet and confer, and instead sat silent for ten months about the issues they now raise, while United produced documents in accordance with its responses and objections.

It is not a coincidence that the Insurers waited until the discovery cut-off was fast approaching to move to compel with respect to two of the most financially burdensome and time-consuming requests.  In a separate motion being heard the same day as this one, the Insurers once again ask the Court to extend the close of discovery, and the massive discovery they seek here is one of the purported grounds for moving the date.

Enough is enough.  The discovery that the Insurers seek by this motion is nothing more than an extremely expensive fishing expedition, which the Insurers are requesting because all of the expense is on United's shoulders, and it serves their purpose to delay the case.  The Court should deny the motion in all respects.

## II.     FACTUAL BACKGROUND

### A.     Insurers' First Set of Common Requests

More than a year ago, United responded to the Insurers' First Set of Common Requests for Production of Documents.  With respect to both request nos. 28 and 42, United's written responses explained why the requests were objectionable, what documents it would agree to produce or not produce, and, while not necessary or typical, *in the discovery responses themselves*, United expressly invited the Insurers to meet and

4

confer on the various requests if there were other documents the Insurers believed should be produced. For example, United's response to Request No. 28 objected that the request was, among other things, overbroad and unduly burdensome, and sought to circumvent Special Master Fraser's Report No. 5. United then agreed to produce the documents that it produced in response to Report No. 5, and concluded as follows: "United is willing to meet and confer with the Defendants about any additional documents they believe should be produced." (Insurers' Br. at 4.)

As noted, the document production responses were not the first time that United raised its concerns about the Insurers' overbroad document production requests. As noted above, United's October 5, 2009 letter to this Court described in detail some of United's objections to those document production requests and asked the Court to set a deadline for completion of the meet and confer process. (Declaration of Esta L. Brand, Ex. A.) Then, at the October 7, 2009 status conference, the parties agreed to a January 2010 deadline for that meet and confer process. (Brand Decl., Ex. I.) Rather than comply with a January deadline, the Insurers said nothing for another almost half year after that before making any attempt to meet and confer on the issues that are the subject of the Insurers' motion. (Declaration of Erin Oglesbay, Ex. E.)

The Insurers accuse United of stonewalling discovery, but the real problem is not that United is producing too little but that the Insurers are seeking too much. They refuse to focus on what is important and reasonable, and instead are using discovery as a bludgeon. United has expended substantial resources and money to produce a huge amount of information in this litigation, including on the "exhaustion" and

"investigation" issues that are the subject of this motion.  Thus far, United has reviewed at least 1.5 million pages and have produced nearly 200,000 pages.  (Brand Decl., ¶ 3.) Through the monthly status conferences and the many more informal telephonic discovery conferences, the Court is fully aware of the prodigious efforts United has made in the past and continues to make to meet the Insurers' insatiable appetite for more documents, including the fact that United has employed a team of 30 lawyers to review ESI for production.

United's production already includes the necessary documents bearing on exhaustion of the underlying self-insured retentions and insurance policies, among other things:  (1) Lexington's comprehensive audits of the claims that exhausted the SIR; (2) non-privileged documents related to an audit conducted by Tautges, a third party retained by United to audit the accuracy of the defense and indemnity payments reflected on the loss runs, including schedules and work papers that Columbia previously subpoenaed in this case; (3) all of the documents relating to the Denied Claims, "open claims" and the additional 20 sample claims from the loss run that were ordered by Special Master Report No. 5 to allow the Insurers to test exhaustion; and (4) correspondence with insurers in which they indicated their satisfaction with exhaustion of the SIR and underlying coverage, such as Fireman's Fund's reservation of rights letter stating that it would not pay United's defense expenses for *Shane* until it was fully satisfied with underlying exhaustion and other documents reflecting that Fireman's Fund was so satisfied as it later paid nearly $30 million for the defense of that litigation.  (Affidavit of Jeffrey J. Bouslog, ¶¶ 4-11, 15-18 & Exs. A-E, G-I; Affidavit of Katherine M. Wilhoit, ¶¶ 13, 17.)

As for government "investigations" into the two Ingenix databases or UCR more generally, United produced the non-privileged documents related to the "master" Attorney General investigation conducted by the NYAG, which quite likely includes any relevant document or information that may also be found in any documents related to any subsequent "me too" investigations of other state attorneys general.

**B.     United Made Many Concessions And Agreed To Produce Additional Documents And Information In Response To The Insurers' Belated Meet And Confer Efforts.**

As discussed, United tried to meet and confer about the scope of the document requests and its objections quickly to avoid the very problems that have arisen as a result of the Insurers' ten-month delay in meeting and conferring and year delay in moving to compel.  The Insurers chose to wait while United steadily produced tens of thousands of documents, without questioning United's objections to any of the responses to the common document requests (apart from more general privilege and PHI objections and certain documents that the Insurers specifically identified and requested).  United repeatedly highlighted to the Insurers in correspondence and during status conferences that it was collecting and producing documents in accordance with its objections.  Yet the Insurers stayed silent.

Eventually, on July 26, 2010, a mere four days after this Court moved the discovery cutoff from September 1 to December 1, 2010, the Insurers sent a letter to United, which for the first time sought to meet and confer regarding United's objections and responses.  United told the Insurers that the meet and confer letter came far too late because their demands would cause substantial prejudice if United had to go back and re-

review documents after it had already devoted enormous resources to producing documents consistent with its objections and responses, and that the Insurers' belated attempt to open up discovery on many new fronts threatened to derail United's efforts to completing discovery in the time set by this Court.  (Brand Decl., ¶ 4 & Ex. H.)  But because United takes its discovery obligations very seriously, United nonetheless met and conferred extensively with the Insurers and, at great cost, located, reviewed and produced thousands of additional documents in the spirit of compromise.  (Brand Decl., ¶ 4.)  United has also agreed to produce, on a rolling basis:  (1) documents responsive to narrowed Requests Nos. 39 and 40 (which seek due diligence documents related to Ingenix's purchase of the MDR and PHCS databases and documents that describe challenges or defense of the databases from the time United acquired the databases up to December 1, 2000) and (2) documents produced by the named plaintiffs in the *AMA* case, which in the case of provider named plaintiffs will require significant time and expense to redact PHI (because a provider cannot consent to disclosure of the patients' PHI).  (Brand Decl., ¶ 4 & Ex. G.)

    With respect to the two extraordinarily broad requests at issue here, the Insurers refused to compromise at all in the meet and confer sessions.  (Brand Decl., ¶¶ 5, 7.)  Although they now express in their papers a willingness to "narrow" the requests, not only do they purport to reserve their right to request more later once they get the first round of documents, but their proposed "narrowing" does not limit the requests in any significant way or alleviate the extreme burden they would impose on United.

