UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITEDHEALTH GROUP<br>INCORPORATED, a Minnesota corporation,<br><br>Plaintiff,<br><br>v.<br><br>COLUMBIA CASUALTY COMPANY, an<br>Illinois corporation; FIREMAN'S FUND<br>INSURANCE COMPANY; AMERICAN<br>ALTERNATIVE INSURANCE<br>CORPORATION; EXECUTIVE RISK<br>SPECIALTY INSURANCE COMPANY;<br>FIRST SPECIALTY INSURANCE<br>CORPORATION; STARR EXCESS<br>LIABILITY INSURANCE<br>INTERNATIONAL LIMITED; LIBERTY<br>MUTUAL INSURANCE COMPANY;<br>STEADFAST INSURANCE COMPANY; and<br>NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA;<br><br>Defendants. | Case No. 05-CV-1289 (PJS/SER)<br><br><br><br>MEMORANDUM OPINION AND ORDER |

David B. Goodwin, Michael S. Greenberg, COVINGTON & BURLING, LLP; Jeffrey J. Bouslog, Christine N. Lindblad, OPPENHEIMER WOLFF & DONNELLY LLP, for plaintiff.

Charles E. Spevacek, Tiffany M. Brown, Katrina M. Giedt, MEAGHER & GEER, PLLP; Michael M. Marick, J. Robert Hall, Rebecca R. Haller, MECKLER BULGER TILSON MARICK & PEARSON LLP, for defendant Columbia Casualty Company.

William L. Davidson, LIND JENSEN SULLIVAN & PETERSON, PA; Louise M. McCabe, Louis M. Segreti, TROUTMAN SANDERS LLP, for defendant Fireman's Fund Insurance Company.

John M. Anderson, Jeffrey R. Mulder, BASSFORD REMELE, PA; Adam H. Fleischer, John A. Husmann, BATES CAREY NICOLAIDES LLP, for defendant American Alternative Insurance Corporation.

Ronald P. Schiller, Daniel J. Layden, Robert L. Ebby, Jacqueline R. Dungee, HANGLEY ARONCHICK SEGAL & PUDLIN, for defendants Executive Risk Specialty Insurance Company and First Specialty Insurance Corporation.

David P. Pearson, Thomas H. Boyd, Erin A. Oglesbay, WINTHROP & WEINSTINE, PA, for defendants Starr Excess Liability Insurance International Limited and National Union Fire Insurance Company of Pittsburgh, PA.

Harvey Weiner, Michael J. Griffin, Jill M. Brannelly, PEABODY & ARNOLD LLP, for defendants Liberty Mutual Insurance Company and Steadfast Insurance Company.

Plaintiff UnitedHealth Group Inc. ("United") brings this action against ten insurance companies — United's primary insurer and nine of United's excess insurers — asking this Court to determine, with respect to each of several dozen claims that were brought against United during the period December 1, 1998, through December 1, 2000, which of the ten insurers must indemnify United or pay United's defense costs.  In essence, then, this lawsuit represents several dozen coverage actions wrapped up into one.  United's primary insurer — Lexington Insurance Company ("Lexington") — threw in the towel early, tendering what was left of its $60 million policy limits (which United refused to accept, until being ordered to do so, *see* Docket No. 123).  But the nine excess insurers have soldiered on, and this lawsuit is now well into its sixth year.

This is a difficult case.  The main problem with this case is that it centers on an insurance policy that is terribly written.  As noted, Lexington was the primary insurer during the relevant time period, and all nine of the excess insurers, to one degree or another, followed form to the Lexington policy.  Unfortunately, though, the 30-page Lexington policy was not a standard policy that would be familiar to litigators and judges.  Instead, the Lexington policy was negotiated — provision-by-provision — by United and its many insurers.  In negotiating the policy, the parties borrowed from other policies, but they did so with little thought as to how the provisions that they were borrowing would work together when combined within a single policy.

And, when the parties took pen in hand to write their own provisions, they drafted those

provisions poorly, often leaving the Court and the attorneys who are now representing the parties

to wonder what the negotiators could possibly have had in mind.  In short, then, the policy is a

mess, chock full of provisions that are unclear, provisions that are clear but absurd, and

provisions that are clear but contradicted by other provisions that are just as clear.

Because the Lexington policy is so badly drafted, it has spawned seemingly endless

disputes among the parties.  Indeed, the parties seem to find new ambiguities in the policy on

almost a daily basis.  Sometimes, in fact, the parties discover new ambiguities after submitting

briefs on a motion and before appearing in court to argue that motion.  And sometimes the

parties even discover new ambiguities while standing before the Court during oral argument.

This matter is now before the Court on the fourth round of summary-judgment motions.

This latest round of summary-judgment motions can be divided into three groups:

(1)     Motions concerning whether the *AMA* and *NYAG* claims are within the primary
        policy's main insuring clause and antitrust endorsement;

(2)     Motions concerning whether certain underlying claims are interrelated with the
        *Shane* claim; and

(3)     Motions concerning United's affirmative defenses to the counterclaim of
        defendant Fireman's Fund Insurance Company ("FFIC").

The Court addresses each set of motions in turn.  Familiarity with the facts and the

Court's previous orders in this and in a related case (*UnitedHealth Group Inc. v. Hiscox

Dedicated Corporate Member Ltd.*, No. 09-CV-0210 (PJS/SRN), filed Jan. 29, 2009) is

presumed.  The Court will briefly summarize the facts only when necessary.

