UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITEDHEALTH GROUP INCORPORATED, a Minnesota corporation,<br><br>Plaintiff,<br><br>v.<br><br>COLUMBIA CASUALTY COMPANY, an Illinois corporation; FIREMAN'S FUND INSURANCE COMPANY; AMERICAN ALTERNATIVE INSURANCE CORPORATION; EXECUTIVE RISK SPECIALTY INSURANCE COMPANY; FIRST SPECIALTY INSURANCE CORPORATION; STARR EXCESS LIABILITY INSURANCE INTERNATIONAL LIMITED; LIBERTY MUTUAL INSURANCE COMPANY; STEADFAST INSURANCE COMPANY; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA;<br><br>Defendants. | Case No. 05-CV-1289 (PJS/SER)<br><br><br>ORDER |

David B. Goodwin and Michael S. Greenberg, COVINGTON & BURLING, LLP; Jeffrey J. Bouslog and Christine N. Lindblad, OPPENHEIMER WOLFF & DONNELLY LLP, for plaintiff.

Ronald P. Schiller, Daniel J. Layden, Robert L. Ebby, and Jacqueline R. Dungee, HANGLEY ARONCHICK SEGAL & PUDLIN, for defendants Executive Risk Specialty Insurance Company and First Specialty Insurance Corporation.

David P. Pearson, Thomas H. Boyd, and Sofia A. Estrellado, WINTHROP & WEINSTINE, PA, for defendants Starr Excess Liability Insurance International Limited and National Union Fire Insurance Company of Pittsburgh, PA.

Plaintiff UnitedHealth Group Inc. ("United") brought this coverage action against ten

insurance companies — United's primary insurer (Lexington Insurance Company or

"Lexington") and nine of United's excess insurers — asking this Court to determine, with respect to each of several dozen claims that were brought against United during the period December 1, 1998, through December 1, 2000, which of the ten insurers must indemnify United or pay United's defense costs. With the assistance of a mediator, the parties and the Court have been breaking this unwieldy litigation into manageable pieces. The Court has ruled on numerous dispositive motions, and certain issues were tried to a jury in May 2012. At this point, Lexington's policy limits have been exhausted, and United has settled with five of its excess insurers. That leaves four insurers as defendants: Executive Risk Specialty Insurance Company ("Executive Risk"); First Specialty Insurance Corporation ("First Specialty"); Starr Excess Liability Insurance International Limited ("Starr"); and National Union Fire Insurance Company of Pittsburgh, PA ("National Union").

This matter is before the Court on several summary-judgment motions:

*First*, Executive Risk and First Specialty move for summary judgment on a number of issues, including (a) whether United's failure to allocate the $350 million *AMA/Malchow* settlement between covered and uncovered claims precludes United from seeking coverage for any part of that settlement; (b) whether Items 1 to 9 in the definition of "Ultimate Net Loss" in the Executive Risk policy are conditions of coverage on which United bears the burden of proof or exclusions from coverage on which Executive Risk bears the burden of proof; and (c) whether the First Specialty policy incorporates the definition of Ultimate Net Loss in the Executive Risk policy.[1]

---

[1] National Union and Starr join the "allocation" portion of this motion.

*Second*, National Union moves for summary judgment as to the *AMA* claim on the ground that United failed to provide timely notice of that claim.

*Finally*, United (on the one hand) and Executive Risk and First Specialty (on the other hand) cross-move for summary judgment on the issue of whether and to what extent the Antitrust Endorsement in the Lexington primary policy is incorporated into the Executive Risk and First Specialty excess policies.

The Court addresses each motion in turn and assumes familiarity with the underlying facts and procedural posture of this case.

## I. EXECUTIVE RISK AND FIRST SPECIALTY'S MOTION [ECF NO. 1331]

Executive Risk and First Specialty move for summary judgment on the following issues:

First, Executive Risk and First Specialty seek summary judgment that they owe nothing with respect to the *AMA* claim because United did not allocate the $350 million *AMA/Malchow* settlement between covered and uncovered claims — either at the time that the settlement was reached or at any time thereafter. The parties also ask the Court to resolve disputes over certain burden-of-proof issues related to allocation, and the insurers ask the Court to exclude the testimony of United's expert on allocation.

Second, Executive Risk and First Specialty seek summary judgment that Items 1 to 9 in the definition of Ultimate Net Loss in Executive Risk's policy are conditions of coverage on which United bears the burden of proof, and not exclusions from coverage on which Executive Risk bears the burden of proof.

Finally, First Specialty seeks summary judgment that its policy incorporates the definition of Ultimate Net Loss in the Executive Risk policy — i.e., that a loss that is not covered under the

Executive Risk policy because it falls outside of that policy's definition of Ultimate Net Loss is also not covered under the First Specialty policy.

The Court addresses these issues in reverse order.

### A. Ultimate Net Loss

With respect to questions concerning Ultimate Net Loss:  For the reasons stated on the record at the February 20, 2013 hearing, the Court finds both (1) that the First Specialty policy is, at best, ambiguous about whether it incorporates the Executive Risk policy's definition of Ultimate Net Loss,[2] and (2) that Items 1 to 9 in the definition of Ultimate Net Loss are exclusions from coverage on which Executive Risk bears the burden of proof rather than conditions of coverage on which United bears the burden of proof.  *Cf. Auto-Owners Ins. Co. v. Jensen*, 667 F.2d 714, 720 (8th Cir. 1981) (applying Minnesota law and finding that the phrase "neither expected nor intended from the standpoint of the insured" was an exclusion even though it was embedded in the same sentence granting coverage).  The Court therefore denies Executive Risk and First Specialty's motion with respect to issues concerning Ultimate Net Loss.

### B. Allocation

#### 1. United's Failure to Contemporaneously Allocate

With respect to questions concerning allocation:  As discussed at the February 2013 hearing, the Court is not aware of — and the insurers have not cited — any Minnesota case holding that an insured must, at the time of settlement, allocate the settlement between covered

---

[2]In fact, the Court believes that it is likely that the First Specialty policy does *not* incorporate Executive Risk's definition of Ultimate Net Loss.

and uncovered claims or risk losing insurance coverage for any covered claim.[3]  The closest the

insurers come is *Bor-Son Building Corp. v. Employers Commercial Union Insurance Co. of

America*, 323 N.W.2d 58 (Minn. 1982).  In *Bor-Son*, however, the Minnesota Supreme Court

faulted the insured *both* for failing to contemporaneously allocate *and* for later failing to offer

proof that it had paid money to settle a covered claim.  *Id.* at 64.  *Bor-Son* thus implies that a

contemporaneous allocation is not the only method by which an insured can establish that it

incurred a covered loss.

   Other Minnesota cases quite clearly allow an insured to seek indemnity for covered

claims despite the settling parties' failure to allocate between covered and uncovered claims at

the time of settlement.[4]  Indeed, even when the parties have allocated — in writing — at the time

---

[3]The rule is different in cases involving *Miller-Shugart* agreements.  *See Miller v.
Shugart*, 316 N.W.2d 729 (Minn. 1982); *see also Corn Plus Co-op. v. Cont'l Cas. Co.*, 516 F.3d
674, 680-81 (8th Cir. 2008).  But the *AMA/Malchow* settlement is not a *Miller-Shugart*
agreement, and Minnesota courts have rejected the notion that all of the protections extended to
insurers in *Miller-Shugart* cases apply outside of that context.  *See Zurich Reins. (UK) Ltd. v.
Can. Pac. Ltd.*, 613 N.W.2d 760, 763-64 (Minn. Ct. App. 2000).

   The Court notes that it has located one Minnesota case arguably outside of the *Miller-
Shugart* context in which the failure to allocate precluded the insured from recovering under its
policy.  *See Ebenezer Soc. v. Dryvit Sys., Inc.*, 453 N.W.2d 545, 548-49 (Minn. Ct. App. 1990).
In *Ebenezer*, the insured purported to enter into a *Miller-Shugart* agreement, but the court
expressly declined to decide whether the agreement was, in fact, a *Miller-Shugart* agreement.  *Id.*
at 547 n.1.  The court nevertheless held that the insured's failure to allocate the settlement
between covered and uncovered items of damage precluded recovery against the insurers.  *Id.*
at 548-49.  Later cases applying *Ebenezer*, however, have treated it as a *Miller-Shugart* case.
*See, e.g., Corn Plus Co-op.*, 516 F.3d at 681 (citing *Ebenezer* for the proposition that "the failure
to allocate the settlement amount by damage item precludes enforcement of a Miller-Shugart
agreement consisting of covered and noncovered claims"); *Sphere Drake Ins. Co. v. Tremco,
Inc.*, 513 N.W.2d 473, 478 (Minn. Ct. App. 1994) (characterizing *Ebenezer* as a *Miller-Shugart*
case).