## III.    ARGUMENT

### A.    Legal Standard

Although the Federal Rules of Civil Procedure generally allow broad discovery, the scope of reasonable discovery is not limitless, as the Insurers freely note whenever they object to United's requests for far more moderate discovery directed to them. "[D]iscovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they 'be construed to secure the just, *speedy*, and *inexpensive* determination of every action.'" *Herbert v. Lando*, 441 U.S. 153, 177 (1979) (quoting Fed. R. Civ. P. 1). To that end, the Supreme Court has admonished the district courts to "firmly" apply the requirement of Rule 26 (b) (1) that the material sought in discovery be "relevant" *Id.*; *see also Miscellaneous Docket Matter # 1 v. Miscellaneous Docket Matter #2*, 197 F.3d 922, 925 (8th Cir. 1999) ("The district court correctly recognized that discovery may not be had on matters irrelevant to the subject matter involved in the pending action").

The Eighth Circuit has cautioned that "[w]hile the standard of relevance in the context of discovery is broader than in the context of admissibility...this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Before discovery is compelled, "[s]ome threshold showing of relevance must be made." *Id.*

Even when a party can articulate some basis for relevance, courts require more before requiring discovery if the discovery appears likely to be voluminous. "Even though the standard of relevancy for discovery purposes is a liberal one ... the parties

should not be permitted to roam in shadow zones of relevancy and to explore matter

which does not presently appear germane on the theory that it might become so." *Smith*

*v. Dowson*, 158 F.R.D. 138, 142 (D. Minn. 1994) (ellipsis in original).  Minnesota federal

courts have also declined to order discovery, like the document requests at issue here, to

satisfy one side's speculative predictions of documents they hope to find.  *See id.* at 142

n.7 (rejecting plaintiff's argument of relevancy of documents related to other criminal

investigations for the same criminal offense for which plaintiff was investigated and

released to buttress claim of lack of probable cause in his arrest); *see also Upsher-Smith*

*Labs. Inc., v. Mylan Labs. Inc.*, 944 F. Supp. 1411, 1444 (D. Minn. 1996) (denying

motion to compel personnel records and files of employees based only on movant's

speculative belief as to the relevance of the documents which was refuted by a factual

declaration by the party resisting discovery).  They also decline to allow a straightforward

case to be mired down in discovery when because one side is using discovery to create

complications and delay. *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.*,

187 F.R.D. 578, 590 (D. Minn. 1999) ("We are not prepared to allow this fairly

straightforward action to be wrenched into the serpentine labyrinth frequented by

complex litigation without a convincing showing that such a course is appropriate.").

Even if the matter sought were relevant, "discovery is not permitted where no need

is shown, or compliance would be unduly burdensome, or where harm to the person from

whom discovery is sought outweighs the need of the person seeking discovery of the

information." *Miscellaneous Docket*, 197 F.3d at 925 (quoting *Micro Motion, Inc. v.*

*Kane Steel Co.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990)); *see also Onwuka v. Fed. Express*

*Corp.*, 178 F.R.D. 508, 516 (D. Minn. 1997).  The Supreme Court has long instructed the district courts to "not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .'"  *Lando*, 441 U.S. at 177.  Rule 26(b)(2) of the Federal Rules of Civil Procedure directs the courts to limit discovery upon a determination that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the part seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issue at stake in the litigation, and the importance of the proposed discovery in resolving issues.

Fed. R. Civ. P. 26(b)(2); *see also Onwuka*, 178 F.R.D. at 516.  "These factors are not talismanic.  Rather, they are to be applied in a common sense, and practical manner."  *Onwuka*, 178 F.R.D. at 516.  Further, before seeking or requiring burdensome discovery, counsel and the court must make a "common sense determination, taking into account all the circumstances[:]

> (1) that the information sought is of sufficient potential significance to justify the burden the discovery probe would impose,
>
> (2) that the discovery tool selected is the most efficacious of the means that might be used to acquire the desired information (taking into account cost effectiveness and the nature of the information being sought), and
>
> (3) that the timing of the probe is sensible, i.e., that there is no other juncture in the pretrial period when there would be a clearly happier balance between the benefit derived from and the burden imposed by the particular discovery effort."

*Id.* (citation omitted) (enumeration and emphasis added).

The Insurers' requests here exceed the scope of permissible discovery under the Rule 26(b)(2) factors, as the Insurers have waited too long and have caused United substantial prejudice by that delay, the discovery sought has marginal, if any, relevance, and any marginal relevance is vastly outweighed by the burden that production of documents would impose on United.

**B.     The Court Has Already Correctly Ruled That Insurers Are Not Entitled To All Documents Relating To Exhaustion Of The Self-Insured Retention And Underlying Insurance.**

Request No. 28 seeks *all* documents relating to exhaustion of *any* layer of United's self-insurance or liability insurance coverage for the 1998-2000 year.[1]  The breadth of this request is staggering:  it purportedly calls for every document about *all* of the nearly *900* claims on United's loss run.  Although the Insurers' motion argues that they are entitled to *all* documents related to each of these claims, they also say that they would be willing, *for the moment*, to accept a subset of the documents, specifically, the operative complaints and demands, as well as the pleadings and discovery indices, for each of those 900 claims, many of which have been closed for more than a decade.

The Insurers say that these documents are necessary because, in their view, United has the burden of showing that the hundreds of claims that exhausted the SIR and the first layers of insurance were indeed "covered" and that each and every penny an insurer or United paid for the defense of such claims was reasonable and necessary.  The Insurers

---

[1]  The Insurers have conceded that this request concerns the 1998-2000 managed care professional liability policies at issue in this case, and not other types of liability policies.

themselves acknowledge that such a showing would be "extraordinary" (Insurers' Br. at 9), and United agrees because it is not aware of any case where a court required that the insured make such a showing for hundreds of claims for which the insured is not seeking coverage from the insurers in the litigation.  The Insurers' papers cite no Minnesota authority (or, indeed, authority elsewhere) supporting their contention that the Court must presume that Lexington paid its full $60 million in aggregate policy limits for claims that it did not cover unless United proves otherwise.  No such authority exists.