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255.

### B.  Coverage for the AMA and NYAG Claims

The first set of motions pertains to whether the *AMA* and *NYAG* claims fall within the main insuring clause of the primary policy (i.e., the Lexington policy) or within the coverage provided by the antitrust endorsement to the primary policy.  The Court addresses each of these provisions in turn, and then addresses the additional contention of the insurers that United cannot recover for the *AMA* claim even if some portion of that claim falls within the coverage afforded by one or both of these provisions.

#### 1.  The Main Insuring Clause

The main insuring clause of the primary policy provides as follows:

> We will pay amounts any **Protected Person** is required to pay as **damages** and **claim expenses**, including **Damages** assumed under contract and related **claim expenses** assumed under contract, for **claims** that directly or indirectly result from or are related to the **Operations**, including but not limited to any **Wrongful Act** committed or allegedly committed by you or another party for whom you are alleged to be liable, in the rendering or failure to render **Services** [sic].

JEx64.  Boldfaced terms are defined elsewhere in the policy.[1]  In particular, the term "damages" is defined as follows:

> **Damages** mean compensation to others.  **Damages** include compensatory, exemplary, enhanced, equitable and punitive damages, settlements, and **Claim Expenses** awarded against or agreed to as part of a covered **claim** settlement by a **Protected Person**.  If you are legally required, by statute, regulation or contract, to pay a claimant's legal costs and any interest that applies to such costs, these costs will also be considered **Damages**.

JEx65.

The insurers argue that the payments United made to settle the *AMA* and *NYAG* claims are not "damages," but rather contractual benefit payments (in the case of *AMA*) or a "capital investment" (in the case of *NYAG*).  The Court disagrees with the insurers that the term "damages" excludes these payments.[2]  As the Court explained in connection with the last round of summary-judgment motions,

> the definitions of "Damages," "Operations," and "Services" are extremely broad . . . . In particular, the definition of "Damages" includes more than just compensatory damages; it expressly includes, among other things, equitable and punitive damages.

---

[1]For the sake of readability, the Court will not use boldface or initial capital letters every time it quotes a term that appears in boldface or with initial capital letters in the policy.  Rather, the Court will use boldface and initial capital letters only the first time that it quotes such a term.

[2]The Court also disagrees with the insurers' attempt to recharacterize the $50 million paid to settle the *NYAG* claim as a "capital investment."  That payment was clearly a "settlement[]" (and also likely "equitable . . . damages") and thus plainly within the express definition of "damages."  JEx65.  It may well be, as the insurers argue, that the $50 million was not paid as "compensation to others," at least if "compensate" is used in its traditional legal sense to mean "make whole someone who has been injured."  But the policy's definition of "damages" is not *limited* to "compensation to others" in that traditional sense.  Rather, the policy explicitly defines "damages" to include not only "compensatory . . . damages," but also "exemplary . . . damages," "enhanced . . . damages," "equitable . . . damages," and even "punitive damages" — payments that are not (or not usually) paid to make injured parties whole.

> Policy § 4.5.  Similarly, the definitions of "Operations" and
> "Services" are drafted to cover essentially everything that United
> does, including "the design, marketing and administration of
> benefit plans," "claim handling, reviewing and adjusting,"
> "insurance operations," and "development, maintenance and
> credentialing of provider networks."  Policy § 4.13; *see also* Policy
> § 4.18.  Finally, as the Special Master found, the business-risk
> doctrine does not override unambiguous policy language.  An
> insurer can elect to cover breach-of-contract claims.  *See Wanzek
> Constr., Inc. v. Employers Ins. of Wausau*, 679 N.W.2d 322,
> 326-27 (Minn. 2004).

Docket No. 460 at 7-8.

Relying mainly on cases applying the business-risk doctrine, the insurers strenuously argue that it would make no sense for them to agree to cover breach-of-contract claims against United, such as claims that United failed to pay benefits that it promised to pay under a health-insurance policy that it issued.  Such an agreement, the insurers point out, would give United carte blanche to shift its contractual obligations onto its insurers.  The Court has three responses:

First, it would make no sense for any insurer to agree to the *entire* Lexington policy — which, as the Court has explained, was so badly drafted that a party to the contract could not know what was and was not insured under the policy.  And yet these insurers agreed to follow form (more or less) to the Lexington policy.  Given that the insurers committed the senseless act of agreeing to the *entire* Lexington policy, it is hard to take seriously their argument that it would have been senseless for them to agree to a particular *provision* within that policy.  The "senselessness" bridge was crossed long ago.  Clearly, these insurers did not read the Lexington policy carefully — or, if they read it carefully, they simply did not care that the plain language of many provisions of the policy made them responsible for risks that insurers ordinarily do not assume.

Second, the Court observes — as it did in the order quoted above — that the business-risk doctrine does not override unambiguous policy language.  Insurers can and sometimes do elect to cover breach-of-contract claims; if they do, they will be held to their promise.  *See Wanzek Constr., Inc.*, 679 N.W.2d at 326-27; *see also In re SRC Holding Corp.*, 545 F.3d 661, 668 (8th Cir. 2008) ("In the absence of contractual ambiguity, whether policy coverage 'makes sense' as a business matter is largely irrelevant; freely contracting actors in the marketplace, particularly sophisticated business entities who rely on experts to advise them, are best suited to determine what makes the most economic sense, and the language they have mutually negotiated and agreed to is the best evidence of what those parties intended.").  The policy's definition of "damages" may be extraordinarily broad, but it is not unclear, and it includes damages paid to someone who has sued United for breach of contract.