   [4]*See Convent of the Visitation Sch. v. Cont'l Cas. Co.*, 707 F. Supp. 412, 416 (D. Minn.
(continued...)

of settlement, Minnesota courts have allowed the insured to later argue for an allocation that differs from the settling parties' contemporaneous allocation. *See Gulf Ins. Co. v. Skyline Displays, Inc.*, 361 F. Supp. 2d 986, 991-92 (D. Minn. 2005) (denying summary judgment in light of evidence that the settling parties' written allocation was solely for tax purposes and did not represent the true allocation of the settlement proceeds).

Even the non-Minnesota authority on which the insurers mainly rely — *Clackamas County v. Midwest Employers Casualty Co.*, No. 07-780, 2010 WL 5391577 (D. Or. Dec. 22, 2010), *aff'd*, 473 Fed. Appx. 782 (9th Cir. 2012) — does not provide much support for their position. True, the district-court opinion in *Clackamas County* contains broad language that could be read to require contemporaneous allocation, but the Ninth Circuit expressly rejected such a reading of the district court's opinion:

> The County frames the issue on appeal as whether the Magistrate Judge erred in requiring contemporaneous allocation of the settlement proceeds. However, that was not the basis of the Magistrate Judge's ruling. Instead, the Magistrate Judge found that no probative evidence of damages was presented . . . .

---

⁴(...continued)
1989) ("Under Minnesota law, the court may interpret a settlement agreement and determine the allocation of payments between claims which are insured and claims which are uninsured."); *see also Jostens, Inc. v. CNA Ins./Cont'l Cas. Co.*, 403 N.W.2d 625, 630-31 (Minn. 1987) (allocating between covered damages for injuries that occurred during the policy period and uncovered damages for injuries that occurred outside the period), *overruled on other grounds by N. States Power Co. v. Fid. & Cas. Co. of N.Y.*, 523 N.W.2d 657 (Minn. 1994); *Gopher Oil Co. v. Am. Hardware Mut. Ins. Co.*, 588 N.W.2d 756, 769-70 (Minn. Ct. App. 1999) (affirming allocation between insured and uninsured parties); *St. Paul Fire & Marine Ins. Co. v. Nat'l Chiropractic Mut. Ins. Co.*, 496 N.W.2d 411, 415-16 (Minn. Ct. App. 1993) (affirming allocation of damages between insurers who insured separate time periods); *Home Ins. Co. v. Marvin Lumber & Cedar Co.*, No. 00-2640, 2002 WL 1285099, at *4-5 (D. Minn. June 5, 2002) (denying summary judgment because of the possibility that some covered claims were settled and that allocation might be necessary).

*Clackamas Cnty.*, 473 Fed. Appx. at 783.

Likewise, the other cases on which the insurers rely do not hold that contemporaneous allocation is required on pain of forfeiture. *See, e.g.*, *Cont'l Cas. Co. v. Sycamore Springs Homeowners Ass'n, Inc.*, 652 F.3d 804, 805-06 (7th Cir. 2011) ("But neither the parties to the settlement nor the state judge tried to apportion the recovery. The Association might have asked the federal district judge to do this but it did not. Its request that we remand for this purpose comes too late."); *Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co.*, 766 F. Supp. 324, 334-35 (E.D. Pa. 1991) (holding that the insured failed to offer evidence from which the court could determine allocation between covered and uncovered claims), *aff'd in part and rev'd in part on other grounds*, 961 F.2d 209, Nos. 91-1480, 91-1527, 1992 U.S. App. LEXIS 38473 (3d Cir. Mar. 19, 1992) (unpublished table disposition).

In sum, United's failure to allocate at the time of settlement does not bar United from recovering from the insurers. United may allocate now — in this litigation — through expert testimony and other evidence, as it proposes to do.

### 2. Burdens of Proof

The parties next dispute who bears the burden of proof as to allocation. It is important to identify exactly what the parties do and do not dispute, and that takes a bit of explaining.

As to United: The parties agree that, because United is the insured, it bears the initial burden of proving that a claim is within a policy's grant of coverage. *Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 617 (Minn. 2012). The parties also agree that the *AMA/Malchow* settlement encompassed at least some claims that are not within any grant of coverage. *See* ECF No. 1377 at 185-86. Specifically, the *AMA/Malchow* settlement included

claims — most significantly, the *Malchow* claim — for which United has not sought coverage in its pleadings and that United has not contended are within any grant of coverage.[5] *See* ECF No. 556 ¶ 3 ("Defendants are obligated to indemnify UHG for the *portion* of the $350 million settlement attributable to resolving the AMA Claim, as well as defense fees and costs incurred in defending the AMA Claim." (emphasis added)). Finally, the parties agree that United has the burden to prove not only what claims are within a grant of coverage, but also what portion of the *AMA/Malchow* settlement should be allocated to those claims. *See Bor-Son Bldg. Corp.*, 323 N.W.2d at 64; ECF No. 1377 at 215, 245.

As to the insurers: The parties agree that the insurers bear the burden to prove that a claim falls within a policy exclusion. *Remodeling Dimensions*, 819 N.W.2d at 617. Suppose, then, that the *AMA/Malchow* settlement encompassed ten claims — Claim Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 — and United succeeded in proving that Claim Nos. 1, 2, 4, 5, 6, 8, 9, and 10 were within a grant of coverage. The parties agree that each insurer would have the burden of proving — with respect to each of the eight claims that were within a grant of coverage — that the claim fell within a policy exclusion.

---

[5]Confusingly, although United admits that *Malchow* is *not* a covered claim, it seems to suggest in its briefing that allocation is unnecessary because the Antitrust Endorsement to the Lexington policy is broad enough to cover the entire settlement — including, apparently, the *Malchow* claim. *See* ECF No. 1359 at 12-13 (for this and any ECF document in which the ECF pagination at the top of the page differs from the document's pagination at the bottom, the Court cites to the document's pagination). These appear to be contradictory assertions, but in any event United misunderstands the effect of the Antitrust Endorsement. As discussed below, the Court rejects United's contention that the Antitrust Endorsement "trumps" any conditions of coverage or exclusions in the Executive Risk and First Specialty policies. To the extent United now argues — contrary to the allegations in its pleadings — that allocation is unnecessary because the broad grant of coverage in the Antitrust Endorsement encompasses the entire *AMA/Malchow* settlement, United's argument is both untimely and meritless.

Suppose that the insurers succeed in proving that Claim Nos. 2, 5, 8, and 9 fell within a policy exclusion. At that point, we would know that: (1) the *AMA/Malchow* settlement encompassed ten claims; (2) four of those claims — Claim Nos. 1, 4, 6, and 10 — were covered; (3) two of those claims — Claim Nos. 3 and 7 — were not covered because they were not within a grant of coverage; and (4) four of those claims — Claim Nos. 2, 5, 8, and 9 — were not covered because, although within a grant of coverage, they fell within a policy exclusion.

Here is what the parties dispute: The insurers argue that United bears the burden of proving how the $350 million *AMA/Malchow* settlement should be allocated between the covered claims (Claim Nos. 1, 4, 6, and 10) and *all* of the uncovered claims (Claim Nos. 2, 3, 5, 7, 8, and 9). United disagrees. It concedes that United has the burden of proving how the *AMA/Malchow* settlement should be allocated between claims that are within a grant of coverage (Claim Nos. 1, 2, 4, 5, 6, 8, 9, and 10) and claims that are not within a grant of coverage (Claim Nos. 3 and 7). But, United argues, the insurers have the burden of proving how the *AMA/Malchow* settlement should be allocated between, on the one hand, claims that are within a grant of coverage and not within an exclusion (Claim Nos. 1, 4, 6, and 10) and, on the other hand, claims that are within a grant of coverage and within an exclusion (Claim Nos. 2, 5, 8, and 9).

In support of their position, the insurers point out that the question of whether an exclusion applies to one or more claims is separate and distinct from the question of how a settlement should be allocated between covered and excluded claims. The fact that the insurers bear the burden on the former question does not mean that they must bear the burden on the latter question. The insurers argue that, if they prove that the *AMA/Malchow* settlement encompassed one or more claims that fell within a policy exclusion, United should then bear the burden of

proving how the settlement should be allocated between covered and excluded claims. *See Exec. Risk Indem., Inc. v. CIGNA Corp.*, Nov. Term, 2004 No. 01495, slip op. at 20-25 (Phila. Cty. C.C.P. Mar. 23, 2012) (holding that insured bore the burden to prove allocation between covered and excluded claims).[6]

The Court finds the insurers' argument persuasive. To begin with, an insured (like any plaintiff) bears the burden of proving its damages. *Cf. Bor-Son Bldg. Corp.*, 323 N.W.2d at 64 (insured's failure to establish the amount that it paid to settle a covered claim precluded recovery); *N. States Power Co. v. Fid. & Cas. Co. of N.Y.*, 523 N.W.2d 657, 664 (Minn. 1994) (when allocating damages between insurers for environmental liability, insured bears the burden of proving the total amount of damages for which coverage may exist); *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 738 (Minn. 1997) ("It is axiomatic that in order to establish its right to defense costs, an insured must first meet its burden of establishing that the costs sought were in fact reasonable and necessary to its defense of the action."). Requiring United to allocate between covered and excluded claims can be understood as a specific application of this general principle. In requiring United to allocate, the Court is simply requiring United to prove how it was harmed by the insurers' breach of their policies.