The Insurers nonetheless assert that United "is asking the Insurers and this Court to simply accept its word that $140 million in underlying coverage was properly exhausted for the payment of covered claims," so they need this discovery.  (Insurers' Br. at 9.)  Setting aside that the Insurers are not being asked to take *United's* word on the "exhaustion" issue – Lexington itself documented exhaustion of the SIR and its payment of its own limits – the Insurers' "exhaustion" argument is directly contrary to their pre-litigation conduct in which they paid nearly tens of millions of dollars in insurance proceeds without requesting information about nearly 900 underlying claims.  Specifically, as the Court may recall, the Insurers' $140 million figure includes the amounts that Lexington, Reliance, Columbia, and Fireman's Fund paid for the *Shane* MDL litigation in Florida.  As to the *Shane* MDL, Columbia already paid its $30 million per-claim limit for the *Shane* litigation and related cases, after determining that the SIR and Lexington's $60 million aggregate limits were exhausted, and Columbia is not contesting coverage of *Shane* or seeking the return of any portion of the $30 million it paid.  Before paying, Columbia did not demand the sort of proof that the underlying

13

layers were properly exhausted that it now seeks, instead relying on United's loss runs and statements from the underlying insurers that those layers had been exhausted. (Bouslog Aff., ¶ 4.)  Although Fireman's Fund has asserted a counterclaim against United to recover the amounts it paid for *Shane* (which it only asserted upon being sued by United), in 2005, Fireman's Fund independently concluded that the underlying limits had been exhausted before paying anything for *Shane*, and then it paid almost all of its $30 million policy limit for *Shane* defense costs.  Fireman's Fund did not then demand the same proof of exhaustion that the Insurers now want.   (*Id.* at ¶¶ 9-10.)

There is yet another reason why the Insurers' exhaustion request is a red herring. The Insurers argue that they should have lots of "exhaustion" discovery, indeed whatever they want, because United is seeking coverage here for the $400 million (actually, around $450 million, including defense costs but not counting pre-judgment interest) it incurred in connection with the *AMA* and *NYAG* Claims.  But if the *AMA* and *NYAG* Claims are covered, those claims alone would more than exhaust the retained limits, the primary and first layer policies, and every policy that remains at issue in this case – twice over.  Thus, even if the Insurers' "proof of exhaustion" argument had any legal merit, as a practical matter, that proof would make no material difference to this case at the end of the day.

### 1.    The Insurers' Exhaustion Discovery Arguments Have Already Been Rejected Twice.

The permissible scope of exhaustion discovery has been addressed twice in this case, first by Magistrate Judge Graham and then by Special Master Fraser, both of whom carefully considered the issue and limited the scope of such discovery.  (Wilhoit Aff.,

Exs. H (Sept. 9, 2006 Order) & C (Special Master Report No. 5).)  Although United has

repeatedly highlighted both opinions in the meet and confer process, the Insurers do not

even mention Magistrate Judge Graham's opinion, and argue that Special Master Report

No. 5 is not applicable.  The Insurers are wrong.

  As to Magistrate Judge Graham's opinion, when Lexington was still a defendant

in this case, United made a much more narrow and less burdensome request for

documents from Lexington concerning exhaustion of Lexington's limits.  This was a

heavily disputed issue at the time, since Lexington claimed it had exhausted its $60

million aggregate limit while United could account for only approximately $58 million in

payments by Lexington.  Lexington refused to produce documents proving that it had

indeed paid the amounts it claimed to have paid, and United moved to compel citing

multiple examples of Lexington's inaccurate assertions of payments that were, in fact, not

made.  Magistrate Judge Graham denied United's discovery requests "to the extent that

they [sought] documents and information about each and every payment made by

Lexington under the policy's $60 million aggregate limit," because they were

"excessively broad and unduly burdensome."  (Wilhoit Aff., Ex. H at 4.)  (Here, the

Insurers not only seek every document relating to such payments, but also every

document relating to the underlying matters that led to those payments too, including all

complaints, discovery, etc.)  Magistrate Judge Graham limited the relevant discovery to

the "gap" between the sums that the parties agreed that Lexington had paid and any

specific payments that United disputed.  Magistrate Judge Graham further required that

United *first* come forward with a reason to question a particular payment before its

15

relevance could possibly outweigh the burden of providing discovery of the documentation relating to a particular payment.  (*Id.* at 5.)  Ignoring Magistrate Judge Graham's order, the Insurers have not come forward with any showing that any portion of the SIR or underlying layers were inappropriately exhausted through the payment of uncovered claims or unreasonable defense costs.

Later in the case, Columbia served discovery on United, seeking all the underlying defense documents for all of the claims on United's 1998-2000 loss run.  United objected and Columbia filed a motion to compel in which it sought such documents for all of the Denied Claims that were actually at issue in the case, as well as for 50 sample "other claims" pertaining to underlying exhaustion.  Special Master Fraser rejected even this much more limited request, and required United to produce only certain documents from defense counsel's files for the Denied Claims, Open Claims and for 20 additional sample claims from the loss run.

Special Master Fraser found that "[t]he request for all defense documents in all cases is excessive."  (Wilhoit Aff., Ex. C at 9.)  He also concluded that "detailed review of every underlying claim is neither consistent with the normal course of business between an insured and an excess carrier, nor is it warranted by litigation when there is other indicia of reliability in the form of claim reviews by others and litigation of the exhaustion issue in this very suit."  (*Id.* at 5.)  Referring to the three audits undertaken by Lexington as well as Lexington's review of claims it paid within its own limits as reliable indications that the underlying limits have been properly exhausted, Report No. 5 also distinguished between claims that were paid to exhaust the SIR and Lexington layers, on

the one hand, and claims in Reliance's layer, on the other hand, because the latter claims

had not been reviewed by an insurer.  (*Id.* at 10.)  As to those latter claims, which were

essentially the Denied Claims, Columbia was allowed more leeway.  Columbia was also

allowed to select and receive litigation files of 20 other claims on the loss run.

### 2. United Produced Ample Proof Of Exhaustion, And Fully Complied With Report No. 5, And No Insurer Has Shown Why That Production Is Not Enough.

United fully complied with Report No. 5.  It began producing documents to

Columbia pursuant to Report No. 5 in November 2008 and had substantially completed

the production by November 2009, except for a few follow-up productions in response to

Columbia's requests.  (Wilhoit Aff., Ex. D.)  These documents included pleadings,

motions, orders, written discovery responses, depositions, settlements, and judgments.

(*Id.* at ¶ 13.)  These documents were later made available to the other moving Insurers.

(*Id.* at ¶ 17.)  The production, though limited to 41 claims as opposed to the nearly 900

claims that the Insurers now say they need, took over eighteen months to complete,

required 957.75 hours of attorney time, and $225,867 in costs.  (Wilhoit Aff., ¶¶ 13-14 &

Ex. D.)