And that leads to the third point:  The overall approach of those who drafted the Lexington policy is apparent.  The drafters structured the policy so that, as an initial matter, it covered just about everything.  This is reflected not only in the extraordinarily broad definition of "damages," but also in the extraordinarily broad definitions of "operations" and "services," which "are drafted to cover essentially everything that United does."  Docket No. 460 at 8.  Then the drafters used a long series of exclusions to cut back on the initial scope of coverage, much as a sculptor might start with a large block of marble and then carve a small statue out of it.  The insurers protest, for example, that the parties could not possibly have agreed to include United's liability for benefit payments within the scope of coverage.  But the fact that the policy contains a specific exclusion for benefit payments (*see* JEx73) is compelling evidence that the parties did

just that.  After all, if benefit payments were not covered as an initial matter, why would the parties include a provision that specifically excluded them?

The insurers complain that the long series of exclusions fails to address every possible type of contractual obligation for which United might be held responsible, and thus the policy could leave the insurers liable for, say, United's failure to pay the landscaper who mows the grass at corporate headquarters, or United's failure to pay the caterer who serves food at company parties.  The insurers are certainly correct that the exclusions are poorly drafted and, as a result, fail to exclude coverage that many insurers might want to exclude.  But the parties chose to draft the policy this way, and they must live with the consequences of their decision. Moreover, as United points out, the policy has a very large self-insured retention of $3 million per claim, *see* JEx55, which by itself would preclude coverage for most routine contractual obligations (such as the obligations to pay the landscaper or caterer).

The Court therefore holds that the amounts United paid to settle the *AMA* and *NYAG* claims are "damages" for purposes of the main insuring clause of the policy.

## 2.  The Antitrust Endorsement

The antitrust endorsement to the policy states, in relevant part:

> In consideration of the premium charged and notwithstanding any other provisions of this policy, including any exclusionary provision, we will pay amounts any **Protected Person** is legally required to pay as **Damages** and **Claim Expenses** for **claims** that directly or indirectly result from or are related to, a **Wrongful Act** consisting or allegedly consisting in whole or in part of anti-trust, price fixing or restraint of trade activities occurring on or after the Retroactive Date stated in the Declaration and before the cancellation date or expiration date of this policy.  **Damages** arising out of the same or inter related acts, errors or omissions shall be deemed to arise from the first such same or interrelated acts, errors or omissions.

JEx78.

The Court notes that, as much as any provision, this endorsement illustrates just how little care the parties took in drafting the policy.  Consider that the endorsement begins with the words: ". . . notwithstanding any other provisions of this policy, including any exclusionary provision, we will pay amounts . . . ."  This clause, on its face, wipes out *every* provision of the policy — including, but not limited to, *every* exclusion — that might eliminate or reduce an insurer's obligation to indemnify United for amounts that it pays in connection with "claims that directly or indirectly result from or are related to, a wrongful act consisting or allegedly consisting in whole or in part of anti-trust, price fixing or restraint of trade activities . . . ."  In other words, according to the literal terms of the antitrust endorsement, as long as a claim results ("directly or indirectly") from a wrongful act that is even *alleged* to consist *in part* of activities that restrain trade, then the insurer must cover the claim, no matter what.  The "notwithstanding" clause, on its face, wipes out provisions regarding the limits of liability, the coverage period, and the reporting requirements (to cite just a few examples), as well as every single one of the policy's exclusions — including exclusions for such things as criminal and dishonest acts.

It is a mystery why ten insurance companies would agree to a broad endorsement that begins with the words ". . . notwithstanding any other provisions of this policy, including any exclusionary provision, we will pay amounts . . . ."  Both United and the insurers agree on one thing:  The "notwithstanding" clause in the antitrust endorsement cannot mean what it says.  But neither United nor the insurers have offered a plausible explanation of what the clause *does* mean.  United argues that the clause overrides only the policy's exclusions, and nothing else in the policy, even though the plain language of the clause says that it trumps "*any* other provisions

of this policy, *including* any exclusionary provision."  For their part, the insurers argue that the "notwithstanding" clause wipes out nothing save exclusions that specifically address liability for restraint of trade, even though the plain language of the clause says that it trumps "*any* other provisions of this policy, including *any* exclusionary provision."  Moreover, the insurers' position is difficult to reconcile with the fact that the policy does not contain any exclusions that preclude coverage for restraint of trade.  Thus, if the insurers are correct, the "notwithstanding" clause has no purpose whatsoever.

Returning to the matter at hand:  There is no dispute that the *AMA* case included antitrust claims, JEx257-JEx261, and thus the *AMA* claim is, at a minimum, a "claim[] that directly or indirectly result[s] from or [is] related to, a wrongful act . . . allegedly consisting in whole or in part of anti-trust, price fixing or restraint of trade activities . . . ."  Although the New York Attorney General did not explicitly threaten United with antitrust claims, the insurers do not dispute that the *NYAG* claim is based on the same underlying conduct (the use of the Ingenix databases) that was at issue in the *AMA* case and therefore, like the *AMA* case, "directly or indirectly result[s] from or [is] related to, a wrongful act . . . allegedly consisting in whole or in part of anti-trust, price fixing or restraint of trade activities . . . ."