Setting that aside, there are compelling reasons to impose the allocation burden on United in this case. United controlled the underlying litigation, and it negotiated the *AMA/Malchow* settlement. The insurers did not play a meaningful role in those settlement negotiations. For that

---

[6]A copy of the *CIGNA* opinion is attached as Appendix A to the insurers' opening brief [ECF No. 1335].

reason, United is not only in a better position to know how the settling parties valued the claims,[7] but United was able to shape the record on that issue — and to do so at a time when United knew that allocation would almost certainly become a crucial issue in coverage litigation. *See* Schiller Decl., Jan. 9, 2013 [ECF No. 1338] Ex. 12 (letter from insurer explicitly requesting that United allocate the settlement). Despite all of this, United chose not to allocate the settlement. Under these circumstances, it hardly seems fair to force the insurers to bear the burden of proof on allocation.

In addition, United concedes that it bears the burden of allocating between claims that fall within a grant of coverage and claims that do not. Imposing that burden on United, while imposing on the insurers the burden of allocating between claims that fall within an exclusion and claims that do not, would require the Court (or a jury) to perform an almost impossibly complex task.

Finally, although this is not a *Miller-Shugart* case, it is instructive that, in the *Miller-Shugart* context, Minnesota courts not only impose the burden of allocation on the insured, but they require that the allocation be contemporaneous, as well as non-collusive and reasonable.[8]

_____

[7]As the Court explained at oral argument, the Court understands allocation to involve an objective question (how would a reasonable person allocate the settlement between covered and uncovered claims?) not a subjective question (how did each of the parties subjectively allocate the settlement between covered and uncovered claims?). Nevertheless, information about how the parties subjectively valued the claims is relevant to the objective inquiry.

[8]*See Corn Plus Co-op.*, 516 F.3d at 681 ("Absent such allocation, a judicial determination into the reasonableness of the Miller-Shugart settlement is impractical since the parties are naturally in a better position to calculate the damages."); *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 331 (Minn. 1993) ("Without knowing what each defendant has agreed to pay as its share, there is no way of judging the reasonableness or prudence of the agreement from the standpoint of each defendant."); *cf. Auto-Owners Ins. Co. v. Todd*, 547

(continued...)

This demonstrates that, when circumstances warrant, Minnesota courts will impose a burden on an insured with respect to allocation that is even heavier than the burden that the insurers seek to impose on United here. The Court agrees with the insurers that, under the circumstances of this case, United should bear the burden of proof on allocation.

United has not offered any reason to impose the burden of allocation on the insurers beyond the general rule that insurers bear the burden of proving that a policy exclusion applies. The Court agrees with the insurers, however, that coverage questions — such as whether a claim falls within a policy exclusion — are distinct from allocation questions. Thus, the fact that the insurers bear the burden to prove that a claim is within a policy exclusion does not dictate that the insurers must also bear the burden to prove how much of the settlement should be allocated to that claim.

United also contends that, whatever logical force the insurers' arguments may have, Minnesota law precludes placing the burden on the insured to allocate a settlement between covered and excluded claims. United cites *SCSC Corp. v. Allied Mutual Insurance Co.*, 515 N.W.2d 588 (Minn. Ct. App. 1994), *aff'd in part, rev'd in part*, 536 N.W.2d 305 (Minn. 1995), *overruled by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009), as a "prominent example" of this rule. ECF No. 1359 at 34. But United reads far too much into *SCSC Corp.*

In *SCSC Corp.*, an insured that had been ordered to clean up soil and groundwater contamination sought coverage from its insurers. The insured's site had been contaminated many times over many years, and thus the insurers argued that the loss suffered by the insured would

_____

[8](...continued)
N.W.2d 696, 699-700 (Minn. 1996) (rejecting settling parties' attempt to allocate a portion of settlement to the only covered claim where damages arose from uncovered claims).

have to be allocated between insured and uninsured time periods. *SCSC Corp.*, 515 N.W.2d at 597. The Court of Appeals held that the insurers bore the burden of proving that the damage to the insured's site was capable of being allocated in this manner. *Id.*

The holding in *SCSC Corp.* has little relevance to this case. To begin with, *SCSC Corp.* was addressing one of the "special problems associated with environmental liability insurance cases, where damages are continuous and where for all practical purposes the bodily injury or property damage suffered during different policy periods is indivisible." *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 418 (Minn. 2003) (citation and quotations omitted). The special problem of divisibility of damages in environmental-cleanup cases — a problem that is inherent in the continuous nature of most environmental contamination — has little to do with this case, which (despite its immense scale and complexity) is at bottom a traditional coverage action regarding insurers' obligations with respect to an insured's settlement of covered and uncovered claims.

Setting that aside, *SCSC Corp.* also has little relevance here because it has nothing to do with the rule on which United relies — namely, the rule that an insurer has the burden of proving that a policy exclusion applies. *SCSC Corp.* was not addressing a policy exclusion;[9] rather, it was addressing whether and how to allocate damages between insured and uninsured time periods. To resolve that issue, *SCSC Corp.* relied on a different principle that applies as a general matter in all civil litigation — namely, the principle that a party who must plead a fact, or who would benefit from establishing a fact, should bear the burden of proving that fact. *SCSC*

---

[9]Other portions of *SCSC Corp.* address policy exclusions (and apply the usual rule that an insurer bears the burden of proving the applicability of an exclusion), but those portions do not concern the issue of allocation and United did not cite them.

*Corp.*, 515 N.W.2d at 597.  Notably, this principle may be altered as justice requires.  *See Holman v. All Nations Ins. Co.*, 288 N.W.2d 244, 248 (Minn. 1980) ("[c]onsiderations of fairness," including that the relevant evidence was within the defendant's control, dictated that burden should be imposed on the defendant despite the general rule); *Tex. Commerce Bank v. Olson*, 416 N.W.2d 456, 461 (Minn. Ct. App. 1987) (stating that "[g]enerally" the burden of proof on an element of a claim lies with the party who would benefit from establishing the element); *SCSC Corp.*, 515 N.W.2d at 597 (citing *Holman* and *Olson*).  Thus, the factual and legal context of *SCSC Corp.* is far removed from the issue of allocation in this case.

It is not clear whether the court in *SCSC Corp.* intended to impose on the insurers not only the burden of proving that the environmental damage to the insured's site was capable of being allocated between insured and uninsured time periods, but the additional burden of actually allocating the damages.  Even if it did, however, there are reasons in this case for imposing the burden of allocation on the insured that did not exist in *SCSC Corp.*  The need for allocation in *SCSC Corp.* did not arise because of any conduct on the insured's part, as it did here.  Likewise, the insured in *SCSC Corp.* did not have special control over or access to information about how to allocate damages, as United does in this case.  Finally, even if the insured in *SCSC Corp.* had enjoyed such control or access, the insurers could hardly have complained; they had breached their duty to defend.  *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 315-16 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009).  In short, *SCSC Corp.* is distinguishable for multiple reasons and, in the Court's view, does not require that the insurers bear the burden of proof on allocation in this case.

United also points to two out-of-state cases to argue that some other states place the burden on the insurer to allocate between covered and excluded losses. *See PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, No. 02-1774, 2006 WL 3290428, at *6 (N.D. Cal. Nov. 13, 2006); *Pepsico, Inc. v. Cont'l Cas. Co.*, 640 F. Supp. 656, 662 (S.D.N.Y. 1986), *disapproved on other grounds by Waltuch v. Conticommodity Servs., Inc.*, 88 F.3d 87 (2d Cir. 1996). While it may be true that some other states follow such a rule, neither of the cases cited by United provide much support for such a rule.

*PMI Mortgage* does not provide any analysis; instead, it simply cites two other cases that appear inapposite and that in any event were later disapproved by the California Supreme Court in *State v. Allstate Insurance Co.*, 201 P.3d 1147, 1167 (Cal. 2009). Notably, in *Allstate Insurance Co.*, the California Supreme Court explained that when damages are divisible, the *insured* bears the burden of allocating between damages falling within an exclusion and damages falling within an exception to an exclusion. *Allstate Ins. Co.*, 201 P.3d at 1167 & n.12. In California, as in Minnesota (*see SCSC Corp.*, 536 N.W.2d at 314), an exception to an exclusion is treated as a grant of coverage. *Allstate Ins. Co.*, 201 P.3d at 1167. *Allstate Insurance Co.* thus suggests that California law is the opposite of what United represents it to be.