In addition to the specific claims files at issue in Report No. 5, United produced

other documents concerning the exhaustion issue.  These include a more detailed loss run

showing the payments at an invoice level for the claims that exhausted the SIR and

underlying policies, as well as documents relating to Lexington's audits of United's

claims files.  Indeed, Lexington audited United's files three times to determine whether

United had exhausted its SIR after which both the Lexington's claims supervisor,

17

Howard Tripolsky, and its independent auditor, Kevin Burke, determined that United had exhausted its $30 million aggregate SIR.  They wrote up their findings and descriptive narratives of nearly 200 claims that they selected for the audits in three very lengthy and detailed audit reports that explained the methodology they followed in arriving at their conclusion that the SIR was exhausted.  (Bouslog Aff., Ex. I.)  These audit reports as well as the deposition transcripts of Mr. Tripolsky and Mr. Burke were produced to the Insurers in October 2009.  (Bouslog Aff., ¶ 18, Brand Aff., Ex. K.)  United also produced documents related to the audit conducted by its own retained outside auditor, HLB Tautges Redpath; Columbia subpoenaed Tautges work papers earlier in this litigation, and all of the non-privileged responsive documents were produced to the Insurers. (Bouslog Aff., ¶¶ 15-17 & Exs. F-H.)  This is exactly the kind of information that excess insurers routinely rely on to determine whether underlying limits have been properly exhausted.  As Special Master Fraser found, the Insurers' demand to see every litigation file for all the claims on United's loss runs is inconsistent with the usual course of business between an insured and an excess insurer.

It is telling that, having put United through the burden of producing documents pursuant to Report No. 5, and having had the opportunity to review the audit reports and 50 claims files for nearly a year (some documents for close to two years), neither Columbia nor any other Insurer has, to date, once raised any specific question regarding the coverage determination or the reasonableness of fees in even a *single* one of the defense files to which they had access.  It is even more telling that when United made the documents produced in response to Report No. 5 available to the rest of the Insurers for

inspection and copying in December 2009, the Insurers spent less than half a day reviewing the documents.  (Wilhoit Aff., ¶ 17.)

In short, the Insurers have had "ample opportunity to obtain the information sought by discovery in the action," Fed. R. Civ. P. 26(b)(2)(ii) but they have failed to take advantage of it.  Moreover, the Insurers' conduct belies their argument that they need all of these documents to litigate the exhaustion issue.  To put it bluntly, from all appearances, the Insurers seek these documents not because they need them for their stated purposes but to make it as time-consuming and expensive as possible for United to advance this case, and to provide support for their pending motion for a five-month extension of the discovery cutoff.

### 3.    The Insurers Have Not Offered Any Valid Reason To Revisit And Deviate From Special Report No. 5.

The Insurers' repeated mantra that Special Master Report No. 5 should not apply here or to all of the Insurers misses the point.  Report No. 5 is not binding (except as to Columbia, of course), but Special Master Fraser devoted substantial efforts to analyzing the very issues that the Insurers are raising again by this motion; and the question for this Court is whether any reason exists to disagree with Special Master Fraser's reasoning. None of the Insurers' grounds for asking this Court to deviate from the earlier ruling resolving the same issues briefed and argued by one of their co-defendants has merit.[2]

---

[2]    As to Columbia, it also has failed to make the showing of "good cause" required under Report No. 5 to seek additional claim files.

*First*, the Insurers say that the dispute resolved by Report No. 5 was "narrowly focused on what was paid versus what was claimed as being paid," and had nothing to do with documents concerning whether the claims were covered.  (Insurers' Br. at 11.)  They are mistaken.  In the prior motion, Columbia argued strenuously, like the Insurers do here, that proper exhaustion of the underlying layers is a "threshold issue" and its discovery requests and motion sought wholesale discovery into underlying defense documents, including materials it might use to assess coverage and to determine the reasonableness of defense fees and costs, the identical reasons that the Insurers offer here. (Wilhoit Aff., Ex. B (Columbia's Mem. at 26-34).)  Special Master Fraser properly rejected that argument.

*Second*, the Insurers contend that "the landscape of this case has changed significantly" because United has amended its complaint twice by adding parties and additional claims.  (Insurers' Br. at 10-11.)  But exhaustion of the SIR and the Lexington, Reliance and Columbia policies was at issue from the very beginning of this case, well before the amended complaints were filed, as evidenced by the rulings of both Magistrate Judge Graham and Special Master Fraser concerning discovery directed to that same subject.

*Third*, the Insurers say that Special Master Fraser noted that Columbia could seek additional discovery beyond that authorized by Report No. 5 by showing why it needed more.  But the Insurers all have the discovery ordered by Report No. 5, yet they have not even tried to use that evidence to demonstrate why they need more.

*Fourth*, the Insurers assert that Special Master Fraser noted that more leeway might be proper with respect to proof of exhaustion of the Reliance layer (the first excess layer policy, in which the insurer is insolvent) because no insurer was overseeing exhaustion of that layer. But Report No. 5 took that into consideration in deciding what Reliance-layer discovery was allowed with respect to claims on the loss run, and how many "sample claims" were appropriate, and the Insurers have not shown why Special Master Fraser's determination was incorrect. Moreover, the facts available now show that an insurer did, in fact, monitor exhaustion of even the Reliance layer. As noted, Fireman's Fund, a party here, refused to pay anything for the defense of *Shane* before it confirmed exhaustion of all underlying coverage, and then, having done so to its satisfaction, paid close to $30 million for *Shane* based on its determination that the underlying layers (which includes Reliance) were exhausted.[3] (Bouslog Aff., ¶¶ 7-10 & Exs. C-D.) So there is even less reason for further discovery now.

*Fifth*, the Insurers point out that only Columbia was involved in the earlier motion, and that United stipulated with ERSIC and FSIC (in connection with transferring venue of those insurers' declaratory relief action from New York to this Court) that prior orders

---

[3] In addition, all the insurance policies explicitly provide that the insolvency of any underlying insurer does not excuse their obligation to pay the claims that trigger their layers. *See, e.g.,* Columbia Policy, § IV ("DEPLETION OF UNDERLYING LIMITS"), Fireman's Fund Policy, CONDITIONS ¶ 3("BANKRUPTCY OF THE UNDERLYING INSURER"); AAIC Policy, V. CONDITIONS ¶ C ("FINANCIAL IMPAIRMENT"). United has already shouldered the burden of paying the claims that should have been paid by Reliance to exhaust its per-claim limit and under any measure, will exhaust Reliance's aggregate limit with *AMA*.

in this action would not "bind" those two insurers.  But, as noted, the issue here is not whether the prior rulings of Magistrate Judge Graham and Special Master Fraser are binding, but whether the Insurers have offered any valid reason for the Court to revisit and deviate from the persuasive reasoning of those rulings, particularly at this late date. They have offered no such reason.