Rather than disputing that the *AMA* and *NYAG* claims involved "anti-trust, price fixing or restraint of trade activities," the insurers rely on their already-rejected argument that the payments that United made to settle the *AMA* and *NYAG* claims are not "damages."  The insurers also raise a couple of additional arguments:

First, as noted above, the insurers argue that the "notwithstanding" clause in the antitrust endorsement does not override all of the policy's exclusions, but only those (non-existent)

exclusions that specifically relate to restraint of trade.  The insurers further argue that the *AMA*

and *NYAG* claims fall within some of the non-wiped-out exclusions.  At this point, the Court

cannot discern the full scope of the "notwithstanding" clause.  The Court agrees that, if the

clause is applied literally, it will lead to an absurd result, but as yet no party has been able to

suggest a plausible non-literal interpretation.  That said, the Court does not need to demarcate all

of the boundaries of the clause to know that the insurers' argument is untenable.  Whatever else

it might mean, the "notwithstanding" clause clearly and unequivocally overrides *all* of the

policy's exclusions.  Because this meaning is clear — indeed, it could not be clearer — the Court

must enforce the clause as written, and not look to extrinsic evidence of the clause's meaning.

*Pederson v. United Servs. Auto. Ass'n*, 383 N.W.2d 427, 430 (Minn. Ct. App. 1986) (extrinsic

evidence was not admissible to construe unambiguous policy).

Second, the insurers argue that coverage for the *AMA* and *NYAG* claims is barred by the

retroactive-date provision in the antitrust endorsement.  As set forth in the insurers' briefs, the

argument is as follows:  The applicable retroactive date is January 1, 1977 — the date that

United came into existence.  *See* JEx77, JEx83-JEx85.  The antitrust endorsement provides

coverage only for antitrust activities that occur "on or after" that date.  One of the Ingenix

databases was created in 1973, and, in their lawsuit against United, the *AMA* plaintiffs alleged

that this database was flawed from the beginning.  Thus, coverage of claims related to the

Ingenix databases — the type of claims made in both *AMA* and *NYAG* — is barred.  This

argument borders on the frivolous.  The "wrongful act" that was at issue in *AMA* and *NYAG* was

not the *creation* of the Ingenix databases in 1973, but rather United's *use* of the Ingenix

databases after 1977 — i.e., *after* the retroactive date.

At the hearing, however, the insurers presented a different argument.  The insurers pointed out that, according to the antitrust endorsement, "[d]amages arising out of the same or inter related acts, errors or omissions shall be deemed to arise from the first such same or interrelated acts, errors or omissions."  JEx78.  According to the insurers, an antitrust conspiracy involving the use of the Ingenix databases began in 1973.  United then joined that conspiracy after United was created in 1977.  United's use of the Ingenix databases after 1977 is obviously interrelated with the use of the Ingenix databases by United's co-conspirators before 1977.  Thus, all damages arising from United's use of the Ingenix databases are "deemed to arise from the first such same or interrelated act" — i.e., from the first use of the Ingenix databases in 1973.  Because all damages arising from United's use of the Ingenix databases are deemed to have arisen in 1973, and because the antitrust endorsement only provides coverage for acts occurring on or after January 1, 1977, the antitrust endorsement provides no coverage for the *AMA* and *NYAG* claims.  That, at least, is the argument of the insurers.

The insurers' argument is certainly plausible.  True, one would normally expect an interrelated-acts provision to be limited to the acts *of the insured*.  In other words, a typical interrelated-acts provision would not work to combine acts committed by the insured with acts committed by someone else before the insured even came into being.  And thus, like so many provisions of this policy, the interrelated-acts clause of the antitrust endorsement is strange.  Here, however, there may be method to the drafters' madness.  One who joins a conspiracy can be held liable for all of the harm caused by the conspiracy, including harm caused by the

conspiracy in the past.[3]  In theory, then, if United joined an antitrust conspiracy that had been in existence for 50 years, United could be held liable for all of the harm caused by that conspiracy during the preceding half century.  The retroactive-date provision of the antitrust endorsement may reflect the insurers' attempt to avoid buying a pig in a poke.  The insurers may have been willing to assume the risk of covering antitrust damages caused by United after it came into existence in 1977, but not to assume the risk of covering the unknown and largely unknowable antitrust damages that had been caused by others prior to 1977.

While the argument presented by the insurers at the hearing may therefore have some merit, the argument was sprung on both the Court and United with little warning.  The Court cannot rule on the insurers' argument without the benefit of full briefing.  Even at this point, however, the Court is confident that the insurers' argument depends on disputed questions of fact concerning whether United joined an antitrust conspiracy that began before the retroactive date. The insurers are therefore not entitled to summary judgment on this basis.

### 3.  Remaining Arguments

With respect to both the main insuring clause and the antitrust endorsement, the insurers argue that, even if some portion of the *AMA* claim is covered, United will not be able to prove at trial (1) what portion, if any, of the global *AMA/Malchow* settlement was allocated to the *AMA* claim; (2) how the *AMA/Malchow* settlement was allocated between damages paid by United and

---

[3]*See, e.g., Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) ("It is well recognized that a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators."); *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) ("One who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy.").

damages paid by various United subsidiaries (and, relatedly, which of those subsidiaries are "protected persons" within the meaning of the main insuring clause and the antitrust endorsement); or (3) that the defense costs United incurred were incurred in defense of an insured claim and were reasonable and necessary, as required by the policy.  All of these arguments may have merit, but they are either beyond the scope of what the parties were supposed to address in this round of summary-judgment motions or they raise disputes of fact that will have to be resolved by a jury.