*Pepsico* likewise does not offer any analysis, but simply cites to *H.S. Equities, Inc. v. Hartford Accident & Indemnity Co.*, 661 F.2d 264, 269 (2d Cir. 1981). *H.S. Equities*, however, did not really involve a dispute over who bears the burden of proof on allocation. Instead, it involved a dispute over whether a settlement is conclusive evidence of the facts alleged in the underlying complaint. *Id.* at 268-69. The Second Circuit held that a good-faith settlement is only presumptive, not conclusive, evidence of those alleged facts. *Id.* at 269-70. The opinion

does indicate that the trial court had allocated the settlement between covered and uncovered claims, *id.* at 268 n.4, but, in affirming the trial court's allocation, the Second Circuit did not discuss which party bore the burden of proof on that issue, *id.* at 272. As another district court has observed,

> The issue presented in *H.S. Equities* is distinguishable from the issue presented in *PepsiCo* . . . . In *H.S. Equities*, the Court was considering whether an indemnitor — under an indemnity clause such as the one in the present case — may challenge its *actual liability* under an indemnity clause where the indemnitee has settled the claims against it in a third-party action. The issue presented in the instant case is whether an indemnitor — under an indemnity clause such as the one in the present case — may challenge the amount *allocable* to those liabilities that it indemnified and which party has the burden of proving the proper allocation.

*John Hancock Healthplan of Pa., Inc. v. Lexington Ins. Co.*, No. 88-2308, 1990 WL 21137, at *2 (E.D. Pa. Mar. 6, 1990). *Pepsico*'s reliance on *H.S. Equities* is therefore questionable at best.

In short, neither *PMI Mortgage* nor *Pepsico* are persuasive authority on the issue of who should bear the burden of proof on allocation between covered and uncovered claims. The Court therefore concludes that United should bear the burden of proof on allocation, even as to claims that are uncovered because they fall within a policy exclusion.

### 3. United's Expert James Halverson

The next issue with respect to allocation is whether the Court should exclude the testimony of James Halverson, United's allocation expert. Halverson opines that the reasonable settlement value of the antitrust claims in the *AMA* lawsuit exceeded $350 million and ranged up to $500 million. Schiller Decl. Ex. 27 at 2-3. He further opines that, at the time of the

settlement, the *AMA* case was almost entirely an antitrust case, and that 90 to 95 percent of the

$350 million settlement is attributable to the antitrust exposure that United faced in the *AMA*

case. *Id.*

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert-

witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
> and
>
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

There is no question that Halverson is an expert on antitrust law. He was the Director of

the Bureau of Competition at the Federal Trade Commission ("FTC") from early 1973 to late

1975, and in that capacity he supervised over 300 antitrust lawyers and economists and brought

several important antitrust cases. Schiller Decl. Ex. 27 at 3. After leaving the FTC in 1975, he

spent the next 30 years defending significant class-action litigation, including antitrust cases. *Id.*

He retired in 2005. *Id.*

The insurers attack Halverson's opinion on various grounds, most of which do not

warrant exclusion. For example, the insurers argue that Halverson did not review any evidence

that had been produced in the *AMA* case regarding the merits of the antitrust claims and does not

know whether United was likely to be found to have engaged in an antitrust conspiracy. At the time of the *AMA*/*Malchow* settlement, however, the parties had not engaged in any discovery on the merits of the antitrust claims. Taken to its logical extreme, the insurers' argument would mean that an expert could never testify as to value of claims that were settled before discovery. That is clearly not the law. The fact that a claim is settled before discovery may *affect* the settlement value of the claim, but it does not mean that the claim does not *have* a settlement value, or that an expert cannot opine on the amount of that settlement value.

Setting that aside, Halverson reviewed a substantial amount of material regarding the *AMA* action, including (1) a report from the New York Attorney General (which included a detailed comparison of United's databases with a model database derived from over a million bills issued by New York medical providers); (2) an opinion from the presiding judge denying a motion to dismiss the antitrust claims; and (3) a decision in a similar New Jersey case approving a class-action settlement. Based on these materials, and based on his discussions with the attorney who represented United in the NYAG action, Halverson has a sufficient basis for opining about the strength and settlement value of the antitrust claims asserted in the *AMA* case.

The insurers are on firmer ground, however, in seeking to exclude Halverson's opinions regarding how the *AMA*/*Malchow* settlement should be allocated between the antitrust claims in the *AMA* case and all of the other claims encompassed by the settlement. To begin with, Halverson did not even purport to offer an opinion regarding the settlement value of the *Malchow* claims, and he will therefore not be permitted to testify as to how the settlement should be

allocated between the *AMA* claims and the *Malchow* claims.[10]  In addition, while Halverson is undoubtedly an expert on antitrust law, he freely admits that he is not an expert on ERISA and has no experience with it.  Halverson Dep. 88-89.  Halverson will therefore not be permitted to testify concerning the settlement value of the ERISA claims or how much of the settlement should be allocated to those claims.  Finally, Halverson's passing reference to "hav[ing] some experience" with RICO (Halverson Dep. 90) is not sufficient to establish that he is an expert on RICO.  Halverson will therefore not be permitted to testify concerning the settlement value of the RICO claims or how much of the settlement should be allocated to those claims.  *See Polski v. Quigley Corp.*, 538 F.3d 836, 841 (8th Cir. 2008) (proponent of expert testimony bears the burden of showing, by a preponderance of the evidence, that it is admissible).  The Court will therefore permit Halverson to opine on the strength and settlement value of the *AMA* antitrust claims, but will not permit him to opine as to how the *AMA/Malchow* settlement should be allocated between those claims and the other claims that were settled.

## II.  NATIONAL UNION'S MOTION [ECF NO. 1330]

### A.  The Issue

National Union moves for summary judgment on the *AMA* claim on the ground that United failed to report the claim to National Union during the policy period in the manner

---

[10]Halverson initially testified that he did not analyze the *Malchow* action.  Halverson Dep. 191.  Later, however, he testified that he took *Malchow* into account indirectly, because the expert report on damages that was produced in the underlying action (and on which Halverson based his exposure analysis) took the *Malchow* claims into account.  Halverson Dep. 194-96.  But whether or not the underlying damages report included amounts for the *Malchow* claims is a separate issue.  The fact remains that Halverson himself did not analyze the *Malchow* claims, and Halverson himself does not offer any opinion about their settlement value.  Halverson therefore cannot offer testimony at trial about how the *AMA/Malchow* settlement should be allocated between the *AMA* claims and the *Malchow* claims.

required by National Union's policy. The "Claims Handling Endorsement"[11] to National Union's policy states, in relevant part:

> In consideration of the premium charged, it is hereby understood and agreed that notice hereunder shall be given in writing to National Union Fire Insurance Company of Pittsburgh, Pa., Financial Services Claims Department, 175 Water Street, New York, NY 10038 (herewritten the "Insurer")

> (a) The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer as soon as practicable during the Policy Period, or during the Extended Reporting Period (if applicable), or [sic] any claim made against the Insureds.

Handler Aff., Jan. 9, 2013 [ECF No. 1336] Ex. 1 at UNITED-0092179. Although the policy refers to an "Extended Reporting Period," National Union asserts that the relevant reporting period ended with the policy's expiration on December 1, 2000, and United does not argue to the contrary.

There is no dispute that National Union's policy is a "claims made and reported" policy that covers only claims that are both made (against United) and reported (to National Union) within the policy period. *See Esmailzadeh v. Johnson & Speakman*, 869 F.2d 422, 424-25 (8th Cir. 1989) (under Minnesota law, failure to report a claim within the policy period of a claims-made-and-reported policy meant that claim was not covered). Minnesota law requires strict compliance with the notice requirements of a claims-made-and-reported policy, at least when it comes to the *timing* of the notice. If a claim is not reported during the policy period, the policy

---

[11]The May 2012 trial established that the "Claims Handling Endorsement" in National Union's policy is the controlling policy provision for purposes of notice. *See* ECF Nos. 1178, 1186.

does not cover the claim, even if the insurer cannot show that it was prejudiced by the late notice. *Cargill, Inc. v. Evanston Ins. Co.*, 642 N.W.2d 80, 87 (Minn. Ct. App. 2000).

When it comes to the *content* of the required notice, however, Minnesota law is more forgiving. No matter what the policy says about the content of the notice, as long as the insured provides "notice of facts that would raise a likelihood of a claim," the insured will be deemed to have provided sufficient notice. *Owatonna Clinic-Mayo Health Sys. v. Med. Protective Co. of Fort Wayne*, 639 F.3d 806, 813 (8th Cir. 2011). At that point, Minnesota law imposes on the insurer the duty to investigate the likely claim and make a coverage determination. *Id.* at 812-13. Again, this is true even when the policy expressly requires more information than the insured provides in the notice. *Id.* at 811 (noting that the parties agreed that the notice did not provide all of the information required by the policy).