On the contrary, Special Master Report No. 5 should be even more persuasive now, for at least three reasons:  (1) the Insurers have had the "exhaustion" documents produced as a result of that ruling and have not used them to show why they need more; (2) the requests at issue here, even if limited as the Insurers now suggest, are far more burdensome than the request for approximately 90 files at issue in the prior motion; and (3) this motion is brought so late in the case that it is even more unreasonable, and is much more likely to seriously delay resolution of this case.

    **4.**     **The Insurers' "Offer" In Their Motion To "Initially" Limit This Discovery To Three Broad Categories Of Documents Does Not Solve The Burden Issues.**

At the tail end of their argument, the Insurers say that subject to the right to come back for everything else they seek, they would, "if necessary," be willing to limit United's *initial* production in response to Request No. 28 to three broad categories of documents.  (Insurers' Br. at 12.)  This belated compromise *in their moving papers* – after failing to offer to compromise during the parties' meet and confer sessions – is the first time they have moved off their unreasonable position that they will accept nothing less than then every single document relating to exhaustion; and setting aside the

Insurers' improper failure to meet and confer in advance of filing this motion, their

proposal does not even begin to solve the relevance, overbreadth and burden issues.

> a)   **The Insurers Request for All Operative Complaints and
> Pleading And Discovery Indices, For Nearly 900 Claims
> On The Loss Run is Overly Broad and Unreasonably
> Burdensome.**

The Insurers suggest that United should start by locating and producing all of the

complaints and defense counsel's pleading and discovery indices for nearly 900 claims

on the loss run.  This is unwarranted and unreasonable for many reasons.

First, it is hard to see how simply having the operative complaints and these

indices could possibly satisfy the purported purposes for which the Insurers say they need

discovery, since whether coverage exists for those claims and whether defense expenses

for each were reasonable could not be determined solely by reference to complaints and

indices.  Thus, this is either the camel's nose poking under the tent, and the Insurers

intend to seek the rest of the 900 claim files once they have the initial subset of the

documents, or the this "compromise" discovery is just intended to be expensive "make

work" for United.

Moreover, the burden of producing even this subset of documents would be

astronomical, and it could take thousands of hours of time that would seriously delay this

case.  The process, burden and costs to conduct such discovery is discussed in detail in

the affidavits of Kathryn Josephson (previously submitted in connection with the briefing

on Report No. 5 and resubmitted here) and Katherine Wilhoit (an Oppenheimer attorney

knowledgeable about prior efforts by Oppenheimer to produce a much smaller number of

the same categories of documents).  Briefly, based on the affiants' personal experience with the requested files, the overall cost to produce the documents in this "limited" subcategory would likely exceed ***one million dollars***, and would exceed ***three million dollars*** if United had to produce the broader categories sought by the motion.

The process would be very time-consuming.  Nearly all of the "other claims" in issue here are "closed," meaning that United's files and the files of underlying defense counsel, to the extent they still exist, are generally in long-term storage in sites like Iron Mountain.  (Wilhoit Aff., ¶ 20.)  United employees would have to first search at least four locations in order to determine the possible whereabouts of each file and then try to locate and retrieve boxes containing each of the files.  (Wilhoit Aff., ¶ 20 & Ex. I (Affidavit of Kathryn E. Josephson) at ¶ 13.)  In addition, United would need to reach out to what are likely hundreds of outside defense counsel firms that were involved in those claims.  (Wilhoit Aff., ¶¶ 19-21 & Ex. I at ¶ 18.)  United's experience in collecting such documents in the past, including to comply with Report No. 5, has revealed that, with the passage of more than a decade, many of the involved lawyers have moved to new law firms; and locating the lawyers and then locating the files (which may not have moved with them) is very time consuming and difficult.  (Wilhoit Aff., ¶¶ 22-23.)  Assuming the files can be found and retrieved, someone would then have to review what likely would be at least two million pages that would be in those boxes (and more, if many files are more than one box apiece) to identify the complaints and any indices of discovery and pleadings.  (Wilhoit Aff., Ex. I at ¶¶ 14, 16.)

Given the at most marginal relevance of the documents, the burden so far

outweighs any potential benefits from production that the Insurers' request should be denied.

### b) All Documents Provided To United's Auditor

The Insurers also say that United should produce all of the documents that United provided to Tautges, the third party that audited these claims for United in 2004 and 2005 to confirm the accuracy of the amounts reflected on its loss runs. But the Insurers already obtained, via subpoena, all of the non-privileged documents in Tautge's files concerning the audit. (Bouslog Aff., ¶¶ 15-17.) These documents include, to the best of United's knowledge, the specific documents that the Insurers mention in footnote 2 of their brief. (*Id.* at ¶ 17.) To the extent that the Insurers also are seeking copies of every document that Tautges reviewed, even aside from the burden, a response is impossible as there is no place where that universe of documents is located since United's electronic databases relating to claims on the loss run change constantly as information comes in, there is no way to recreate that universe now. (*Id.* at ¶ 14.) In any event, these documents are irrelevant to the purported reason for which the Insurers seek the documents – to test whether the claims paid to exhaust the underlying layers are covered and the reasonableness of defense fees, because neither criterion was tested by the auditor. (*Id.* at ¶ 12.)

The Court should deny the Insurers' motion with respect to Request No. 28.

**C.    The Insurers Are Not Entitled to All Documents Relating to All Governmental or Regulatory Investigations Relating in Any Way To The Ingenix Databases Or United's Determination of UCR for Out-of-Network Services.**

Request No. 42 seeks all documents relating to *every* regulatory or governmental investigation of *any* sort directed to *any* United subsidiary at *any* time that includes a reference to UCR or that concerns two Ingenix databases that United used to determine UCR health care provider charges in *any* way. Although the Insurers have identified in their motion three categories of investigations — a Senate investigation, the follow-on state attorney investigations and "market conduct examinations" — they have not limited their request to even these categories since the Insurers emphasize that this is the "minimum" to which they believe they are entitled. (Insurers' Br. at 13.) Even these purportedly limited categories of investigations are overbroad, unduly burdensome, and seek documents that are cumulative of documents already produced in connection with the NYAG investigation and/or are a fishing expedition for something of at best marginal potential relevance.