The Court therefore denies the insurers' motion for summary judgment, grants United's motion in part, and concludes as follows:

First, the Court holds that the *AMA* and *NYAG* claims are within the main insuring clause of the primary policy.

Second, the Court holds that the *AMA* and the *NYAG* claims are also within the insuring language of the antitrust endorsement to the primary policy.

And third, the Court is unable to determine whether coverage for the *AMA* and *NYAG* claims exists under the antitrust endorsement as a whole, because the Court is unable to determine whether coverage is barred by the retroactive-date provision.  That issue will have to be tried to a jury.

### C.  Interrelation with the Shane Claim

The second set of motions concerns whether certain underlying claims are interrelated with the *Shane* claim within the meaning of § 5.2 of the primary policy.  Columbia Casualty Company ("Columbia") has already exhausted the per-claim limit of its policy on the *Shane* claim.  Columbia accordingly seeks a ruling that various other claims are interrelated with *Shane*

and that Columbia's layer of coverage is therefore exhausted with respect to those claims as well.  FFIC, which provides the next layer of coverage after Columbia, joins Columbia's motion to the extent that it seeks a ruling on interrelatedness.

Before addressing whether any particular claim is interrelated with *Shane*, the Court must first address whether United should be allowed to raise a logically antecedent argument.  United now seeks to argue, for the first time, that whether a particular claim is interrelated with *Shane* for purposes of § 5.2 of the primary policy is irrelevant because (1) Columbia's and FFIC's policies do not *incorporate* § 5.2 of the primary policy and (2) Columbia's and FFIC's policies apply on a per-*incident* and per-*occurrence* basis (respectively), while the primary policy applies on a per-*claim* basis.

To the extent that United seeks to raise these arguments against Columbia, the Court holds that United is precluded from doing so by its failure to raise them earlier.  Nearly three and a half years before oral argument on the parties' current motions, United filed a motion for partial summary judgment against Columbia seeking, among other things, a ruling that the *McRaney/Murphy* claim — one of the claims now at issue in Columbia's current motion — was *not* interrelated with *Shane* within the meaning of § 5.2 of the primary policy.  The parties, a Special Master, and the Court spent a considerable amount of time and effort resolving United's motion — a motion whose very premise was that Columbia's policy *did* incorporate § 5.2 of the primary policy.  (If it did not, then obviously there would have been no reason for United to ask the Court to interpret § 5.2.)  At no time during the exhaustive process of briefing and arguing that motion before the Special Master and then before this Court did United so much as hint that § 5.2 of the primary policy was irrelevant because it was not incorporated in the Columbia

-15-

policy.  At oral argument on the current motions, United admitted that it in no way raised this

argument — in correspondence, in conversation, in discovery, in briefs, or in oral argument —

until it filed its brief opposing Columbia's current motion.  That brief was filed in July 2011, *six*

*years* after United sued Columbia, and well after the close of discovery.  *See* Hr'g Tr. 198, Sept.

8, 2011; Docket No. 915 (United's proof memorandum dated July 29, 2011); Docket Nos. 666,

709, 716, 798 (scheduling orders).

Much the same can be said about United's argument that the per-incident limitation in the

Columbia policy means something different than the per-claim limit in the primary policy.

Indeed, in its January 19, 2010 order regarding United's previous motion, the Court highlighted

this difference in language and noted that neither side contended that the difference had any

practical effect.  Docket No. 460 at 16 n.8.  United said not one word in response.  In fact,

months *after* the Court made this assertion, United filed a supplemental complaint that continued

to treat the policies as substantively identical in this respect.  Docket No. 556 ¶¶ 25, 87.

There is no excuse for United's failure to raise these arguments against Columbia earlier.

United's arguments do not rest on newly discovered facts or evidence, but rather on policy

language that United's lawyers have been dissecting for over a decade.  The Court therefore

finds that, by failing to raise these arguments against Columbia earlier, United has waived them.

*See Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 367 (Minn. 2009) (waiver is the

intentional relinquishment of a known right, the requisite knowledge may be actual or

constructive, and the intent to waive may be inferred from conduct).

In addition to finding that United has waived these arguments against Columbia, the

Court also finds that United should be precluding from raising them under the Court's inherent

authority to control its docket.  As Columbia notes, United's arguments are in essence an attempt

by United to get the Court to reconsider its denial of United's earlier motion without making the

showing of "compelling circumstances" required by D. Minn. L.R. 7.1(h).  In an ordinary case, it

is possible that the Court might nevertheless entertain United's arguments, given that the Court's

earlier orders are interlocutory and therefore subject to reconsideration.  *See First Union Nat'l*

*Bank v. Pictet Overseas Trust Corp.*, 477 F.3d 616, 620 (8th Cir. 2007) (interlocutory orders can

always be reconsidered and modified by a district court prior to entry of final judgment).  But

this is far from an ordinary case.

    As the Court has already explained, this case is in reality not one case, but dozens of

coverage actions consolidated into one proceeding.  Indeed, this case resembles the type of case

normally overseen by the United States Judicial Panel on Multidistrict Litigation.  This case is

already over six years old (it was filed nearly a year before the undersigned became a federal

judge), it has already consumed hundreds of hours of the time of magistrate and district judges, it

has undoubtedly already cost the parties millions of dollars in attorney's fees — and the parties

insist that they have barely scratched the surface of the arguments that they wish to make.  This

is an extraordinarily difficult case to manage.