The Eighth Circuit recently explained why timing requirements in claims-made-and-reported policies are strictly enforced but content requirements are not:

> As the district court observed, requiring strict compliance with provisions in claims-made policies that set deadlines for making claims makes sense because insurers can then make plans and fix premiums based on a sounder actuarial footing than would be possible if there were unknown, percolating claims that might be pressed after the policy period ran. Besides, specific time-limit provisions do not lend themselves to the application of a relaxed interpretive standard because they set out bright, discriminating lines. But we don't think that the same considerations are in play when the substantive adequacy of the notice is in issue. In that kind of case, we conclude that the law of Minnesota places a burden of inquiry on the insurer when it has notice of facts that would raise a likelihood of a claim, and we are satisfied that this case falls within the ambit of that principle.

*Id.* at 812-13.

This case, however, involves neither a *timing* requirement nor a *content* requirement, but instead what might be called a "to whom" requirement — that is, a requirement in a policy about *to whom* notice of a claim must be provided.[12]  As noted, the National Union policy was specific about to whom United had to provide notice:  "[N]otice hereunder shall be given in writing to National Union Fire Insurance Company of Pittsburgh, Pa., Financial Services Claims Department, 175 Water Street, New York, NY 10038[.]"  Handler Aff. Ex. 1 at UNITED-0092179.  For the sake of simplicity, the Court will refer to the group of employees working in the Financial Services Claims Department of National Union at 175 Water Street in New York as the "Claims Department."[13]

National Union argues that this "to whom" requirement should be strictly enforced, just as timing requirements are strictly enforced.  And although National Union is not entirely clear about what strict compliance with this requirement would mean, National Union essentially says that its policy required United to direct written notice of the claim to the Claims Department in

---

[12]National Union does argue that the content of the notice was insufficient.  But National Union's policy does not impose any content requirements, other than requiring United to give written notice of a "claim."  *See* Handler Aff. Ex. 1 at UNITED-0092179.  United's alleged notice included the date the *AMA* lawsuit was filed, a short description of the lawsuit (including that it was a "[p]urported class action . . . based on alleged flaws in the PHCS leading to inappropriate UCR cuts"), and retention information.  Bouslog Aff., Jan. 30, 2013 [ECF No. 1352] Ex. LL at 2-3.  This is more than enough to constitute notice of a claim under the National Union policy.  *See St. Paul Fire & Marine Ins. Co. v. Metro. Urology Clinic, P.A.*, 537 N.W.2d 297, 300 (Minn. Ct. App. 1995) (phone call informing insurer of injured party's name and possibility of malpractice action was sufficient notice).

[13]The Claims Department appears to be run by a company called Chartis Insurance Company ("Chartis"), which is apparently an affiliate or subsidiary of American International Group, Inc. ("AIG").  Borowiec Dep. 5-6; Hirschorn Dep. 10-11.  Although the record is somewhat sparse and confusing on this subject, there appears to be no dispute that National Union is also affiliated with AIG.

some fashion — such as by mailing a letter addressed to the Claims Department or hand-delivering written notice to the Claims Department. There is no dispute that United did not provide such notice of the *AMA* claim. That, says National Union, should be the end of the matter.

United argues that the Court should require only substantial compliance with the "to whom" requirement, just as courts require only substantial compliance with content requirements. United further argues that, although it did not send or deliver written notice of the *AMA* claim directly to the Claims Department, it nevertheless substantially complied with the notice provision in various ways.

## *B. The Legal Standard*

As just discussed, the parties frame their argument as a choice between a strict-compliance standard and a substantial-compliance standard. Put in those terms, the Court agrees with United that a substantial-compliance standard should apply to the "to whom" requirement in the National Union policy. But the Court disagrees with United about what is necessary to substantially comply with that "to whom" requirement.

To begin with, the Court has difficulty knowing what it would mean to strictly enforce a "to whom" requirement, and National Union struggled to answer that question at oral argument. One can imagine countless ways in which notice of a claim might reach the Claims Department during the policy period, other than by United putting written notice of the claim in an envelope, addressing the envelope to the Claims Department, and depositing the envelope in the U.S. Mail. For example, a United representative might hand notice of a claim to an employee of the Claims Department while that employee is attending a meeting in Minneapolis, and that employee might

carry the notice back with him to 175 Water Street.  Or a United representative might provide

written notice of a claim to her contact at National Union — someone who works at 175 Water

Street, although not in the Claims Department — and her contact might walk the notice down the

hall to the Claims Department.  Or a United representative might attempt to mail notice of a

claim to the Claims Department but mistakenly address the envelope to the wrong National

Union office, and then an employee at that office might forward the notice to the Claims

Department.  Or a United representative might provide notice of a claim to the primary insurer

and ask the primary insurer to forward copies to all of the excess insurers, and the primary

insurer might then send a copy of the notice to the Claims Department.

In all of these examples — and in countless other examples that could be imagined —

National Union could argue that, although the Claims Department received written notice of the

claim during the policy period, United nevertheless did not strictly comply with the "to whom"

provision of the policy.  Again, that provision requires United to "give written notice to the

Insurer" and further requires that notice be "given . . . to National Union Fire Insurance Company

of Pittsburgh, Pa., Financial Services Claims Department, 175 Water Street, New York, NY

10038[.]"  But to hold that United had failed to give sufficient notice in these circumstances

would be at odds with Minnesota law, which generally disfavors "technical and narrow

objections to the existence of coverage, especially when it comes to matters of notice."

*Owatonna Clinic-Mayo Health Sys.*, 639 F.3d at 812.  Thus, the Court agrees with United that

Minnesota law does not demand strict compliance with the "to whom" requirement; instead,

substantial compliance is sufficient.

But substantial compliance requires compliance that is *substantial*. The Court does not agree with United that it *substantially* complies with the "to whom" requirement in the National Union policy when it provides any kind of notice to any kind of agent of National Union during the policy period. Rather, in the Court's view, the "to whom" requirement in the National Union policy has not been substantially complied with unless *the Claims Department* receives notice of a claim — somehow, from someone — during the policy period. If an agent of National Union has become aware of a claim, but that agent does not work in the Claims Department and does not notify the Claims Department of the claim, then there has not been substantial compliance with the "to whom" requirement.

"Compliance" with a provision in an insurance policy should not be deemed "substantial" if doing so would defeat the very purpose of the provision. And the very purpose of a "to whom" requirement — its entire reason for existing — is to ensure that notice is provided not just to the insurance company, but to a particular *part* of the insurance company. A large insurance company has a legitimate reason to require that notice of a claim be given to a particular person or department within the company, rather than to any of the company's thousands of employees and agents scattered around the globe. Otherwise, there is a substantial danger that the "notice" will not be recognized as such and will not serve its function.

This is especially true with respect to a claims-made-and-reported policy, under which notice to the insurer is the crucial event that triggers coverage. Requiring that the designated recipient actually receive notice during the policy period "makes sense because insurers can then make plans and fix premiums based on a sounder actuarial footing than would be possible if there were unknown, percolating claims that might be [discovered] after the policy period ran."

*Owatonna Clinic-Mayo Health Sys.*, 639 F.3d at 812.  Moreover, "to whom" requirements — at least insofar as they specify the exact person or department that must receive notice — "set out bright, discriminating lines" that "do not lend themselves to the application of a relaxed interpretive standard." *Id.*  It is entirely understandable that an insurer would not, for example, want to depend on its underwriting department to "sift through a renewal application and decide what should be forwarded to the claims department on the insured's behalf." *Am. Cas. Co. of Reading, Pa. v. Continisio*, 17 F.3d 62, 69 (3d Cir. 1994).

United's view of the law, however, would require exactly that, even when the insurance policy informs the insured precisely to whom notice must be sent.  Indeed, under United's view of the law — in which notice to an underwriter would suffice, even if the policy demanded notice to a claims representative — an insurer could almost never require that its insureds send notice to a particular person or department, because its insureds will commonly submit renewal applications during the policy period, and those renewal applications will commonly include information that, in hindsight, could be considered notice of a claim.

The Court can conceive of no reason why an insurer such as National Union should not be able to protect itself by requiring that notice be given to a particular person or department.  And enforcing such a requirement does not place an onerous burden on an insured — particularly an insured such as United, which is itself a huge and sophisticated insurance company, and which has no excuse for failing to send notice of the *AMA* claim to the Claims Department, as National Union's policy clearly required United to do.  *Cf. Nat'l Union Fire Ins. Co. of Pittsburgh v. Baker & McKenzie*, 997 F.2d 305, 309 (7th Cir. 1993) (noting that "[i]t is far easier for the

insured to lick a postage stamp" than it is for the insurer to scour insurance applications for notice of claims).