The Insurers claim that that the documents they seek are relevant in two ways. They argue that (1) documents relating to the investigations by other state attorneys general that post-date the *NYAG* and *AMA* actions may show United's perception of its exposure in the *AMA* and *NYAG* matters and its basis for liability; and (2) the documents are relevant to the timing of United's knowledge of the facts giving rise to its liability in the *AMA* and *NYAG* actions. The Insurers are off-target on both points.

26

### 1.    All "Market Conduct" Examinations[4]

The Insurers quest for all documents related to all "market conduct" examinations ever conducted with respect to any of the myriad United subsidiaries that are engaged in the business of paying health care claims is based on a fundamental misunderstanding of the nature of a market conduct examination.  As United advised the Insurers in the meet and confer process (but they have not advised this Court), and as is described in the Affidavit of Michelle Huntley Dill, United and its many subsidiaries operate in a heavily regulated industry and are therefore subject to regular and routine market conduct examinations that inquire into all sorts of health care activities, including, for example, eligibility, marketing, financial, sales, and claims processing.  (Affidavit of Michelle Huntley Dill, ¶¶ 2-3.)  Because United did not have any centralized or regional units that handled such exams until fairly recently, it cannot even quantify all of the market conduct exams that have taken place with respect to all of its subsidiaries.  However, even excluding exams that United can determine could have nothing to do with the databases or UCR determinations, such as financial exams, it has been able to determine that there have been more than **200** such examinations just from 1999 onwards.  (*Id.* at ¶ 3.)

A market conduct examination typically begins with a notice of an examination that may describe one or more areas that the agency wants to review (for example, the

---

[4] Although the Insurers use the term "market conduct *investigations*" in its motion, the correct terminology for the routine compliance activities conducted by the various states is "market conduct *examinations*."

network, broker, claims and appeals process).  (*Id.* at ¶ 4.)  The examinations do not start from any allegation of wrongdoing but are a regular part of United's regulatory compliance efforts and take place on a periodic basis, on schedules that differ from state to state.  (*Id.* at ¶ 3.)  Depending on the subjects of the examination, United may provide the examiner with lists of claims (paid and denied claims for a limited period) or policies and procedures for processing claims (if the examination has something to do with that topic).  (*Id.* at ¶ 4.)  The examiner will then usually look at a sample from the list.  (*Id.*)  In this process, the examiners ordinarily test whether a health plan is complying with the state's prompt pay statutes, whether it is paying the benefits mandated by state law, and whether United appropriately processed and paid the claim.  (*Id.*)

Neither UCR determinations nor the Ingenix databases that are used for such determinations are a standard part of these examinations.  (*Id.* at ¶ 6.)  In fact, Ms. Huntley-Dill, who handled such exams for United from 2001-2006, cannot recall any investigation that specifically related to these two subjects.  (*Id.*)  Although it is possible that a regulator may send a written question asking *how* UCR is determined, none, as far as we have been able to ascertain from our investigation thus far, have involved inquiries about flaws in Ingenix's PHCS and MDR databases.  (*Id.*)  Therefore, the likelihood that the Insurers would find pertinent evidence supporting their defenses, let alone some key admission by a United representative in response to a market conduct examination, is very low.  And, as discussed below, the burden of finding and reviewing such documents would be great.

To support their request for discovery of all market conduct examinations, the Insurers point to a letter dated June 24, 1997 from the State of Montana to a third party, the Health Insurance Association of America ("HIAA"), which mentions several citizen complaints about UCR determinations, and the Insurers suggest that was a "market conduct investigation." (Insurers' Br. at 18; Oglesbay Decl., Ex. M.) That letter was *not* part of a market conduct examination, so this document does not actually support an order compelling discovery of market conduct examinations. (Oglesbay Decl., Ex. M.) Even more important, this letter had nothing at all to do with United. The inquiry was directed to HIAA – not United – and occurred *before* United purchased the PHCS databases from HIAA in late 1998. That United later came into possession of such a document and produced it here in 2010 does not turn the document into support for discovery directed to market conduct examinations against United.

Moreover, the documents the Insurers seek are likely duplicative and cumulative. United has already produced, many times over, correspondence exchanged between United and the NYAG, which was conducting a very targeted, very aggressive, investigation into the very matters that are the subject of Request No. 42. The Insurers gain no meaningful benefit by forcing United to the great burden of looking for all market conduct examinations to search for some wished for critical admission (particularly since such examinations do not usually address UCR determinations at all). If a market conduct examination happened to address the two Ingenix databases or UCR and found anything wrong with United's conduct, such matters would be discussed in the final report. (Dill Aff., at ¶ 6.) United has no central repository of such reports, but they

are public documents (*id.* at ¶¶ 5, 11), so if the Insurers want to go fishing in this area, they can obtain whatever documents they want through requests to state insurance departments.  We discuss the undue burden on United even to look for all such examinations within its own files in Section II.C.4 below.

### 2.     The Senate Hearing And Report

The Insurers also focus on documents related to an investigation that the United States Senate conducted as a follow-on to the NYAG investigation.  The Senate Report, the Hearing Transcripts, testimony of the NYAG and United employees, and documents that the Senate found important, are publicly available on the Senate's website, something we already told the Insurers.

In an attempt to show that documents United may have produced to the Senate are important, the Insurers cite the part of the Senate Report that states that "Ingenix anticipated legal challenges to the reliability of the data" and "promised to provide customers with technical and legal assistance in the case of a 'Database Challenge.'" (Oglesbay Decl., Ex. L at 5.)  The Insurers suggest that this shows that United had early knowledge that the Ingenix databases were flawed.  Even assuming *arguendo* that such information were relevant to any coverage issue under the insurance policies involved in this case, the Insurers' description of this "evidence" is misleading.  United previously explained to the Insurers that the document the Senate was quoting from, a contract between United and a customer that was using the Ingenix databases, is available on the Senate website (so they surely have it), and they thus know that the document is dated from 2005, five years *after* the filing of the well-publicized *AMA* suit.  (*Id*; Brand Decl.,

Ex. E.)  It is not surprising that customers *at that time* wanted Ingenix to provide legal

support if there was a challenge to their use of the databases.  But it does not at all

suggest that United offered such support, or contemplated any challenges like the *AMA* or

*NYAG* Claims, at any time before the policies incepted in 1998.  On the contrary, United

already produced to the Insurers similar contracts from the earlier period that, not

surprisingly, contain no similar promise of legal support.  (Brand Decl., Ex. F.)  Indeed,

the same Senate website that contains the 2005 contract the Insurers cite also contains a

1999 version of a United customer contract that does not contain such a promise.  The

2005 contract is another red herring.