    Given the formidable challenges presented by this case, the Court cannot allow the

parties to ambush the Court and each other by making up new arguments years into the litigation

and following the close of discovery.  None of the parties to this lawsuit has been shy about

changing its position — that is, about first arguing that the policy clearly means one thing, and

then, years later, arguing that the policy means exactly the opposite.  That type of gamesmanship

must stop if the Court is to have any chance of resolving this litigation.  Under its inherent

authority to control its docket, therefore, the Court precludes United from arguing at this late date that the Columbia policy does not incorporate § 5.2 of the primary policy or that the Columbia policy's per-incident limitation differs in some respect from the primary policy's per-claim limitation.  *Cf. Link v. Wabash R.R.*, 370 U.S. 626, 630-31 (1962) (courts have inherent authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases").[4]

It is not entirely clear, however, whether United should be precluded from arguing that the *FFIC* policy does not incorporate § 5.2 of the primary policy or that the *FFIC* policy's per-occurrence limitation differs in some respect from the primary policy's per-claim limitation.  On the one hand, FFIC was not a party to United's earlier motion on interrelatedness and thus there does not appear to have been an earlier opportunity for United to raise these arguments against FFIC.  On the other hand, although FFIC joined Columbia's current motion, the motion was briefed by Columbia and thus FFIC did not really have an opportunity to explain how it may be prejudiced by United's newfound arguments.  Nor has FFIC had a proper chance to respond on the merits with arguments specific to the FFIC policy.  The Court will therefore decline to rule at this time on whether United may raise these arguments against FFIC and, if so, on whether those arguments are meritorious.

---

[4]It should go without saying that the Court is unmoved by United's lament at the hearing that it did not have a chance to respond to Columbia's assertion that United should be precluded from switching its position at this late date.  United could not possibly have failed to anticipate that both the Court and Columbia would take a dim view of United's attempt to argue for the first time after the close of discovery that policy provisions over which United and Columbia have been litigating for years are irrelevant.

Turning now to the application of § 5.2 to this case:  Columbia and FFIC ask the Court to rule, as a matter of law, that the *AMA*, *NYAG*, *McRaney/Murphy*, and *Florida Physicians* claims are interrelated with *Shane*.  Whether the *AMA* and *NYAG* claims are interrelated with *Shane* involves issues of fact that must be resolved by a jury.  The record conclusively demonstrates, however, that the *McRaney/Murphy* and *Florida Physicians* claims are interrelated with *Shane*.

Section 5.2 of the primary policy states, in relevant part:

> Any **damages** or **claim expenses** incurred because of: . . .
>
> — a **Wrongful Act**; or
>
> — a series of **Wrongful Acts** that have as a common nexus, any true facts, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes shall constitute a single **claim**.  The claim will be subject to the Limit of Liability effect [sic] at the time of the first reported **Wrongful Act**.

JEx68-69.  In its earlier order, the Court concluded that, but for the odd use of the word "true" in § 5.2, it would not hesitate to find that the overlapping allegations in *McRaney/Murphy* and *Shane* rendered the claims interrelated.  The only question with respect to the interrelatedness of *McRaney/Murphy* with *Shane*, therefore, is whether any of the common facts linking those two claims are "true."

As the Court noted in its earlier order, § 5.2 is exceptionally broad — so broad that, once again, the drafters could not have meant what they said.  If § 5.2 is read literally, then just about every claim ever brought against United would be considered interrelated with just about every other claim ever brought against United because, as the Court explained in its earlier order, "all claims for which United seeks indemnity from an insurer involve at least one common 'true' fact or circumstance — such as the 'true fact' that United was named as a defendant in the

underlying action or the 'true fact' that, in the underlying action, United was alleged to be a Minnesota corporation or to have entered into a contract to make payments to healthcare providers."  Docket No. 460 at 24-25.  The Court nevertheless held in its earlier order that § 5.2 is not ambiguous as applied to the question of the interrelation between *Shane* and *McRaney/Murphy* because those claims "share numerous important allegations that, if true, would render the actions interrelated under any possible construction [of § 5.2]."  Docket No. 460 at 25.  On the basis of this statement, the parties have agreed that the "true facts" necessary to render claims interrelated must be "important."  Hr'g Tr. 244, Sept. 8, 2011; Hr'g Tr. 266, 269, Sept. 9, 2011.

Among the common (and unquestionably important) circumstances linking *Shane* and *McRaney/Murphy* are the plaintiffs' allegations in each case that United "downcoded" claims — that is, that United reduced provider payments by substituting lower, less-expensive billing codes for the higher codes that were submitted by the provider.  Likewise, one of the central allegations in the *Florida Physicians* case was that United used a software program to automatically downcode office-visit claims.  JEx2301-JEx2303; *see also Fla. Physicians Union, Inc v. United Healthcare of Fla., Inc.*, 837 So. 2d 1133, 1134 (Fla. Dist. Ct. App. 2003) (describing allegations).  The allegation that United substituted lower billing codes for the higher codes submitted by providers is thus an important fact or circumstance that, if true, provides a "common nexus" between *Shane*, on the one hand, and *McRaney/Murphy* and *Florida Physicians*, on the other.[5]

---

[5]To the extent relevant, the Court notes that the *Florida Physicians* case was filed in 1999, indicating a temporal overlap (or at least a temporal proximity) between the downcoding

(continued...)