The Court's conclusion is bolstered by a review of the case law. Neither side has cited any Minnesota case that addresses whether an insured who sends notice to an insurer, but not to the person or department specified in the policy, has complied with the notice requirement. The only possible exception is *Home Insurance Co. v. Tennant Co.*, No. 99-0349, 2001 WL 1636493 (D. Minn. June 29, 2001). In *Tennant Co.*, the policy required the insured to send notice to the insurer's claims department at a particular address, which the insured failed to do. *Id.* at *2. Judge Tunheim found that the policy's notice provision was ambiguous, however, because it had been amended by a separate agreement that required notice to the insurer generally, and not to a specific department of the insurer. *Id.* at *4-5. Notably, Judge Tunheim observed that, were it not for the separate agreement, the notice likely would have been insufficient. *Id.* at *5. *Tennant Co.* is therefore consistent with the Court's analysis in this case.

Also consistent with the Court's analysis are a number of decisions by courts outside of Minnesota holding that it is not sufficient for an insured to provide notice to the underwriting department when the policy requires notice to the claims department. *See, e.g.*, *Atlantic Health Sys., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 463 Fed. Appx. 162, 166-68 (3d Cir. 2012). By contrast, United has not identified a single case from any jurisdiction in which an insured was held to have provided adequate notice even though it failed to give notice to the person or department specified in the policy. Given the complete lack of legal support for United's position — as well as the lack of a good reason to prohibit insurers from specifying to whom notice must be sent — the Court finds that, under Minnesota law, an insured has not substantially

complied with a "to whom" requirement unless the designated recipient (here, the Claims Department) has received notice of the claim during the policy period.

United finally argues that, if its notice was insufficient because it was given to an agent of National Union who did not work in the Claims Department, then National Union had a duty to inform United of that fact. *See St. Paul Fire & Marine Ins. Co. v. Metro. Urology Clinic, P.A.*, 537 N.W.2d 297, 300 (Minn. Ct. App. 1995) (where notice was defective, insurer had "an obligation to investigate further or at least to make [insured] aware of the defects in the notice"). This rule makes sense — and is applied by Minnesota courts — when the *content* of a notice is insufficient. An insurer who has received some form of notice has the opportunity to further investigate the claim and obtain the information it needs. It is therefore appropriate to place the burden of further inquiry on the insurer in that situation.

The same cannot be said, however, when the problem with the notice is that it did not reach the person or department specified in the policy. When that is the case, the insurer has no reason to suspect that the insured has *made* a claim, as the person or department whose job it is to receive, recognize, and process claims has not received any notice (defective or otherwise) of the claim. Imposing an obligation to investigate on the insurer in this context would mean that every agent of the insurer would have to be charged with the responsibility of receiving, recognizing, and processing claims, which is precisely what National Union sought to avoid by specifying to whom notice must be sent. Moreover, even if National Union had a duty to inform United that notice to anyone other than the Claims Department was insufficient, National Union fulfilled that duty by clearly informing United of that fact in its policy.

The Court therefore concludes that, in order to show that it substantially complied with National Union's notice requirement, United must show that notice of the *AMA* claim was received by the Claims Department during the policy period. It does not matter how the notice got to the Claims Department, but the Claims Department — and not some other department of National Union — must have received notice of the *AMA* claim during the policy period. The Court now turns to the question of whether a jury could find, based on the evidence in the record, that the Claims Department received notice of the *AMA* claim during the policy period.

*C. The Evidence*

For purposes of the following discussion, the Court distinguishes between notice to "National Union" — by which the Court means notice to any employee or agent of National Union *other* than those working in the Claims Department — and notice to the "Claims Department." The Court begins by examining the evidence that National Union received notice of the *AMA* claim.

1. Notice to National Union

Much of United's evidence that it gave notice of the *AMA* claim to National Union is inadmissible or at least problematic. There are obvious hearsay problems, *see* Bouslog Aff. Ex. A (emails between various Marsh representatives discussing what a National Union underwriter supposedly said to other unidentified people), and, more broadly, much of the evidence on which United relies simply does not support United's factual assertions. Nevertheless, there is sufficient admissible evidence to allow a jury to find that *someone* at National Union — most likely an underwriter —  received notice of the *AMA* claim during the policy period.

First, a jury could find that Marsh, United's insurance broker, sent quarterly loss runs to National Union during the policy period, and that some of those loss runs listed the *AMA* claim (along with numerous other claims). Marilyn Nevin, United's vice president of risk management, testified that it was her practice to send quarterly loss runs to Lexington during the 1998-2000 timeframe, Nevin Dep. 989, 994, and a Marsh representative testified that she forwarded those loss runs to the excess insurers, Rodenborn Dep. 100-01. There is no evidence, however, as to the identity of the person at National Union to whom Marsh sent the loss runs, and therefore no evidence that the loss runs were provided to the Claims Department.

Second, a jury could conclude that National Union underwriters received a March 31, 2000 loss run that listed the *AMA* claim and that was attached to a renewal application sent during the policy period. National Union renewed United's coverage for the 2000-2002 policy period on or before December 1, 2000.[14] Bouslog Aff. Ex JJ; Nevin Aff., Jan. 25, 2013 [ECF No. 1361] ¶ 4. The renewed policy states that National Union relied on an April 24, 2000 application for insurance that United had submitted to Lexington. Bouslog Aff. Ex. II at UNITED-0092100. The Lexington application, in turn, asked whether United was aware of any claims against it; United's written response stated, "see attached loss data valued 3/31/00." Bouslog Aff. Ex. KK at UNITED-0090515. United claims that this is a reference to a loss run that was attached to the application. *See* Bouslog Aff. Ex. LL. The loss run that United contends was attached lists the *AMA* claim along with many other claims. The loss run identifies the date

---

[14]The initial binder only covered December 1, 2000 to December 1, 2001; the parties evidently later negotiated an extension to May 1, 2002. Bouslog Exs. II, JJ.

of the *AMA* claim and (on the following page) provides a short description of the claim. Bouslog Aff. Ex. LL at 2-3.

National Union contends that there is no evidence that this loss run was actually attached to the Lexington application or submitted to National Union. But Marilyn Nevin, who completed the April 24, 2000 application, attested that she sent a copy of a 1998-2000 loss run to every insurer from whom United was seeking insurance and further asserted that, in her experience, none of the underwriters would have offered a quote without first reviewing a loss run for that period. Nevin Aff. ¶ 4. And given that the application is (1) very short, (2) contains very little substantive information, and (3) conspicuously refers to attached "loss data," a jury could conclude either that the loss run was attached to the application or that National Union would have demanded a copy of the loss run before renewing its policy.

The Court therefore concludes that there is sufficient evidence from which a jury could find that *someone* at National Union received notice of the *AMA* claim. Before turning to the question of whether a jury could find that such notice made its way to the *Claims Department*, however, the Court addresses evidence on which United has placed particular emphasis — namely, evidence regarding a meeting of underwriters that took place at United's headquarters on September 6, 2000.

The purpose of this meeting was to discuss the renewal of United's insurance policies. Nevin Dep. 1107. At the meeting, United presented a PowerPoint presentation that included a slide listing the "AMA reasonable and customary suit" as one of three items of "Significant Litigation." Handler Aff. Ex. 6 at UNITED-0262542. The slide said nothing else about the lawsuit, but Nevin testified that United's general counsel provided general information and said

that United was carefully watching the case because it had the potential to be a large claim.

Nevin Dep. 1109.  Attendees at the meeting were given copies of the PowerPoint presentation.[15]

Nevin Dep. 1036.

There is little evidence that anyone from National Union — much less a representative of the Claims Department — attended this meeting.  United offers copies of faxed invitations to two National Union underwriters named Dexter Griffin and Haroldene Scott.  Bouslog Aff. Ex. H. Nevin testified that she thought that Griffin and Scott had attended, but she also testified that she does not know them and is aware of no documentation confirming that they attended.  Nevin Dep. 1046-47.  Nevin does specifically remember that an individual named Tom Allen attended the meeting.  Nevin Dep. 1050.  United contends that Allen was a National Union underwriter, but there is no evidence to support that assertion; to the contrary, the faxed invitation to Allen identifies his company as AIG and says nothing about National Union (in contrast to the invitations to Griffin and Scott, which identify National Union).  Bouslog Aff. Ex. I.  Finally, United contends that it would be reasonable to infer that Claude Ronnel, the National Union underwriter who was handling United's renewal application, would have attended the meeting. But this is sheer speculation; there is no evidence that Ronnel was even invited to the meeting, much less that he attended.  And even if United's evidence is sufficient to show that *someone* from National Union attended the meeting, there is absolutely no evidence that anyone from the

---

[15]United insists that nothing could be more likely to attract an insurer's attention, and in particular the attention of its claims handlers, than litigation that the insured has flagged as "significant."  To put the "significance" of the *AMA* claim in context, however, it is worth noting that United's retention for the *AMA* claim, as listed in the March 31, 2000 loss run, was $75,000, Bouslog Aff. Ex. LL — a minuscule amount compared to the $240 million in insurance coverage (as well as United's own self-insured retention of $3 million) that sat below National Union's policy.