> **3.   The Documents the Insurers Seek Might, At Best, Have
>       Marginal Potential Relevance To The Insurers' Purported
>       Knowledge Based Defenses.**

The Insurers say that documents relating to the various "investigations" may lead

to admissible evidence about when United had knowledge of the facts and circumstances

giving rise to the underlying *AMA* and *NYAG* actions, which they say are critical to the

applicability of various coverage defenses that turn on United's knowledge before the

inception of the policy period, though they do not bother to explain how.  Again, even

assuming *arguendo* that such knowledge is relevant to any coverage issues in this case,

the Insurers' proposed discovery is irrelevant, duplicative, and unduly burdensome.  *See,*

*e.g.,* Section II.C.4 *infra.*

The "retroactive date" defense — which would preclude coverage for *wrongful*

*acts* taking place prior to the retroactive date stated in the policies for the insured seeking

coverage, here **1977** — cannot justify this discovery.  Not only does that not turn on

"knowledge," United did not even acquire the PHCS or the MDR databases until very

late in the 1990s, and the damages in *AMA* and *NYAG* do not go back any further than

1994, so it is inconceivable that this discovery would unearth relevant documents

showing that United knew about the facts giving rise to its liability in the *AMA* and *NYAG*

actions before the retroactive date of 1977, more than twenty years earlier.

      For the same reasons, grounding this discovery on the purported unsigned "prior

acts exclusion" that AAIC says is in its policy (assuming for the sake of argument that it

is even part of the policy) makes no sense.  That provision, if it were part of the AAIC

policy, would concern liability arising from facts and circumstances known by United's

risk management department or the law department before the 1977 retroactive date,

which is, again, so many years ago that it is nothing more than wishful thinking on the

Insurers' part that this discovery could possibly unearth something relevant.  As to the

other part of AAIC's "prior acts exclusion" which turns on United's risk management or

law departments' pre-policy inception knowledge of an "incident" leading to liability,

United has already produced loss runs from 1996-1998 and has agreed to produce

documents relating to the claims that AAIC identified on the loss run in response to

discovery separately propounded by AAIC.  (Brand Decl., ¶ 6.)  What is more, as

discussed below, United has already agreed to the Insurers' other discovery requests that

are far more targeted and more likely to yield documents relevant to this issue, if any

exists.  Accordingly, the Insurers cannot justify this overbroad and duplicative discovery

on the basis of AAIC's purported "prior acts exclusion."

Grounding this discovery on the "late notice" and "known loss" defenses makes no sense either.  Late notice turns on when the insured had notice of a "claim," and, here, because this is a "claims made" policy, on whether United gave notice of the *AMA* Claim within the time period specified in the policies, i.e., within 90 days after the policies ended in December 2000.[5]  This discovery, purportedly necessary to show what United knew before the policy incepted, cannot have anything to do with late notice of a claim, since it is undisputed that neither the *AMA* Claim nor the *NYAG* Claim was made before the 1998-2000 policies incepted.  In addition, such discovery cannot be relevant to a "known loss" defense. Under Minnesota law, "known loss" is a "fraud-based defense" and "requires proof that the insured withheld material information concerning the existence of loss."  *See Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 738 (Minn. 1997).  Even the Insurers – which collectively have asserted more than 500 affirmative defenses – have not gone so far as to allege that United committed willful fraud.

Moreover, leaving aside the issue of whether the "proof of knowledge" the Insurers speculate they may find in these documents supports their defenses, to the extent any document exists in these vast universes of documents that would bear on such knowledge, anything significant will, if it exists, most likely be produced in response to

---

[5] *See Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 891 (8th Cir. 2009) (when notice is required "as soon as practicable after it becomes known to the Insured's Risk Management Department," notice is determined by when that department actually became aware of the loss, not when it should have known of the loss) and Lexington policy, §§ 5.1, 5.3 (imposing such a requirement).

other document requests, including the Insurers' narrowed Requests Nos. 39 and 40, to which United agreed to respond.  (Brand Decl., ¶ 13 & Ex. G.)  As narrowed, these requests calls for documents created after United's acquisition of the Benchmarking Databases (PHCS and MDR) up to December 1, 2000 (the inception of the policies), which describe the suitability of, accuracy of, challenges to, complaints about, concerns regarding, and potential or actual claims or liability arising from the use of the Benchmarking Databases for UCR calculations or determinations for out-of-network services and the due diligence documents surrounding the purchase of the PHCS and MDR databases.  These requests would encompass the proof of United's pre-policy knowledge, if any such proof exists (again, assuming *arguendo*, that such knowledge is relevant to a legitimate coverage issue).  The Insurers' overbroad Request No. 42 is a crude and unnecessary tool, a sledgehammer, in light of United's agreement to produce documents pursuant to reformulated Request No. 40.

### 4. The Burden To Search For And Produce All Documents Related To All Examinations And Investigations Would Vastly Outweigh Any Marginal Benefit to the Insurers.

As was the case with Request No. 28, the burden of complying with Request No. 42 would be staggering.  As an initial matter, to the extent that any of the documents the Insurers seek are public records that are accessible on public websites and/or subject to public access statutes, the Insurers can and should bear the burden of finding them.  Given the age of some of the documents, it will often be quicker for the Insurers to request the documents from the states than for United to search and locate them in its files, if it were even possible to do so.

As explained in the Affidavit of Michelle Huntley Dill, searching for all investigations of any United subsidiary by any governmental agency at any time, in order to determine whether any of them mention the PHCS or MDR databases or UCR determinations, would be very difficult, time-consuming, and costly. There is no central repository of all market conduct or other investigations or final reports. (Dill Aff., ¶ 11.) There is no index of all such documents that could be consulted to determine which examination or investigation, if any, had any mention of the two databases or UCR, so all such investigations would have to be located and reviewed. (*Id.* at ¶¶ 9-10.) This would require someone to figure out who at each of the many United subsidiaries had something to do with such examinations and investigations who might still work at the company, in order to determine whether such persons recall anything about them and in which off-site storage facility somewhere in the country may have boxes containing such materials. (*Id.* at ¶ 11.) Then, it would have to search indexes of such storage facilitates in an effort to find the right boxes, retrieve them and review them to see what they say. (*Id.*) It is difficult to estimate the cost to do this, but just describing the process shows that it is anything but easy.

\*    \*    \*    \*    \*

To summarize, the Insurers have failed to make even a threshold showing of the relevance of this broad discovery into all investigations and market conduct examinations of all United companies, or that this discovery would produce any pertinent documents that would not be revealed by other discovery. And, they cannot possibly refute United's evidence of the extreme burden this discovery would cause to United, or the prejudicial

delays that would occur in the progress of this case.  Accordingly, the Court should deny
the Insurers' motion to compel documents responsive to Request No. 42.