Columbia and FFIC have submitted testimony from United representatives admitting that United did, in fact, change billing codes from higher, more-expensive codes to lower, less-expensive codes.  JDep310-JDep312, JDep265.  Faced with this testimony from its own representatives, United does not dispute that it changed billing codes.  But United argues that, to constitute "downcoding," the changes must have been *wrongful*.  United denies that the changes were wrongful.  Thus, says United, there is a factual dispute over whether it "downcoded" claims.

On one level, United's argument seems to be about semantics.  Whether the term "downcoding" means any changing of billing codes or just wrongful changing of billing codes is beside the point.[6]  What matters is that United admits that it *did* change billing codes — and this

---

[5](...continued)
alleged in that case and the downcoding alleged in *Shane* and *McRaney/Murphy*.  *See* Docket No. 460 at 18.

[6]It is worth noting that, when asked to define the term "downcoding," a United representative offered a non-pejorative definition and described United's practice of changing billing codes as "downcoding."  JDep310-JDep312.

"true fact"[7] provides a common nexus between *Shane*, *McRaney/Murphy*, and *Florida Physicians*.

On another level, United seems to be arguing that, for claims to be interrelated for purposes of § 5.2, the conduct connecting the claims must be proven to be wrongful. The Court disagrees. Section 5.2 does not require proof that United committed an act that was wrongful. Rather, § 5.2 defines claims as interrelated if the "wrongful acts" — which term, crucially, is defined to include not only acts that *are* wrongful, but also acts that are merely *alleged* to be wrongful, *see* JEx68 — "have as a common nexus, any true facts . . . ." In *Shane*, *McRaney/Murphy*, and *Florida Physicians*, the plaintiffs alleged two different things: (1) that United changed billing codes and (2) that United acted wrongfully in changing billing codes. Because it is *true* that United changed billing codes, and because United's changing of billing codes was *alleged* to be wrongful, the wrongful acts alleged in *Shane*, *McRaney/Murphy*, and *Florida Physicians* have a "true fact[]" that serves as a "common nexus." The Court therefore

---

[7]Reflecting the lack of care with which the policy was drafted, the parties used both the plural "facts" and the singular "circumstance, situation, event, transaction, [or] cause" in the same clause of § 5.2. A close examination of the clause suggests that adding the "s" at the end of "fact" was probably a typographical error. At oral argument, though, United suggested that there might be some significance to the use of the plural "facts" — although United could not plausibly explain what that significance might be — and United appeared to take issue with the Court's use of the phrase "true fact" in lieu of the phrase "true facts."

Why United is making an issue of this is difficult to understand. Even if § 5.2 requires more than one "true fact," it requires only one "true . . . circumstance, situation, event, transaction, [or] cause," and virtually every "fact" can also be described as a "circumstance, situation, event, transaction, [or] cause." In any event, the Court clarifies that it is using the terms "true fact[]" and "true facts" as shorthand for the entire phrase "true facts, circumstance, situation, event, transaction, [or] cause."

holds that *McRaney/Murphy* and *Florida Physicians* are interrelated with *Shane* within the meaning of § 5.2.

United next argues that, even if Columbia and FFIC can prove that *McRaney/Murphy* and *Florida Physicians* are interrelated with *Shane*, Columbia and FFIC cannot prove which "damages or claim expenses" were incurred "because of" the interrelated wrongful acts. United's argument is based on the language of § 5.2, which states that "damages or claim expenses" that are incurred "because of . . . a series of wrongful acts" having a common nexus "shall constitute a single claim."   In other words, § 5.2 does not, on its face, aggregate *claims*; instead, it aggregates *damages* incurred "because of" the interrelated wrongful acts.

United correctly describes the wording of the policy.  But here it is not only impossible to know what the policy's drafters intended, it is also impossible to know what the words that they used mean.  "Damages" can no more "constitute" a "claim" than, say, a dog can "constitute" a cat.  The policy variously defines "claim" as "a written demand which seeks Damages," a "written report of a bodily injury, incident, or Wrongful Act," or a "suit."  JEx64.  It makes no sense to say that "damages" and "claim expenses" incurred "because of" a series of interrelated wrongful acts become a "claim" — that, for example, such "damages" become "a written demand which *seeks* damages."  This aspect of § 5.2 is gibberish, and thus the jury will have to decide what, if anything, the parties actually agreed to.

### D.  United's Affirmative Defenses of Waiver and Estoppel

The final set of motions relate to United's defenses to FFIC's counterclaim.  In its counterclaim against United, FFIC seeks a declaration that FFIC does not owe a duty to defend, reimburse defense costs, or indemnify United in connection with the *Shane* claim or in

connection with what the parties call the *Shane* "tag-along" claims.  FFIC also seeks reimbursement of amounts that it has paid for *Shane* and the tag-along claims to date.  Docket No. 573 at 16-29.  (For simplicity's sake, further references in this section to *Shane* are intended to include the tag-along claims.)

FFIC's counterclaim is based on several alternative grounds.  First, FFIC contends that it is entitled to reimbursement of all defense costs because *Shane* is not a covered claim.  Second, FFIC contends that, even if *Shane* is a covered claim, FFIC is entitled to reimbursement of some defense costs because those costs were not reasonable or necessary.  Finally, FFIC contends that it is entitled to reimbursement of all defense costs regardless of whether *Shane* is a covered claim because the liability limits of the underlying insurance policies were not fully exhausted.