*Claims Department* attended. Griffin, Scott, Allen, and Ronnel were all underwriters, not

members of the Claims Department.

Having concluded that a jury could find that someone at National Union — most likely an

underwriter — received written notice of the *AMA* claim during the policy period, the Court next

turns to the question of whether there is any evidence from which a jury could find that such

notice made its way to the Claims Department.

### 2. Notice to the Claims Department

United has no direct evidence that anyone in the Claims Department received notice of

the *AMA* claim during the policy period. United nevertheless contends that, based on indirect

evidence, a jury could infer that the Claims Department received notice of the *AMA* claim.

Broadly stated, United's arguments on this score may be divided into two categories:

First, United argues that (a) it gave notice of the *AMA* claim to Lexington; (b) because

Lexington is a subsidiary of National Union, notice to Lexington is the equivalent of notice to the

Claims Department, and (c) in any event, the National Union policy required Lexington or,

alternatively, National Union, to give notice to the Claims Department.

Second, United argues that there is sufficient circumstantial evidence from which a jury

could infer that National Union underwriters notified the Claims Department about the *AMA*

claim during the policy period.

The Court examines each of United's contentions in turn.

### a. Notice to Lexington and National Union

There is no dispute that Lexington received notice of the *AMA* claim during the policy

period. United contends that because Lexington is a subsidiary of National Union, notice to

Lexington is the equivalent of notice to National Union. Whether or not that assertion is true as a factual or legal matter, however, it is irrelevant. The Court has already held that a jury could find that National Union itself received notice of the *AMA* claim. But the Court has also held that United must prove that the *Claims Department* received notice of the *AMA* claim. Notice to Lexington — like notice to National Union — is not notice to the Claims Department.

United next points to evidence that National Union shared a claims department with Lexington. (Both National Union and Lexington are affiliated with AIG. Nevin Aff. ¶ 5.) United argues that because Lexington received notice of the *AMA* claim during the policy period, and because Lexington shared a claims department with National Union, the Claims Department should be deemed to have received notice of the claim.

There are several problems with this argument. First, none of the evidence of a shared claims department pertains to the 1998-2000 policy period. United relies on the testimony of two witnesses, Thaddeus Borowiec and Deborah Hirschorn, but only Borowiec worked for National Union during the policy period. *See* Hirschorn Dep. 10-11 (Hirschorn first began working for Chartis in 2006). Borowiec was asked about claims handling in the present tense, without any reference to the 1998-2000 policy period. Borowiec Dep. 19-20. Notably, United elsewhere argues that Borowiec was not involved in the United account in 2000 and therefore "lack[s] personal knowledge of what information 175 Water Street received back then." ECF No. 1360 at 18; Borowiec Dep. 25 (Borowiec first became aware of the *AMA* lawsuit in June 2008).

The second problem with United's argument is that the Lexington policy requires that notice of claims be sent to Lexington's *Boston* office. *See* Pl.'s Tr. Ex. P-5 §§ 2.9, 5.3.[16] And the record demonstrates that, consistent with this requirement, United sent notice of the *AMA* claim to Lexington in Boston. *See* Bouslog Aff. Exs. Z, AA. Obviously, the fact that Lexington received notice in Boston within the policy period does not mean that the Claims Department received notice in New York within the policy period.

United next points out that the Claims Handling Endorsement in the National Union policy requires "[t]he Company or the Insureds" to give notice. *See* Handler Aff. Ex. 1 at UNITED-0092179. United argues that "the Company" must mean either National Union or Lexington. If "the Company" refers to National Union, says United, then any National Union underwriter or other employee who received notice was obligated under the policy to send that notice to the Claims Department — and, because it was National Union's own policy, National Union should be deemed to have received proper notice, even if a National Union underwriter or other employee failed to fulfill her obligation to forward notice to the Claims Department. If "the Company" refers to Lexington, it is not clear how this would help United. There is no evidence that Lexington in fact sent the notice to the Claims Department, and the Court has already rejected the notion that notice to Lexington is the equivalent of notice to the Claims Department. Setting all of this aside, however, the Court does not agree with United's interpretation of "the Company."

---

[16]There does not appear to be a copy of the Lexington policy in the current summary-judgment record; the Court cites to Exhibit 5 of United's trial exhibits for the May 2012 trial.

It is true, as United points out, that "the Company" is not expressly defined in the policy. And it is also true, as United points out, that elsewhere in the policy it is clear that "the Company" refers to National Union. *See, e.g.*, Handler Aff. Ex. 1 at 0092177. Nevertheless, the Court finds that the term "the Company" in the Claims Handling Endorsement refers to United rather than to Lexington or National Union.

To begin with, United's interpretation is senseless. Reading "the Company" to mean Lexington makes no sense, for the simple reason that Lexington was not a *party* to the contract. Obviously, someone who is not a party to a contract cannot be bound by that contract. And reading "the Company" to mean National Union also makes no sense. On that reading, the policy would allow United to provide notice of a claim to any employee of National Union. But if that is what the parties agreed, the policy would simply require notice to "National Union." There would be no reason to specify that notice must be given to a specific department at a specific address in a specific city.

Of course, as the Court has noted before in this litigation, insurance policies sometimes do not make sense, and the Court cannot disregard plain policy language just because it is senseless. But United's reading is not merely nonsensical. It also conflicts with the language and structure of the Claims Handling Endorsement, which make it clear that, for purposes of the Endorsement, National Union is "the Insurer" and United is "the Company."

The Endorsement first expressly defines National Union as "the 'Insurer.'" Handler Aff. Ex. 1 at UNITED-0092179 ("National Union Fire Insurance Company of Pittsburgh, Pa., Financial Services Claims Department, 175 Water Street, New York, NY 10038 (herewritten the 'Insurer')"). The Endorsement then requires "[t]he Company or the Insureds" to "give written

notice to the Insurer . . . ."  It is plain, from the structure of this sentence, that "the Company" and "the Insurer" must be different entities.  No insurance policy is going to require the insurer to give notice to *itself*.

A few paragraphs later, the Endorsement gives "[t]he Insurer" the right to "associate with the Company and the Insureds" in defending and settling claims.  The Endorsement also requires "[t]he Company and the Insureds" to cooperate with "the Insurer."  Finally, the Endorsement refers to "any claim made against the Company and the Insureds . . . ."

These references make clear that "the Company" cannot be National Union or Lexington.  There is no "claim" that would be "made against" either Lexington or National Union *and* "the Insureds."  Likewise, it would be absurd to require National Union to cooperate with itself or to give National Union permission to associate with itself.  Although it is at least possible for *Lexington* to cooperate or associate with National Union, the Court has already noted that the policy cannot reasonably be read to impose obligations on a company that is not even a party to the policy (and, in any event, there is no evidence that Lexington in fact gave notice to the Claims Department).  The only remaining option, then, is that "the Company" must be United.

It is true, as United argues, that interpreting "the Company" to refer to United renders the phrase "the Company and the Insureds" somewhat redundant.  But there is no other way to read the Endorsement without creating even more redundancies and rendering whole portions of it either meaningless or absurd.  The Court therefore rejects United's argument that "the Company" refers to either National Union or Lexington.

### b. *Circumstantial Evidence of Receipt by the Claims Department*

United next argues that, setting aside the policy language and any arguments about Lexington, there is sufficient circumstantial evidence from which a jury could find that National Union underwriters gave information about the *AMA* claim to the Claims Department during the policy period.

United primarily relies on evidence that National Union underwriters periodically had conversations with National Union claims adjusters. None of the testimony on this subject, however, suggests that claims adjusters obtained information about potential claims — much less about the *AMA* claim — from underwriters. To the contrary, all of the testimony cited by United indicates that these conversations concerned other subjects — such as marketing efforts or active claims that had already been reported to the Claims Department — and that, to the extent that information about claims was passed between the departments, it went *from* the claims adjusters *to* the underwriters.[17] When asked directly whether he forwarded notices of claims to the Claims Department, underwriter Ian Watson specifically denied doing so, citing the fact that National Union's policies instruct insureds to send notices of claims directly to the Claims Department:

> Q:   So how would that occur? Would you communicate a
>       claim to the claims unit?