**D.     Redactions Of Privileged Information From Documents**

The Insurers' final complaint concerns the way that United has, for the past nine
months, been redacting documents to protect privilege.  They accuse United of
overzealous redactions because where a document was sent in a privileged way, *e.g.*,
from a lawyer to client, client to lawyer, or lawyer to lawyer, United redacted the names
of the specific senders, recipients, dates and headers that may reveal its subject matter.
The Insurers' complaint is a perfect example of "no good deed goes unpunished."  United
carefully redacted documents in a way that was aimed at leaving unredacted as much as
possible and the Insurers accepted such documents for the better part of a year.  After
standing silent while United was producing documents in that manner – and ignoring this
Court's repeated instructions to the Insurers to speak up if they had concerns about
electronic discovery – the Insurers belatedly want United to redo the redactions on
thousands of documents to include such details about who sent the email to who and on
what date.  Their request not only is very burdensome, and comes too late, it is, in effect,
a ploy to get around the Court's prior Order finding that United need not reveal,
document-by-document on a privilege log that same information.  The Insurers creatively
demand that United reveal it on the documents themselves.

It is important to understand how and why United performed these redactions.
Because the Insurers have focused their discovery efforts primarily on privileged
documents, such as communications involving United's in-house and outside lawyers, the

lion's share of the documents that United has been reviewing and producing come from attorneys or persons communicating with attorneys.  So it is no surprise that most of these documents are privileged.  For example, United has reviewed many emails sent by United's outside counsel to someone within United in which the outside attorney forwards and comments on a non-privileged email that the outside attorney received from the underlying plaintiffs.  Most litigants producing such documents would leave intact the name of the sender and recipient, as well as the date, and then redact everything below that in the email chain, because all of that constitutes the substance of the communication from the attorney to the client.  But here that would have meant the Insurers would not have received the non-privileged communication at the bottom of the chain.  So, in an effort to give the Insurers as much discovery as possible, United instead left intact the non-privileged parts of the chain and redacted all of the information about who then forwarded that to whom and when, along with headers that may reveal privileged communications.  In other words, the good deed was maximizing what substance was produced.  And the proposed punishment is the Insurers' request for an order requiring United to redo all of these redactions.  Their arguments in support of this request lack merit.

*First*, as noted, requiring United to put the details of each privileged communication back onto all redacted documents would directly undermine the Court's privilege ruling.  If the Insurers are not entitled to a log containing such details for documents that have been withheld on privilege grounds, it is even more groundless for them to argue that they are entitled to it for documents that were redacted.  Indeed, if

United adds back the details of sender, recipient, date, and headers for the privilege portions of the email strings, that would effectively reveal virtually all aspects of the privileged communication, which United is not required to do.

*Second*, contrary to their suggestion, header information is not categorically non-privileged. *See Schuler v. Invensys Building Systems, Inc.*, No. 07-50085, 2009 WL 425923 (N.D. Ill. Feb. 20, 2009). In *Schuler*, the court upheld a party's redaction of an email chain that consisted of multiple emails, the last two of which were completely redacted, including their headers. The court held that the redactions were proper because the email header may contain information subject to the attorney-client privilege or the work product doctrine. *See id.* at *2-3. In addition, this Court has acknowledged that header information may contain privileged information during the last status conference. (Brand Decl., Ex. J (Excerpt from Sept. 22, 2010 Status Conference).)

*Third*, the Insurers' purported reasons for wanting the additional information are disingenuous. They say that they need this information to identify additional custodians. They are wrong. Not only did United answer the Insurers' interrogatories asking for persons responsible for the defense and settlement of the *AMA*, *NYAG*, and *Malchow* Claims way back in January 2010, but the Insurers have thousands upon thousands of unredacted portions of the emails, which United has been producing over the past year, which reveal the names of myriad United employees and defense counsel involved in these matters. This "reason" is made of whole cloth.

The Insurers also claim that they need the header information to authenticate and to elicit non-privileged information about the redacted emails. This is another red

herring.  United produced these documents along with metadata identifying the custodian from which the document came.  Most, if not all, will likely be the subject of authenticity stipulations when the time comes to do so.  Moreover, United also left intact the name of the latest (in time) recipient of the non-privileged portions of the email strings, so the Insurers know two people that they could seek to question about the non-privileged part of the email chain, the custodian and the "sender" of the forwarded email that was redacted as privileged.

*Fourth*, just like the Insurers' tardy efforts to meet and confer on their First Set of Common Requests to Produce Documents, their objection to United's method of redactions comes far too late.  United has been following the same redaction practices since January 2010, and has produced thousands of documents with similar redactions. (Brand Decl., ¶ 11.)  The time to object was soon after the first documents were produced, or at the very latest when they moved to compel with respect to privilege issues back in May (since this is a "privilege" issue), yet the Insurers did not object for many additional months.  They have waived their right to object and cannot belatedly impose the burden on United to re-do the redactions.

*Fifth*, the burden of re-doing the prior document productions would be substantial. There are over 4,500 documents and 19,000 pages produced by United thus far that have been redacted in some part.  (*Id.* at ¶ 12.)  Using conservative estimates, an attorney can review and re-redact 15 documents per hour.  (*Id.*)  A contract attorney's billing rate is $90 per hour.  (*Id.*)  Using these figures, it would require 300 attorney hours to re-do the redactions at total cost of $27,000.  (*Id.*)  Because the redactions are appropriate, it would

cause substantial burden to United if it were required to re-redact, and the Insurers, by their dilatory conduct, have created the present situation, the Court should deny this motion.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny the Insurers' motion to compel.


Dated:  October 13, 2010                Respectfully submitted,


                                        _____/s/ David B. Goodwin_____
                                        David B. Goodwin (pro hac vice)
                                        Michael Greenberg (pro hac vice)
                                        Covington & Burling, LLP
                                        One Front Street
                                        San Francisco, California 94111-5356
                                        Telephone:   (415) 591-6000
                                        Facsimile:    (415) 591-6091
                                        Email:  DGoodwin@cov.com


                                        Jeffrey J. Bouslog  (No. 174671)
                                        Christine L. Lindblad (No. 277666)
                                        Oppenheimer, Wolff & Donnelly LLP
                                        45 South Seventh Street, Suite 3300
                                        Minneapolis, Minnesota  55402-1609
                                        Telephone:   (612) 607-7000
                                        Facsimile:    (612) 607-7100
                                        Email:        JBouslog@Oppenheimer.com

                                        *Attorneys for Plaintiff*
                                        *UnitedHealth Group Incorporated*