In its answer to FFIC's counterclaim, United raises the affirmative defenses of waiver and estoppel.  Docket No. 602 at 10.  United does not dispute that FFIC can seek reimbursement of defense costs on the ground that *Shane* is not a covered claim.  But United contends that FFIC's conduct over the five-years-and-counting course of the *Shane* litigation should, under the doctrines of waiver and estoppel, preclude FFIC from contesting the reasonableness and necessity of United's legal bills or the exhaustion of the underlying coverage.  In particular, United points to FFIC's ongoing review, audit, and payment of United's legal bills; FFIC's concurrent failure to object to the billing formats, hourly rates, and staffing levels that it now contends made those bills unreasonable; and FFIC's affirmative representation (before it started paying United's bills) that it would not begin paying United's bills until it received proper proof of exhaustion.  Both FFIC and United seek summary judgment on United's affirmative defenses.

FFIC first argues that, as a matter of law, the doctrines of waiver and estoppel may not be used to expand the scope of insurance coverage. *See Shannon v. Great Am. Ins. Co.*, 276 N.W.2d 77, 78 (Minn. 1979). This general rule, however, does not mean that waiver and estoppel never apply in a coverage action. Although waiver and estoppel cannot operate to change the written terms of an insurance policy — that is, to change an insurance policy that does not cover *x* into an insurance policy that does cover *x* — these doctrines may operate to preclude the insurer from denying the factual bases for coverage. *Compare Shannon*, 276 N.W.2d at 78 (insurer's offer to settle for more than the amount of the policy did not estop the insurer from relying on policy limits), *Cont'l Ins. Co. v. Bergquist*, 400 N.W.2d 199, 201 (Minn. Ct. App. 1987) (waiver could not create coverage where damage occurred before the effective date of the policy), *and Pederson v. United Servs. Auto. Ass'n*, 383 N.W.2d 427, 430-31 (Minn. Ct. App. 1986) (insurer's erroneous payment of underinsured-motorist benefits did not preclude insurer from denying further payments on the ground that insured did not have such coverage), *with Reinsurance Ass'n of Minn. v. Timmer*, 641 N.W.2d 302, 310-11 (Minn. Ct. App. 2002) (insurer's knowledge of insureds' cattle-selling activities estopped insurer from denying that those activities were covered as "farm operations"). *See also Alwes v. Hartford Life & Accident Ins. Co.*, 372 N.W.2d 376, 379 (Minn. Ct. App. 1985) (general rule that estoppel cannot create coverage "does not mean that estoppel cannot be applied in insurance cases where misrepresentation or material omission occurs"), *holding limited on other grounds by In re Westling Mfg., Inc.*, 442 N.W.2d 328 (Minn. Ct. App. 1989).

The facts of this case are more akin to those of *Timmer* than those of *Shannon*, *Bergquist*, or *Pederson*. United is not trying to alter the terms of the policy or otherwise obtain coverage

for which it has not paid.  United acknowledges that, under the policy, FFIC is obligated to pay only for defense costs that are reasonable.  United is merely arguing that FFIC is precluded, by its own statements and conduct, from denying that United's defense costs *were* reasonable.  Similarly, United acknowledges that, under FFIC's policy, FFIC has no obligation to United until the underlying layers of coverage are exhausted.  United is merely arguing that FFIC is now precluded from denying that the underlying layers of coverage *were* exhausted.  The Court therefore does not agree that United's defenses of waiver and estoppel fail as a matter of law.

FFIC next argues that United cannot establish the required elements of either waiver or estoppel because FFIC sent United a reservation-of-rights letter in June 2005.  Having reviewed the record, however, the Court believes that a reasonable jury could find that, notwithstanding the letter, FFIC's actions over the next five years amounted either to a misrepresentation or concealment of material fact (for estoppel purposes) or to the intentional relinquishment of a known right (for waiver purposes).  *See Brekke v. THM Biomedical, Inc.*, 683 N.W.2d 771, 777 (Minn. 2004) (elements of estoppel); *Frandsen v. Ford Motor Co.*, 801 N.W.2d 177, 182 (Minn. 2011) (elements of waiver).  In light of FFIC's reservation-of-rights letter, however, the Court also cannot find waiver or estoppel as a matter of law.  In short, genuine issues of fact preclude summary judgment for either side, and the issues of waiver and estoppel will have to be tried to a jury.  *See Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 367 (Minn. 2009) (waiver is generally a question of fact); *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1057 (8th Cir. 2006) (under Minnesota law, equitable estoppel is ordinarily a jury question).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    United's motion for summary judgment on the insuring agreements in the Lexington policy [Docket No. 879] is GRANTED IN PART as more fully described in the text of this opinion.

2.    Defendants' cross-motion for summary judgment on the insuring agreements in the Lexington policy [Docket No. 906] is DENIED.

3.    Columbia and FFIC's motion for summary judgment on interrelatedness [Docket No. 865] is GRANTED IN PART AND DENIED IN PART.

    a.    The motion is GRANTED with respect to Columbia and FFIC's argument that the *McRaney/Murphy* and *Florida Physicians* claims are interrelated with the *Shane* claim within the meaning of § 5.2 of the Lexington policy.

    b.    The motion is DENIED in all other respects.

4.    FFIC's motion for summary judgment as to United's second and third affirmative defenses of waiver and estoppel [Docket No. 872] is DENIED.

5.    United's motion for partial summary judgment against FFIC [Docket No. 883] is DENIED.


Dated: December 27, 2011                      s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge

-27-