---

[17]*See* Watson Dep. 54-55 (testifying that underwriters speak to the claims department about "having them be present at meetings where we were, I guess, pitching our insurance products" and about "active claims on policies"); Borowiec Dep. 156 (testifying that claims adjusters periodically meet with underwriters to provide underwriters updates on large claims); Hirschorn Dep. 136-37 (claims adjusters periodically met with underwriters "to keep underwriting in the loop of what was going on in the claims department"); *see also* Bouslog Aff. Ex. BB (February 2000 email communicating information about a claim to a National Union underwriter); Bouslog Aff. Ex. EE at 153, Ex. FF (National Union underwriter asked Marsh for loss runs in February 2000 and was told to contact Lexington).

A:      No.  No.  I mean I think in all our policies it gave the
        address and so I think all claims went to our home office
        and went to the — directly to the claims department, so
        they would have contacted us if they had questions about
        the circumstances of a particular policy.

Watson Dep. 54-55.  The unremarkable fact that National Union underwriters sometimes talked

to National Union claims adjusters is therefore insufficient to support a finding that the

underwriters notified the claims adjusters about the *AMA* claim during the policy period.

United also points to emails about United's renewal application for the 2000-2002 policy

period that mention "New York" (where the Claims Department was located).  *See* Bouslog Aff.

Exs. A, V.  For example, a November 2000 email string among various Marsh personnel

mentions that Claude Ronnel, the National Union underwriter, was waiting to hear back from his

"compatriots."  Bouslog Aff. Ex. A.  In response, a Marsh employee writes that Ronnel is the

"line underwriter" and that "[a] decision on something like this is going to be generated in New

York."  *Id.*  From these vague references to the *underwriting* process, United argues that a jury

could infer that *claims adjusters* at 175 Water Street in New York had access to the Lexington

renewal application, including the attached loss run.

Setting aside the fact that this email string contains multiple levels of hearsay, it is not

reasonable to infer that it has anything to do with the Claims Department.  This email string is

obviously related to underwriting, not claims adjusting.  Moreover, the only mention of "New

York" is a speculative musing by a *Marsh* representative, which is not sufficient to show that

Ronnel's "compatriots" were in New York, much less that any application materials were in New

York.  And even if it is possible to infer that application materials were in New York, United

offers no evidence from which a jury could conclude that "New York" in this context is

synonymous with 175 Water Street (much less with the Claims Department at 175 Water Street). *Cf. Atlantic Health Sys., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 463 Fed. Appx. 162, 164-65 (3d Cir. 2012) (noting the existence of a separate National Union underwriting office in New York during the 2003-2004 timeframe).

Similarly, United points to a July 2001 email from Ronnel in which he refers to a file that was then in New York. Bouslog Aff. Ex. V. The email is in response to a cryptic question from someone at Marsh asking "when we could expect," apparently referring to some aspect of United's renewal application. Ronnel replies that he has been waiting for "this file," which "apparently is still in NY," but that he will "go ahead and issue the endorsement without the file . . . ." Again, this communication, to the extent it is comprehensible, has to do with underwriting, not claims adjusting. Moreover, it is unclear to what "file" Ronnel and Marsh are referring; at that point, National Union had already bound coverage, Bouslog Aff. Ex. JJ, and the discussion between Ronnel and Marsh apparently relates only to a particular endorsement, and not to the policy as a whole. Finally, even if it would be reasonable to assume that (1) the file in New York contained the Lexington renewal application with an attached loss run, (2) the file was at 175 Water Street, as opposed to at a different office in New York, and (3) the file was with the Claims Department, and not with someone else (such as an underwriter) at 175 Water Street, the email was sent in July 2001, many months after the end of the reporting period.

Finally, United points to the expert testimony of Dennis Connolly, a former managing director of Marsh. Connolly opines that, during the relevant time period, it was the normal practice of the insurance industry for underwriters to communicate information about potential claims to claims adjusters and that, if an insured sent a loss run to an underwriter, the underwriter

would forward it to the claims department.  Connolly Dep. 98, 100-02.  Connolly also opines

that, during the underwriting process, underwriters would normally require help from the claims

department to evaluate the information in a loss run.  Bouslog Aff. Ex. R at 12.

As discussed above, however, there is uncontradicted evidence that (1) National Union's

policies specifically instructed its insureds to send notice of claims directly to the Claims

Department and (2) National Union underwriters were aware of this policy language and

therefore did not consider it necessary to forward information about potential claims to the

Claims Department.  In the face of this affirmative evidence about National Union's specific

practices, and in the absence of any evidence suggesting that National Union deviated from those

practices in the case of the *AMA* claim, a reasonable jury could not find, based solely on the

testimony of an expert about the general practices of the insurance industry, that the Claims

Department received notice of the *AMA* claim during the policy period.

For these reasons, United has failed to show that there is a genuine issue of fact about

whether the Claims Department received notice of the *AMA* claim during the policy period.

National Union's motion for summary judgment on the *AMA* claim is therefore granted.

### III.  UNITED AND EXECUTIVE RISK/FIRST SPECIALTY'S CROSS-MOTIONS
### [ECF NOS. 1341, 1348]

United seeks a ruling that, not only is the entire Antitrust Endorsement in the Lexington

policy incorporated into Executive Risk's and First Specialty's policies, but that, when there is a

conflict between the Antitrust Endorsement and any other provision of those policies, the

Antitrust Endorsement "trumps" the conflicting provision.  For their part, Executive Risk and

First Specialty seek a ruling that *none* of the Antitrust Endorsement is incorporated into their policies.

For the reasons stated on the record at the February 2013 hearing, the Court finds that the Executive Risk and First Specialty policies are unambiguous, and that the interpretations of those policies advocated by United, on the one hand, and Executive Risk and First Specialty, on the other hand, are inconsistent with the plain terms of those policies. There is no dispute that the Executive Risk policy expressly follows form to the Lexington policy "except . . . with respect to any provisions to the contrary contained in this Policy . . . ." Schiller Decl. Ex. 2 § I(E)(2). Likewise, there is no dispute that the First Specialty policy follows form to the Lexington policy "except for . . . any other provisions, including terms, conditions, exclusions and definitions which are inconsistent with the provisions of this policy."[18] Schiller Decl. Ex. 3 § A(I)(A)(4).

The clear meaning of these provisions is that the Executive Risk and First Specialty policies provide the coverage described in the Antitrust Endorsement, but only insofar as providing that coverage would not conflict with any provision of the Executive Risk and First Specialty policies. So, for example, if the Antitrust Endorsement provides coverage for punitive damages, but the Executive Risk and First Specialty policies exclude such coverage, then the Executive Risk and First Specialty policies do not provide coverage for punitive damages. Again, those policies follow form to the Antitrust Endorsement only insofar as the Antitrust Endorsement is consistent with the other terms of the policies; where there is a conflict, the

---

[18]Technically speaking, the Executive Risk and First Specialty policies each follow form to their immediate underlying policies, which in turn follow form to the Lexington policy (or to yet another policy that follows form to the Lexington policy). But Executive Risk and First Specialty do not dispute that, as a practical matter, their policies ultimately follow form to the Lexington policy. *See* ECF No. 1349 at 5, 8.

Antitrust Endorsement is "trumped" by the conflicting provisions of the Executive Risk and First Specialty policies. The Court therefore denies both sides' motions for summary judgment on this issue.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    The motion of defendant National Union Fire Insurance Company of Pittsburgh, PA for summary judgment on its claims-made-and-reported policy defense [ECF No. 1330] is GRANTED. National Union has no obligation to indemnify United in connection with the *AMA* claim.

2.    The motion of defendants Executive Risk Specialty Insurance Company and First Specialty Insurance Corporation for summary judgment [ECF No. 1331] is GRANTED as to the following issues:

      a.    Plaintiff will bear the burden of proof on the allocation of the *AMA/Malchow* settlement between covered and uncovered claims, regardless of whether a claim is uncovered because it is not within a grant of coverage or because it is within a policy exclusion.

      b.    James Halverson will not be permitted to testify about:

            i.    the strength or settlement value of any of the claims that were encompassed by the *AMA/Malchow* settlement, except for the antitrust claims asserted in the *AMA* lawsuit; and

        ii.     how the *AMA*/*Malchow* settlement should be allocated between the

antitrust claims asserted in the *AMA* lawsuit and all of the other

claims that were encompassed by the *AMA*/*Malchow* settlement.

    c.    The motion is DENIED in all other respects.

3.    The cross-motions of plaintiff UnitedHealth Group Inc. [ECF No. 1341] and

defendants Executive Risk Specialty Insurance Company and First Specialty

Insurance Corporation [ECF No. 1348] concerning the incorporation of the

Antitrust Endorsement into the insurers' policies are DENIED.


Dated: April <u>25</u>, 2013                  <u>s/Patrick J. Schiltz</u>
                                            Patrick J. Schiltz
                                            United States District Judge