UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITEDHEALTH GROUP INCORPORATED, a Minnesota corporation, | Case No. 05-CV-1289 (PJS/SER) |
| Plaintiff, | |
| v. | ORDER |
| COLUMBIA CASUALTY COMPANY, an Illinois corporation; FIREMAN'S FUND INSURANCE COMPANY; AMERICAN ALTERNATIVE INSURANCE CORPORATION; EXECUTIVE RISK SPECIALTY INSURANCE COMPANY; FIRST SPECIALTY INSURANCE CORPORATION; STARR EXCESS LIABILITY INSURANCE INTERNATIONAL LIMITED; LIBERTY MUTUAL INSURANCE COMPANY; STEADFAST INSURANCE COMPANY; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; | |
| Defendants. | |

David B. Goodwin and Michael S. Greenberg, COVINGTON & BURLING, LLP; Jeffrey J. Bouslog and Christine N. Lindblad, OPPENHEIMER, WOLFF & DONNELLY LLP, for plaintiff.

Ronald P. Schiller, Robert L. Ebby, Jacqueline R. Dungee, and Bonnie M. Hoffman, HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER; Alan L. Kildow and Sonya R. Braunschweig, DLA PIPER US LLP, for defendants Executive Risk Specialty Insurance Company and First Specialty Insurance Corporation.

David P. Pearson, Thomas H. Boyd, Brent A. Lorentz, and Sofia A. Estrellado, WINTHROP & WEINSTINE, P.A., for defendant Starr Excess Liability Insurance International Limited.

Plaintiff UnitedHealth Group Inc. ("United") brought this coverage action against ten

insurance companies — United's primary insurer and nine of United's excess insurers — asking

this Court to determine, with respect to each of several dozen claims that were brought against United during the period December 1, 1998, through December 1, 2000, which of the ten insurers must indemnify United or pay United's defense costs. This case is now in its ninth year. The Court has ruled on numerous non-dispositive motions, dispositive motions, and motions in limine, and certain matters were tried to juries in May 2012 and June 2013. United has exhausted its primary insurance and settled with some of its excess insurers. At this point, there are effectively three excess insurers remaining in this case: Executive Risk Specialty Insurance Company; First Specialty Insurance Corporation; and Starr Excess Liability Insurance International Limited (collectively "the insurers").

This matter is before the Court on the insurers' motion for summary judgment on Counts V and VI of United's second amended supplemental complaint. In Counts V and VI, United seeks coverage for the "*AMA* claim," which is by far the largest of the underlying claims. For the reasons that follow, the Court grants the insurers' motion.

## I.  BACKGROUND

On January 14, 2009, United executed a $350 million settlement ("the Settlement") of two putative class actions: *American Medical Association v. United Healthcare Corp.*, No. 00-2800 (LMM/GWG) (S.D.N.Y. removed Apr. 12, 2000) ("*AMA*")[1] and *Malchow v. Oxford Health Plans, Inc.*, No. 08-935 (FSH/PS) (D.N.J. filed Feb. 19, 2008) ("*Malchow*"). UA0432.[2] Broadly

---

[1]In 2001, the *AMA* case was consolidated with another case entitled *Oborski v. United Healthcare Corp.*, No. 00-7246 (LMM) (S.D.N.Y. filed Sept. 25, 2000). ECF No. 556 ¶ 1(a). References to *AMA* are intended to include *Oborski*.

[2]Rather than separately numbering its exhibits, United assembled and Bates-stamped each page of every exhibit in the order in which United submitted the exhibits to the Court. So,

(continued...)

speaking, the *AMA* and *Malchow* actions involved similar factual allegations against United,

various United subsidiaries, and various entities related to United.  To simplify the discussion of

*AMA* and *Malchow*, the Court will collectively refer to the defendants in those cases as "United"

except when it is necessary to distinguish among them.

### A. *United's Coverage Actions*

This action had been pending for over three years when United executed the Settlement.

Shortly after executing the Settlement, United amended its complaint in this case to seek

coverage for the portion of the Settlement attributable to the claims asserted against United in the

*AMA* action.  ECF No. 336 ¶ 3; *see also*  ECF No. 556 ¶¶ 1-3.[3]

At about the same time, United filed a separate lawsuit seeking coverage for the portion

of the Settlement attributable to the claims asserted against United in the *Malchow* action.[4]  *See*

*UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, No. 09-0210 (PJS/SRN) (D. Minn. filed Jan. 29,

2009) ("the '09 action").  United filed the separate '09 action — rather than amending its

complaint in this action — because United sought coverage for the *Malchow* claim under a tower

---

[2](...continued)
for example, there is no "Exhibit 2"; instead, what would be "Exhibit 2" is labeled "UA0006."
The Court therefore follows United's convention in citing United's exhibits by Bates number.
Because many of the documents were already Bates-stamped during discovery, many pages bear
more than one Bates number.  The Court (and United) cite to the number on the upper right
corner of each page.

[3]United also seeks to be indemnified for the attorney's fees and costs that United incurred
in defending the *AMA* action.

[4]United also sought to be indemnified for the attorney's fees and costs that United
incurred in defending the *Malchow* action.

of insurance that differed from the tower of insurance that is at issue in this case.[5]  *See id.* ECF

No. 44 ¶ 43.

The Court dismissed most of the '09 case in February 2010.  In essence, the Court held

that the *Malchow* action was not covered under United's insurance policies, and thus United's

insurers were not obligated to indemnify United for the amounts that it paid to defend and settle

the *Malchow* claim.  *Id.* ECF No. 151.  The parties then stipulated to entry of judgment, and the

Court dismissed the case with prejudice.  *Id.* ECF Nos. 170-72.  United did not file an appeal.

That brings us to the nub of the present dispute:  As noted above, the Settlement covered

both the *AMA* claim and the *Malchow* claim.  In the '09 case, this Court held that the portion of

the Settlement attributable to the *Malchow* claim was not covered.  In this case, United is seeking

to be indemnified for the portion of the Settlement attributable to the *AMA* claim.  Thus, United's

claim for indemnity requires a jury to allocate the Settlement between the (uncovered) *Malchow*

claim and the (potentially covered) *AMA* claim.[6]  In their motion for summary judgment, the

insurers argue that the record does not contain sufficient evidence to permit a reasonable jury to

---

[5]The original complaint in the '09 action sought coverage for both the *AMA* portion of the Settlement and the *Malchow* portion of the Settlement under two separate towers of insurance. In its amended '09 complaint, United dropped its claim for coverage of the *AMA* portion of the Settlement.

[6]This may just scratch the surface of the allocating that the jury would have to do.  The insurers argue that a number of provisions in their policies exclude portions of the Settlement from coverage.  Thus, according to the insurers, after allocating the Settlement between the *AMA* claim and the *Malchow* claim, the jury would have to further allocate the Settlement between the covered portions of the *AMA* claim and uncovered portions of the *AMA* claim.  For purposes of the insurers' current motion, it suffices to focus on the need to allocate between the *AMA* claim and the *Malchow* claim.

perform this allocation.  Familiarity with the substantive and procedural complexity of the *AMA* and *Malchow* cases is necessary to evaluate the insurers' argument.

### B. The AMA Case

United is a large health-insurance company.  In the *AMA* lawsuit, the plaintiffs alleged that, under the terms of certain United healthcare policies, United was obligated to pay a certain percentage of the "usual, customary and reasonable" ("UCR") rate for out-of-network medical services.  UA0053-54.  United determined UCR rates using databases maintained by Ingenix, a wholly owned subsidiary of United.  The plaintiffs alleged that the Ingenix databases incorporated flawed, incomplete, and manipulated data, resulting in United paying less for out-of-network services than it was obligated to pay.  UA0063-66.  The *AMA* plaintiffs included healthcare providers as well as subscribers and beneficiaries of United healthcare plans.

The *AMA* case was originally filed in New York state court in March 2000.  UA0008.  The defendants removed the case to the United States District Court for the Southern District of New York, and the case was assigned to Judge Lawrence McKenna.

Over the next nine years, Judge McKenna presided over extensive motion practice and discovery.  UA1089-90.  Judge McKenna issued a number of lengthy and detailed opinions, including a 75-page order granting in part the defendants' motion for summary judgment on the claims pleaded in the third amended complaint, UA1086; a 57-page order granting in part the plaintiffs' motion for leave to file a fourth amended complaint, UA0220; and a 40-page order granting in part the defendants' motion to dismiss the fourth amended complaint, UA0180.

Judge McKenna's rulings considerably narrowed the plaintiffs' claims. The third amended complaint consisted largely of claims under ERISA[7] and claims that United had engaged in deceptive trade practices in violation of New York law. UA1088-89. Judge McKenna held that the plaintiffs were required to exhaust their administrative remedies with respect to any ERISA claim that was based on an alleged violation of a healthcare plan. UA1096-1130. He also agreed with the defendants that those plaintiffs who could not show that they had suffered out-of-pocket losses lacked standing to seek monetary damages (although they could nevertheless seek injunctive relief for breach of fiduciary duty). UA1133-39. Finally, he held that those plaintiffs whose plans named someone other than United as the plan administrator could not seek monetary benefits from United. UA1153-57.

Before issuing these rulings, Judge McKenna closely examined evidence concerning various plan terms, United's claims practices, and individual plaintiffs' administrative records. Judge McKenna had to make many tough calls on difficult legal issues, such as whether the failure to exhaust administrative remedies could be excused on any of a number of grounds. UA1106-23. Judge McKenna's task was further complicated by the fact that the *AMA* plaintiffs were insured under various healthcare plans with various administrative requirements and other provisions. *See, e.g.*, UA1111-12.

Although he narrowed the plaintiffs' ERISA claims, Judge McKenna permitted the plaintiffs to expand the overall scope of the case by adding antitrust and RICO[8] claims in the fourth amended complaint. In August 2008, Judge McKenna dismissed most of the RICO claims

---

[7]Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq.

[8]Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.

but left the antitrust claims largely intact.  UA0180-219.  This was Judge McKenna's last substantive ruling in *AMA* before the parties executed the Settlement.

### C.  The *Malchow* Case

Meanwhile, in February 2008 — nearly eight years after the *AMA* case commenced — the *Malchow* plaintiffs filed suit in the United States District Court for the District of New Jersey.  UA0277.  United was not a defendant in *Malchow*.  Instead, the *Malchow* plaintiffs brought claims against various Oxford entities that United had acquired in 2004.  *Malchow* was assigned to Judge Faith Hochberg.

Like *AMA*, the *Malchow* case challenged the use of the Ingenix databases to determine UCR rates.  UA0283-85.  In addition, the *Malchow* plaintiffs alleged that the Oxford entities had engaged in other wrongful conduct, such as denying full reimbursement for emergency services in violation of state law; automatically reducing coverage for multiple procedures performed on the same day; denying full reimbursement even after subscribers reached the contractual out-of-pocket maximum; and wrongfully denying coverage altogether when subscribers failed to get preauthorization for a procedure.  UA0313-16.

Based on these allegations, the *Malchow* plaintiffs brought various ERISA claims. A subset of plaintiffs also alleged violations of a New Jersey regulation that set particular standards for calculating UCR rates for small-employer health plans.  UA0320-28.  Unlike *AMA*, however, *Malchow* did not involve antitrust or RICO claims.

### D.  The Health Net *Case*

Again, *Malchow* was assigned to Judge Hochberg.  As it turned out, Judge Hochberg did not have to issue much in the way of substantive rulings in *Malchow*.  But the parties

nevertheless had considerable evidence about how Judge Hochberg was likely to rule on certain critical issues.  At the time that *Malchow* was filed, Judge Hochberg was already presiding over several other cases that also challenged the use of the Ingenix databases to calculate UCR rates. Several of those cases had been consolidated into a single case that the parties refer to as "*Health Net*."

Like *AMA*, *Health Net* was a protracted, hard-fought case involving extensive motion practice (not to mention several appeals to the Third Circuit).  Long before *Malchow* was filed, Judge Hochberg had already issued a number of significant rulings in *Health Net*.  Among other things, Judge Hochberg had held that the plaintiffs did *not* need to exhaust administrative remedies, and she certified a class of subscribers and beneficiaries.  *Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196, 208, 218-19 (D.N.J. 2004), *vacated and remanded*, 453 F.3d 179 (3d Cir. 2006) (vacating and remanding for a definition of claims, issues, and defenses to be treated on a class basis).

About six months after *Malchow* was filed — and about five months before United executed the Settlement — Judge Hochberg approved a settlement of the *Health Net* case.  The *Health Net* settlement provided a $215 million fund and significant equitable relief estimated to be worth $26 to $38 million for a class of about 2.5 million people.  *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 452-55 (D.N.J. 2008).

### E.  The AMA/Malchow *Settlement and Approval Process*

As noted, United executed the Settlement of the *AMA* and *Malchow* lawsuits on January 14, 2009.  UA0432, UA0467.  Under the Settlement, United essentially agreed to pay

$350 million in return for the release of the claims of a large settlement class that included

putative class members from both *AMA* and *Malchow*.

The settling parties agreed that they would implement the Settlement by asking

Judge McKenna to certify a settlement class and approve the Settlement as part of the *AMA* case.

UA0453-56, UA438 (procedure for seeking settlement approval and certification from the

"Court," defined as the United States District Court for the Southern District of New York);

UA0445 (defining "Settlement Class" to include all persons whose healthcare benefits were

insured or administered by any "Defendant"); UA0439 (defining "Defendants" to include United

entities (who were sued in *AMA*) and Oxford entities (who were sued in *Malchow*)).

The Settlement did not call for consolidation of the *AMA* and *Malchow* cases, however.

In the event that Judge McKenna did not approve the Settlement, *Malchow* would continue to

proceed before Judge Hochberg, and *AMA* would continue to proceed before Judge McKenna.

UA0452 ("In the event that this Settlement Agreement is terminated or the Effective Date does

not occur, the stay shall be vacated and the Oxford Action shall proceed as though the Settlement

Class has never been certified."); UA0435 (defining *Malchow* as the "Oxford Action").  The

parties agreed that, pending Judge McKenna's consideration of the Settlement, they would ask

Judge Hochberg to stay *Malchow*.

As they had agreed to do, the parties jointly moved in *AMA* for conditional certification

of a settlement class and preliminary approval of the Settlement.  *Am. Med. Ass'n*, No. 00-2800,

ECF No. 344.  Judge McKenna held an evidentiary hearing that spanned seven days.  UA0393.

Among the witnesses who testified at the hearing was Daniel Slottje, a professor of economics at

Southern Methodist University.  *Am. Med. Ass'n*, No. 00-2800, ECF No. 393 at 11-12; UA0899.

Slottje testified about what the parties called the "delta," which (roughly speaking) refers to the difference between the total amount that had been billed by out-of-network healthcare providers to United subscribers and the total amount that United had paid on those bills.  *Am. Med. Ass'n*, No. 00-2800, ECF No. 393 at 10.  The parties used calculations of the delta to provide a rough estimate of the "worst-case" scenario for United — that is, of the outer boundary of damages that plaintiffs could recover.  UA0395.  At the hearing, Slottje testified that he calculated the delta to be approximately $4.18 billion.  *Am. Med. Ass'n*, No. 00-2800, ECF No. 393 at 11-12.

After the evidentiary hearing, Judge McKenna issued an order in which, among other things, he reserved judgment on the motion for preliminary approval of the Settlement and requested additional information about the delta.  *Id.* at 15-16.  United then gave Slottje access to extensive claims records and data.  UA0899, UA0901.  Slottje prepared a lengthy affidavit (dated September 10, 2009) in which he analyzed the records, calculated a new delta, and estimated the size of the settlement class.  UA0898-936.  Specifically, Slottje opined that the delta was $4.76 billion (after excluding certain claims), and he estimated that the settlement class included 21.11 million members.  UA0900.[9]

After conducting more hearings and receiving extensive submissions, Judge McKenna preliminarily approved the Settlement and certified a settlement class in an order dated November 17, 2009.  UA0393-410.  Judge McKenna discussed the parties' competing calculations of the delta — he noted, for example, that the objecting plaintiffs' estimates ranged as high as $26.4 billion — and he found that Slottje's estimate was the most reasonable.

---

[9]The September 10, 2009 affidavit is denominated a "corrected" affidavit; the original version is not in the record.

UA0394-96.  Judge McKenna also accepted the Settlement proponents' contention that the delta should be reduced by 60 percent on the basis of his ruling that United could not be held liable with respect to claims submitted under plans for which United did not serve as the named administrator.  UA0399-401.  He also took note of the argument that the delta should be further reduced by 20 percent to account for deductibles and coinsurance, but it is unclear whether he agreed with that argument.  UA0399.  Judge McKenna did not expressly calculate a final delta; he did, however, find that the Settlement was reasonable in light of what he characterized as the "considerable problems facing plaintiffs should they choose to proceed to trial," UA0401, including the exhaustion-of-remedies issue and the issue of standing, UA0402-03.

For about another year, Judge McKenna dealt with various requests for clarification and miscellaneous motions.  A number of class members submitted objections to the Settlement.  Ultimately, Judge McKenna granted final approval to the Settlement on October 5, 2010.  UA0411-27.

## F.  The Wrap-up of Malchow

Shortly after the Settlement was executed, the *Malchow* defendants asked Judge Hochberg to stay *Malchow* pending the settlement-approval process in *AMA*.  *Malchow*, No. 08-935, ECF No. 102.  As the parties informed Judge Hochberg, however, there was a complicating factor: only one of the five named *Malchow* plaintiffs supported the Settlement, and the *Malchow* plaintiffs' attorneys were sharply divided over it.  *Id.* ECF No. 95; *id.* ECF No. 109 at 3.[10]  The four non-settling plaintiffs and their lawyers opposed any stay of *Malchow*,

---

[10]For this and any ECF document in which the ECF pagination at the top of the page differs from the document's pagination at the bottom, the Court cites to the document's

(continued...)

explaining that they objected to the Settlement on both substantive and procedural grounds.  *Id.*
ECF No. 109.

Judge Hochberg denied the motion to stay.  *Id.* ECF No. 117.  Shortly thereafter, the
*Malchow* plaintiffs filed an amended complaint.  *Id.* ECF Nos. 121, 122.  The parties continued
with discovery.  *See, e.g.*, *id.* ECF Nos. 129, 130, 145.

After Judge McKenna preliminarily approved the Settlement in November 2009, the
*Malchow* defendants again moved to stay *Malchow*.  *Id.* ECF No. 162.  This time,
Judge Hochberg granted the motion.  *Id.* ECF No. 174.  After Judge McKenna issued his final
approval order, Judge Hochberg dismissed *Malchow* without prejudice.  *Id.* ECF No. 182.  The
*Malchow* parties later stipulated to dismissal with prejudice.  *Id.* ECF Nos. 183, 184.

## II.  ANALYSIS

United now seeks to be indemnified for the amount of the Settlement that was
attributable to the *AMA* claim.  The insurers move for summary judgment on the ground that
United has insufficient evidence from which a jury could allocate the Settlement between the
(possibly covered) *AMA* claim and the (definitely uncovered) *Malchow* claim.

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the
suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[10](...continued)
pagination.

(1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255.

In responding to a motion for summary judgment, a party with the burden of proof must

submit and cite specific evidence in support of its claims.  *See Ince v. Aetna Health Mgmt., Inc.*,

173 F.3d 672, 677 (8th Cir. 1999) ("A party opposing summary judgment who will bear the

burden of proof at trial must come forward with evidence substantiating his position to avoid

summary judgment."); *cf. Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006)

("Without some guidance, we will not mine a summary judgment record searching for nuggets of

factual disputes to gild a party's arguments.").

The Court emphasizes this point because, during oral argument, United often alluded to

broad categories of evidence without providing citations or other specifics.  *See, e.g.*, ECF

No. 1533 at 10 (stating that United's *AMA* counsel "will testify extensively on what happened in

the *AMA* case").  At one point in its briefing, United even suggested that, at trial, it can meet its

burden of proof on allocation by using any admissible evidence that it disclosed during

discovery.  *See* ECF No. 1527 at 19.

United overlooks, however, that it will not even get to trial unless it first survives the

insurers' motion for summary judgment.  United cannot survive that motion on the basis of

vague descriptions of evidence that it intends to introduce at trial, but that it did not cite in its

briefs or even submit to the Court.  *See Ince*, 173 F.3d at 677; *Steen v. Myers*, 486 F.3d 1017,

1022 (7th Cir. 2007) ("summary judgment is not a dress rehearsal or practice run; it is the put up

or shut up moment in a lawsuit, when a party must show what evidence it has that would

convince a trier of fact to accept its version of the events" (citation and quotations omitted)).

### B. General Principles

#### 1. Allocating a Settlement

Generally speaking, the Court and United agree that allocation is an objective inquiry:

The question for the jury is how would a reasonable person in the position of United have

allocated the $350 million between the *AMA* claim and the *Malchow* claim at the time that the

Settlement was reached, in light of the information available to United at that time.  *See* ECF

No. 1527 at 34 (stating that "the ultimate question is . . . how an objective party in United's

position at the time of settlement, aware of the *AMA* orders, would ascribe the settlement

payment"); ECF No. 1359 at 32 ("any allocation of settlement payments is based upon the case

at the time of the settlement"); ECF No. 1533 at 4 (agreeing that "the question for the jury will

be how would a reasonable person at the time of the settlement with the information available to

the parties at the time of the settlement allocate the settlement"); *cf. Zurich Reins. (UK) Ltd. v.*

*Can. Pac. Ltd.*, 613 N.W.2d 760, 764-65 (Minn. Ct. App. 2000) (examining settlement

negotiations and internal memoranda to determine whether the settlement included uncovered

punitive damages); *Convent of the Visitation Sch. v. Cont'l Cas. Co.*, 707 F. Supp. 412, 416-17

(D. Minn. 1989) (examining evidence contemporaneous with the settlement to determine an

allocation).

Although the Court and United generally agree that the jury must allocate based on the

information that was available to United at the time of the Settlement, it turns out that the Court

and United do not agree about what constitutes "the time of the Settlement."  United contends

that the Settlement did not take legal effect until it was approved, and therefore the information available to United at "the time of the Settlement" includes anything that was said or done during the settlement-approval process before Judge McKenna.  The Court disagrees.

The Settlement was reached on January 14, 2009, when the parties executed the formal agreement to settle *AMA* and *Malchow*.  At that point, United became legally bound to pay $350 million to settle the *AMA* and *Malchow* claims, and the plaintiffs became legally bound to dismiss those claims.  That this legal obligation was contingent on a judge's later approval is not relevant for purposes of allocation.  All of the decisions that the parties made about the Settlement — such as their assessments about the plaintiffs' chances of prevailing on various claims and the range of damages that might be awarded on those claims — were made before the parties reached a formal agreement to settle the case on January 14, 2009.  Nothing said or done after January 14, 2009 could have influenced the parties' decision to settle because they had already made that decision — and, indeed, had executed a legally binding written commitment to settle contingent only on a decision made by a third party (Judge McKenna) to approve that settlement.

Indeed, United itself relies on similar reasoning in arguing that none of the Settlement should be allocated to claims that were not asserted against United until an amended complaint was filed in *Malchow* in March 2009 — two months after the Settlement was executed, but long before the Settlement was approved by Judge McKenna.  ECF No. 1527 at 21-22.  United has no explanation for why claims not made until two months after the Settlement was executed are not relevant to allocation, but information that came to light many months after the Settlement was executed is relevant.

United is right about the claims, but wrong about the information.  The Court agrees with United that none of the Settlement should be allocated to claims that were not asserted against United until the amended complaint was filed in *Malchow* in March 2009 (at least absent evidence that United knew at the time that it executed the Settlement in January 2009 that the *Malchow* plaintiffs were planning to bring those new claims).  Again, the question that the jury must answer in this lawsuit is how would a reasonable person in United's position have allocated the Settlement between *AMA* and *Malchow* at the time that the Settlement was reached, in light of the information that was available to United at that time.  Without any evidence that United was aware of the new *Malchow* claims at the time that it executed the Settlement, those new claims are not relevant to the issue of allocation.  By the same token, however, United cannot rely on events that occurred or on information that it learned after the Settlement was reached to show how a reasonable party in its position would have allocated at the time that the Settlement was reached.

United also points out that the Settlement was amended a couple of times after January 14, 2009.  The amendments did not materially alter the terms of the Settlement, however.  Instead, they merely involved minor changes and corrections, such as specifying which "out of network" policies were involved in the Settlement.  *Compare* UA0445 *with* UA0513-514.  United does not contend — and no evidence in the record suggests — that these minor revisions would have had an impact on the manner in which a reasonable person would have allocated the $350 million Settlement between the *AMA* claim and the *Malchow* claim.

2.  The Burden of Proof

The Court previously held — and United agreed — that United bears the burden to prove how much of the $350 million Settlement should be allocated to the *AMA* claim.  *See UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, 941 F. Supp. 2d 1029, 1035 (D. Minn. 2013); *see also Camden-Clark Mem. Hosp. Ass'n v. St. Paul Fire & Marine Ins. Co.*, 682 S.E.2d 566, 568 (W. Va. 2009) ("where an insurance policy does not impose a duty to defend upon the insurer and the insured is a sophisticated entity which has controlled the defense of the underlying claim, the burden of proof regarding allocation of a jury verdict between claims covered by the policy and claims not covered by the policy falls upon the insured"), *cited in Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 617-18 (Minn. 2012).

The Court also held — over United's objection — that, should any further allocation be necessary, United will bear the burden of proving how much of the *AMA* portion of the Settlement should be allocated to covered claims.  What the Court has referred to as the "*AMA* claim" was, of course, a number of claims — including, for example, ERISA claims and antitrust claims.  The insurers argue that some of these claims are not covered, either because they do not fall within a grant of coverage, or because they fall within an exclusion from coverage.  The parties agree that, with respect to each claim asserted in the *AMA* lawsuit, United has the burden of proving that the claim falls within a grant of coverage, and the insurers have the burden of proving that the claim falls within an exclusion from coverage.  What the parties dispute is whether United has the burden of proving how much of the *AMA* portion of the Settlement should be allocated to covered claims — that is, claims that fall within a grant of coverage and that do not fall within an exclusion from coverage.

-17-

The Court held that United has the burden of proving how much of the *AMA* portion of the Settlement should be allocated to covered claims.  *UnitedHealth Grp. Inc.*, 941 F. Supp. 2d at 1035-39.  United asks the Court for permission to seek reconsideration of this latter holding.  But nothing said by United persuades the Court that it was mistaken, and thus United's request is denied.  Moreover, given that the current motion focuses on allocating the Settlement between the *AMA* claims and the *Malchow* claims (and not on allocating the Settlement between covered *AMA* claims and uncovered *AMA* claims) — and given that there is no dispute that United bears the burden of proving how much of the $350 million Settlement should be allocated to *AMA* (as opposed to *Malchow*) — it does not matter for present purposes who should bear the burden of proof regarding further allocation among the claims brought in the *AMA* lawsuit.

### 3.  Types of Evidence

There are several types of evidence that an insured may introduce to meet its burden to prove what portion of a multi-claim settlement should be allocated to a particular claim.  First, the insured may offer testimony or other evidence of how the insured itself (or its attorneys) evaluated the claims at the time of settlement.  *See, e.g.*, *Zurich Reins. (UK) Ltd.*, 613 N.W.2d at 764-65 (relying on attorneys' testimony about settlement negotiations and internal risk-assessment memoranda prepared during negotiations to determine whether the settlement included punitive damages); *Gopher Oil Co. v. Am. Hardware Mut. Ins. Co.*, 588 N.W.2d 756, 769 (Minn. Ct. App. 1999) ("The evidence on the allocation consisted of undisputed testimony of Gopher's defense attorney that $10,000 was a reasonable allocation of Bame's and Gopher Rubber Cote's combined share of the settlement.").  Because allocation is an objective inquiry, this subjective evidence would not be dispositive, but it would nevertheless be relevant.

Second, an insured may present evidence of the information that was known to the insured at the time of settlement — such as court rulings, deposition testimony, or the insured's personal knowledge of the underlying facts — and ask the factfinder to determine how a reasonable person in the insured's position would have allocated the settlement in light of that information. *See, e.g.*, *Convent of the Visitation Sch.*, 707 F. Supp. at 416-17 (examining evidence about the nature of the parties' contractual relationship, the plaintiff's demand for damages, and a statement by a judge during a settlement conference to determine that only a small portion of the settlement was attributable to uncovered claims).

Finally, an insured may present expert testimony about how the settlement should be allocated among the settled claims in light of what was known to the insured at the time of settlement:

> At its core, this issue [of allocation] concerns the evaluation of the comparative responsibilities of the particular parties and of their exposure to an award of damages in the underlying suit.  Evidence of this evaluation came from lawyers representing the Nodaway bank officers and directors, the claim manager for Continental, and a lawyer testifying as an expert witness, all of whom gave opinions as to the respective liability of the non-insured corporate entities and the insured individual officers and directors.  The testimony . . . involved legal theories of recovery against the parties in the underlying action and an analysis of the facts applicable under those theories.

*Nodaway Valley Bank v. Cont'l Cas. Co.*, 916 F.2d 1362, 1365-66 (8th Cir. 1990).[11]

---

[11]At times in the past, United has suggested the possibility of a fourth type of evidence — namely, evidence as to how the Settlement proceeds were actually distributed to members of the settlement class.  At one time it appeared that United intended to introduce such evidence to support its position on allocation, *see* ECF No. 511 at 36-37; Schiller Decl., Nov. 1, 2013 [ECF No. 1509] Ex. 29 at 6-7, but United has submitted no such evidence to the Court, and United apparently never produced such evidence during discovery, *see* ECF No. 1508 at 14 n.6.

### C. *United's Evidence*

The first type of evidence — that is, evidence of how the insured or its attorneys evaluated the claims at the time of settlement — is not available to United, as United repeatedly invoked the attorney-client privilege and work-product doctrine to prevent the insurers from inquiring into United's (or its counsels') subjective evaluations of *AMA*, *Malchow*, and the Settlement. *See, e.g.*, Schiller Decl., Nov. 1, 2013 [ECF No. 1509]  Ex. 9 at 102-03, 205; *id.* Ex. 11 at 157-58; *id.* Ex. 12 at 372-74; *id.* Ex. 13 at 200, 416-17, 506-07, 509-10, 518-21; *id.* Ex. 14 at 23-24, 27-28, 30-33, 35; ECF No. 1533 at 10 ("The defense counsel in the *AMA* case, they are not going to get up and waive the privilege and say here's my analysis of the case.").

Although United has not been clear about the matter, United appears to believe that it has the option of supporting its allocation position with evidence of unprivileged statements that United or its counsel made during settlement negotiations and the settlement-approval process. *See* ECF No. 1533 at 10, 36.  United did not actually cite such statements to support its position regarding allocation,[12] and thus the Court is not certain what United has in mind.  But any attempt by United to introduce evidence of such out-of-court statements would run into at least two problems.  First, the hearsay rule would bar any use of an out-of-court statement to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered to prove the truth of the matter asserted in the statement).  Second, introduction of such statements by United and its counsel would put in issue a subject about

---

[12]United did cite some deposition testimony in its brief, but only in the context of arguing that it disclosed evidence during discovery, and not to show how that testimony supports its position on allocation. *See, e.g.*, ECF No. 1527 at 39-40, 42-43.

which United adamantly refused to provide discovery — namely, the subjective evaluations of the Settlement and of the *AMA* and *Malchow* actions by United and its counsel.

United appears to believe that it or its counsel can testify as to out-of-court statements indicating how United evaluated the Settlement without being subjected to cross-examination about those statements — such as questions designed to elicit evidence that the speaker did not believe what he said. *See, e.g.*, Schiller Decl. Ex. 14 at 31 ("I would also instruct him not to respond with what his legal thinking was behind the statement.  He made public statements and you can find out what he said in those public statements, but not his thinking that he did not reveal to the public.").  Needless to say, a party cannot use the attorney-client privilege or the work-product doctrine both as a shield and as a sword.  If United wanted to use evidence of its or its counsels' settlement evaluations as evidence in this case — which is what United would be doing were it to offer its or its counsels' out-of-court statements on that subject — then United had to allow the insurers to inquire about those evaluations during discovery.

United contends that this is tantamount to requiring an insured to waive its privileges in order to obtain insurance coverage.  ECF No. 1533 at 81.  That is obviously not true.  As described above, there are other types of evidence that an insured can use to prove allocation that do not require waiver of any privilege.  In addition, contrary to United's implication, insureds have in the past waived the attorney-client privilege so that trial attorneys could testify about their subjective evaluation of settled claims.  *Cf. Zurich Reins. (UK) Ltd.*, 613 N.W.2d at 764-65 (examining counsels' testimony and insured's internal memoranda to determine whether punitive damages were part of the settlement).

In any event, this discussion is largely academic because, although United mentioned the

possibility of offering such out-of-court statements at oral argument, United has not actually

cited any such statements to support its allocation position.  Instead, United has (at least until

very recently) made it clear that it would rely mostly, if not entirely, on expert testimony to meet

its burden of proof on allocation.  *See* UA0939 at 48 (United attorney characterizing damages as

"clearly . . . an expert witness issue").

United identified James Halverson, an attorney and expert on antitrust litigation, as its

expert on allocation.  In his expert report, Halverson opined that (1) the reasonable settlement

value of the antitrust claims in *AMA* exceeded $350 million and ranged up to $500 million and

(2) 90 to 95 percent of the Settlement should be attributed to the antitrust claims in *AMA*.

UA0702.  It will not come as a surprise that the Court's early rulings on coverage issues made it

clear that the Court believes that any antitrust claims are likely covered.  Understandably, then,

United has been laboring to allocate almost all of the Settlement to the antitrust claims asserted

in the *AMA* lawsuit, and to downplay the other claims asserted in *AMA* and all of the claims

asserted in *Malchow*.

In a previous round of motions, the Court addressed the admissibility of Halverson's

testimony.  The Court held that Halverson may testify as to the settlement value of the *AMA*

antitrust claims.  *UnitedHealth Grp. Inc.*, 941 F. Supp. 2d at 1040.  As the Court noted, there is

no question that Halverson is an expert on antitrust, and Halverson engaged in a detailed analysis

of the *AMA* antitrust claims to determine their strength and likely settlement value.

But the Court also held that Halverson may not testify about how the Settlement should

be allocated between the *AMA* antitrust claims and the other claims encompassed in the

Settlement, including the claims asserted in *Malchow*. *Id.* at 1040-41. The Court explained that

Halverson "did not even purport to offer an opinion regarding the settlement value of the

*Malchow* claims, and he will therefore not be permitted to testify as to how the settlement should

be allocated between the *AMA* claims and the *Malchow* claims." *Id.* The Court also found that

United had not established that Halverson was an expert with respect to ERISA or RICO and that

therefore he could not testify as to the settlement value of those claims in *AMA*. *Id.* at 1041.

In their current motion, the insurers argue, among other things, that the Court's ruling

partially excluding Halverson's testimony leaves United without sufficient evidence from which

a jury could apportion the Settlement between the *AMA* claim and the *Malchow* claim. In

response to this insufficiency-of-the-evidence argument, United argues that (1) the Court should

change its mind and permit Halverson to testify as to how the Settlement should be allocated

between *AMA* and *Malchow*; (2) even without Halverson's testimony on allocation, there is

sufficient evidence from which a jury can allocate; and (3) even if the jury does not have

sufficient evidence to allocate, United can prove that its covered damages likely exceed the

remaining amount of available insurance. The Court will consider each of these arguments.

### 1.   Halverson

As noted, the Court excluded Halverson's opinion that 90 to 95 percent of the Settlement

should be allocated to the antitrust claims in the *AMA* case. Among the other problems with

Halverson's opinion, Halverson did not analyze the *Malchow* case or determine a likely

settlement value for it. Having failed to analyze *Malchow*, Halverson cannot possibly allocate

between *AMA* and *Malchow*.

An allocation is, by its very nature, a determination of the *relative* value — not the *absolute* value — of the items being assessed. *See Nodaway Valley Bank*, 916 F.2d at 1365 ("At its core, this issue [of allocation] concerns the evaluation of the *comparative* responsibilities of the particular parties and of their exposure to an award of damages in the underlying suit." (emphasis added)). By opining that 90 to 95 percent of the Settlement should be attributed to the antitrust claims in *AMA*, Halverson is necessarily making a judgment about the relative value of every claim involved in the Settlement. Without any clue as to the value of the *Malchow* claims, however, Halverson has no basis for making such a comparative judgment.

To illustrate: Suppose a buyer purchases two paintings at an estate sale for a lump sum of $50 million. One of the paintings is by Picasso, and the other is by a different artist. Suppose further that the buyer needs to allocate a portion of the $50 million to the Picasso — perhaps because the buyer intends to sell the Picasso immediately at auction, and needs to establish a tax basis for the painting.

No expert could reliably opine on the amount of the $50 million purchase price that should be allocated to the Picasso without examining the other painting. If, for example, the buyer hired an art expert, the expert examined only the Picasso, and the expert opined that the Picasso was worth $50 million, the expert would have established the *absolute* value of the Picasso. But it would be impossible to say whether all of the $50 million that was paid for the two paintings should be allocated to the Picasso without knowing its value relative to the other painting. And, of course, no one could assess the Picasso's *relative* value without assessing the value of the other painting.

Suppose, for example, that the other painting was a Van Gogh, and the art expert assessed its value at $100 million.  At that point, we would know that the buyer struck a good deal:  He purchased $150 million worth of paintings for $50 million.  We would also know that the portion of the purchase price that should be allocated to the Picasso is about $16.67 million.

Suppose instead that the other painting was painted in a high-school art class by the former owner's son, and the art expert opines that it is worthless.  At that point, we would know that the buyer bought a $50 million Picasso and a piece of worthless art for $50 million.  We would also know that the portion of the purchase price that should be allocated to the Picasso is $50 million.

What is true about purchased paintings is also true about settled claims.  In this case, the *AMA* claim is the equivalent of the Picasso, the *Malchow* claim is the equivalent of the other painting, and Halverson is the equivalent of the art expert.  Halverson examined the *AMA* litigation in detail and opined about the value of the claims in that case.  But Halverson did not review any of the pleadings or other materials in *Malchow*.  UA0713-721, UA0768-776 (list of documents that Halverson reviewed).  Nor did Halverson say anything about the merits of *Malchow* in his reports or during his deposition.

The contrast between Halverson's detailed discussion of *AMA* and his lack of any discussion of *Malchow* is striking.  Whereas Halverson set out an exhaustively detailed review of the procedural history of *AMA* — including a detailed description of each complaint, motion, and ruling — he did nothing of the sort regarding *Malchow*.  At his deposition, Halverson seemed barely to be aware of the existence of *Malchow*, Halverson Dep. 191, and there is no evidence

that Halverson understood that *Malchow* was a separate case proceeding before a different judge in a different district.

To the contrary:  Halverson discounted the importance of Judge Hochberg's ruling on exhaustion in *Health Net* precisely because Judge McKenna, and not Judge Hochberg, was presiding over *AMA*.  Halverson Dep. 154.  Yet, at the same time, Halverson repeatedly insisted that understanding the presiding judge's views and the jurisdiction in which that judge sits is crucial to determining the settlement value of a case.[13]  Halverson's insistence on understanding the presiding judge's views reflects the truism that the settlement value of a case depends on the parties' predictions as to what will happen in the *absence* of a settlement.  Had Halverson realized that Judge Hochberg — not Judge McKenna — would continue to preside over *Malchow* in the event that the Settlement fell through, it is inconceivable that he would not have considered her exhaustion ruling in *Health Net* in determining a settlement value for *Malchow*.

At his deposition, Halverson initially admitted that he did not analyze *Malchow*. Halverson Dep. 191.  Halverson later qualified that statement by pointing out that he considered Daniel Slottje's affidavit and calculation of the delta, which in turn included amounts attributable

---

[13]*See* Halverson Dep. 47 ("you had to assess if you were settling the case what the likelihood of success would be, and that would be based on the judge's rulings and where the case was at that point and what facts you had in hand"); *id.* at 86 ("my view is that you make a judgment as a lawyer on settlements based on the district, United States district you're in, the judge you have, and the fact situation"); *id.* at 87 ("I think before a New York — Southern District of New York jury the question was not how much, it was how many billion dollars they'd lose by"); *id.* at 88 ("I mean you've got to read the judge's opinions to get a feel for the judge.  That's why I insisted on getting every single thing written by Judge McKenna."); *id.* at 116-17 ("I think you look more at the judge when you're settling a case, and the judge didn't think much of the ERISA claims"); *id.* at 137 ("The Southern District of New York is not a good place to try a case if you're an anti-trust defendant.").

to Oxford subscribers (that is, members of the *Malchow* putative class).  Halverson Dep. 194-96.
United relies on this testimony to claim that Halverson did, in fact, evaluate *Malchow*.

 United is grasping at straws.  As United knows, Slottje is not a lawyer, and he would
have no idea of the settlement value of the *Malchow* claims.  Not surprisingly, then, his
affidavits do not purport to express an opinion about the settlement value of the *Malchow* claims
— nor, for that matter, do those affidavits even contain information about the claims in
*Malchow*.[14]  Instead, Slottje undertook a statistical analysis of all of the bills that United had
received from out-of-network providers and the amount of those bills that United had paid in an
effort to determine the outer limit of the damages that United might be forced to pay.  This is
useful information in determining a settlement value, but someone attempting to assess the
settlement value of a case obviously needs to know much more.  To determine the settlement
value of a case, it is essential to analyze not only the amount of money that the plaintiff *could*
win, but the likelihood that the plaintiff *will* win — exactly the kind of analysis that Halverson
performed with respect to *AMA* but that no one performed with respect to *Malchow*.  Halverson's
consideration of Slottje's delta is no substitute for this kind of analysis and does not provide
Halverson with any basis on which to opine about the settlement value of *Malchow*.

 United also appears to contend that, because Judge McKenna ultimately approved a
Settlement that included *Malchow*, *AMA* and *Malchow* are the same, and any references in
Halverson's report to *AMA* were intended to include *Malchow*.  This argument appears mainly

---

[14]Halverson's report indicates that he reviewed more than one version of Slottje's
affidavit.  UA0717.  Only the September 10, 2009 version is in this Court's record.  In the
absence of evidence to the contrary, the Court presumes that Slottje's other affidavits contain the
same sort of statistical analysis as the September 10 version.

intended to counter the insurers' argument that United never disclosed an allocation between *AMA* and *Malchow* during discovery.  The Court agrees with United that Halverson's allocation of 95 percent of the Settlement to the claims in *AMA* necessarily disclosed an allocation between *AMA* and *Malchow*.  The problem with Halverson's allocation is not that it was not disclosed; the problem is that Halverson had no basis for it.  In any event, if United is trying to argue that Halverson actually evaluated *Malchow* because Halverson's references to *AMA* included *Malchow*, this argument is thoroughly refuted by the fact that Halverson did not review any documents filed in *Malchow* and admitted during his deposition that he did not review *Malchow* (with the exception of the Slottje affidavit discussed above).

United also asks the Court to reconsider its previous holding that Halverson cannot opine about the strength of the ERISA and RICO claims asserted in *AMA* because United failed to show that he has any expertise in those areas of law.  The Court need not revisit this issue, however, because it makes no difference to the outcome of the insurers' current motion.  Whether or not Halverson has sufficient expertise to opine on the value of the ERISA or RICO claims asserted in *AMA*, the fact remains that he did not analyze *Malchow* and thus he can neither opine on the settlement value of the *Malchow* claims nor testify as to how the Settlement should be allocated between *AMA* and *Malchow*.

Finally, United spends a great deal of time arguing that 5 to 10 percent of the Settlement is attributable to the ERISA claims asserted in the *AMA* and *Malchow* actions, and that United need not further break that figure down between the *AMA* ERISA claims and the *Malchow* ERISA claims.  The obvious problem with this argument is that it starts with the premise that 90 to 95 percent of the Settlement should be allocated to the antitrust claims in *AMA*.  Because

the Court has excluded Halverson's allocation testimony — and because (as discussed below) United has no other evidence from which a jury could determine a settlement value for *Malchow* — United has no evidence to establish the premise on which this argument depends.

In short, Halverson is like the art expert who examined only the Picasso and opined that it is worth $50 million.  Without knowing anything about the value of the other painting — without knowing whether it is a Van Gogh worth $100 million or a worthless piece of junk — the art expert cannot express a rational opinion about how the $50 million purchase price should be allocated between the two paintings.  Likewise, Halverson cannot express a rational opinion about how the $350 million Settlement should be allocated between the *AMA* claim and the *Malchow* claim without knowing anything about the value of the *Malchow* claim.  The Court affirms its ruling that Halverson may not testify about the *relative* value of the *AMA* claim, and thus he may not testify about allocation.

### 2.  United's Alternative Method

United argues that, instead of proving how the Settlement should be allocated between *AMA* and *Malchow*, it can simply prove that it is more likely than not that the *AMA* antitrust claims are worth more than the insurers' combined coverage limits.  In other words, United says that it can prove (1) that the *AMA* antitrust claims are covered by the excess insurance policies; (2) that the settlement value of the *AMA* antitrust claims exceeded $350 million; and (3) that the combined coverage limits of the excess policies is less than $350 million.

The problem, though, is that this is just another way of arguing that it is sufficient for United to prove the absolute value of the *AMA* claim without also proving its value in relation to the value of the *Malchow* claim.  As explained above, that is not enough.  The question is not

what the *AMA* claim was worth in the abstract; the question is how much of the $350 million Settlement was paid to settle the *AMA* claim.  It is not possible to answer the latter question without also determining how much of the Settlement was paid to settle the *Malchow* claim.

At oral argument, United mentioned that counsel for the settlement class received a fee award of $87.5 million that was paid out of the Settlement.  United seemed to imply that — failing all else — United can at least prove covered claims of $87.5 million.  *See* UA0424; ECF No. 1533 at 19.  But United did not brief this issue, and as a result it has cited no evidence (and the Court has found none) from which a jury could determine which portion of the $87.5 million went to pay plaintiffs' counsel for their legal work in *AMA* rather than for their legal work in *Malchow*.  Similarly, United mentioned defense costs in its briefing and at oral argument, but cited no evidence whatsoever of those costs.  Thus, even if United could theoretically prove some amount of covered damages without performing an allocation, United has not offered any evidence to establish such damages — and without such evidence, summary judgment must be entered against it on its claim for *AMA* defense costs.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### 3.  Sufficiency of the Evidence

United argues that, even if the Court excludes Halverson's opinion that 90 to 95 percent of the Settlement should be allocated to the antitrust claims in *AMA*, United still has sufficient evidence from which a jury can allocate between *AMA* and *Malchow*.  Specifically, United says that it will prove its allocation case with evidence of the following:

> the history of the *AMA* litigation; the *AMA* Court's orders
> dismissing or limiting the claims; the settlement and approval
> process; expert testimony regarding the strength of the key claims

> in the case; and the *AMA* Court's impartial, contemporaneous
> approval order evaluating the settled claims . . . .

ECF No. 1527 at 1.

Using this evidence, United intends to prove that nearly all of the Settlement should be allocated to the antitrust claims in *AMA*. Specifically, United proposes to prove that (1) Judge McKenna eliminated 98.5 percent of the *AMA* plaintiffs' ERISA monetary claims because those plaintiffs had failed to exhaust their administrative remedies; (2) Judge McKenna eliminated a further 60 percent of the remaining ERISA claims in *AMA* by holding that United could not be held liable with respect to plans for which someone else was the plan administrator; (3) Judge McKenna also held that the remaining plaintiffs in *AMA* had to prove that they were actually billed for the unpaid balance, which further reduced the "microscopic" number of remaining ERISA claims; (4) Judge McKenna got rid of almost all of the other claims in *AMA* except for the antitrust claims; and therefore (5) most of the $350 million Settlement should be attributed to the antitrust claims in *AMA*. *See* ECF No. 1527 at 7-9.

An astute reader will notice that United's argument is entirely focused on what Judge McKenna did in the *AMA* case and has nothing to do with the *Malchow* case. An astute reader who is familiar with Halverson's expert report will also notice that United's argument essentially parrots the analysis used by Halverson to reach his allocation — an allocation to which Halverson cannot testify because he did not evaluate *Malchow*. Without actually saying so, United seems to imply that it can fix this problem by handing the *Malchow* materials to the jury and asking the jury to perform the analysis of *Malchow* that it failed to ask Halverson (or any other expert) to perform.

There are two major problems with United's proposal — if, in fact, this is what United proposes.  First, United seeks to ask a jury of lay persons to take the summary-judgment and Rule 12(b)(6) decisions that Judge McKenna issued in *AMA* and use them to determine the settlement value of the claims pending before Judge Hochberg in *Malchow*.  This is far beyond the capabilities of a lay jury.  Second, even if a lay jury could perform this kind of analysis, United has failed to offer admissible evidence that would support the chain of inferences that United is asking the jury to draw.

### a. Need for Expert Evidence

As discussed earlier, there are essentially three types of evidence that a party may introduce to prove an allocation case.  A party may introduce evidence of how the settling parties and their attorneys valued the claims at the time of settlement; a party may introduce evidence of what was known to the parties and their attorneys at the time of the settlement and ask the jury to assess the settlement value of each of the claims based on that information; or a party may introduce expert testimony about the settlement value of the settled claims.  Each of these approaches shares a common element:  Someone looks at the information available to the parties at the time of settlement and assesses the value of each of the settled claims.  The difference between the approaches is in the identity of the evaluator.

Undoubtedly, in a case involving relatively uncomplicated facts and law — where, for example, the underlying claims were asserted in a simple slip-and-fall case —  a lay jury may be able to act as the evaluator without guidance from either the settling parties or an expert witness.  Here, however, United is asking the jury to determine the settlement value of *Malchow* — a case pending before Judge Hochberg, a district judge in the Third Circuit — by reading, digesting,

and applying the voluminous and complex summary-judgment and Rule 12(b)(6) rulings issued in a different case by Judge McKenna, a district judge in the Second Circuit.  This would be a daunting task for a *lawyer*.  No responsible lawyer would attempt such a determination without carefully comparing the factual assertions and legal arguments made in the two cases, researching the prior opinions and predilections of the two judges, and ascertaining whether there are any differences in circuit law that might affect the outcomes of the cases.

Such a lawyer would, without question, closely examine Judge Hochberg's rulings in the *Health Net* case.[15]  As discussed above, United's own expert repeatedly testified that understanding the views of the presiding judge is essential to determining a case's settlement value.  Thus, the lawyer would undoubtedly take into account the fact that (1) Judge Hochberg excused the *Health Net* plaintiffs from exhausting their administrative remedies (in contrast to Judge McKenna requiring the *AMA* plaintiffs to exhaust their remedies); (2) Judge Hochberg certified a class in *Health Net*; and (3) Judge Hochberg approved a cash settlement of $215 million for a class of about 2.5 million (in contrast to the Settlement approved by Judge McKenna, which provided $350 million to a class of over 21 million).[16]  All of this suggests that

---

[15]United makes the odd claim that the insurers cannot raise the significance of *Health Net* because they did not disclose it when, in discovery, United inquired into the factual basis of the insurers' allocation position.  ECF No. 1527 at 22.  Again, it is United — not the insurers — who has the burden of proof on allocating between *AMA* and *Malchow*.  If United does not have sufficient evidence to prove its allocation contentions by a preponderance of the evidence, then the insurers are entitled to summary judgment, whether or not they even *have* a position on allocation, and whether or not they have *any* evidence to support that position.  It is thus irrelevant whether or not the insurers disclosed an allocation, and their failure to do so does not foreclose them from pointing out the flaws in United's position.

[16]United contends that the Third Circuit reversed class certification in *Health Net* and that, on remand, Judge Hochberg found that whether exhaustion should be excused on the

(continued...)

an ERISA claim pending before Judge Hochberg in *Malchow* might have a considerably higher settlement value than a similar claim pending before Judge McKenna in *AMA*.

None of this analysis could be performed by a lay jury. To make matters worse, *AMA* and *Malchow* were far from simple slip-and-fall cases. They were extraordinarily complex class actions involving, among other things, claims under ERISA — a labyrinthine federal statutory scheme that is challenging even for legal experts. The complaints in these cases are dozens of pages long and contain arcane legal concepts and vocabulary that no lay juror would comprehend. The hundreds of pages of rulings issued by Judge McKenna interpret and apply legal principles from many sources and examine the factual record in detail. For a juror to have any hope of digesting these rulings and assessing their impact (if any) on *Malchow*, the juror would need not just an understanding of ERISA and other complex areas of substantive law, but also an understanding of civil procedure, the class-certification process, the litigation process, and the structure of the federal-court system.

This is evident from the fact that Halverson brought all such knowledge to bear in determining the settlement value of *AMA*. Indeed, in his rebuttal report Halverson opined that the insurers' expert (an antitrust economist) is not qualified to opine on the settlement value of the antitrust claims in *AMA*. UA0724. If even an *antitrust economist* is not qualified to determine a settlement value for *antitrust claims*, a jury of farmers and mechanics and nurses and

---

[16](...continued)
ground of futility was an issue for trial. ECF No. 1527 at 23. In the Court's view, this is an incorrect reading of the Third Circuit's decision and Judge Hochberg's order following remand. More importantly, though, this disagreement simply illustrates why a lay jury could not, without expert assistance, interpret the meaning of Judge Hochberg's rulings in *Health Net* and determine how they affected the settlement value of *Malchow*.

factory workers could not possibly assess the settlement value of *Malchow* by reading

Judge McKenna's rulings in *AMA* and then "applying" them to the claims pending before Judge

Hochberg in *Malchow*.

       The Court does not intend to suggest that expert testimony is required in every case in

which a jury is asked to allocate a settlement among various claims.  The Court holds only that

in *this* case — a case in which United seeks to present evidence that no lay jury would

understand and to ask the jury to draw inferences that no lay jury would be capable of drawing

— the jury would need the assistance of the expert testimony of an attorney who participated in

litigating the underlying cases or an attorney who is hired to give expert testimony.  *See Stern v.*

*Univ. of Osteopathic Med. & Health Scis.*, 220 F.3d 906, 908-09 (8th Cir. 2000) ("We conclude

that expert opinion is necessary here because neither the average layperson nor this court can

determine without expert assistance the nature of dyslexia and what measures would actually

address Mr. Stern's needs."); *Walstad v. Univ. of Minn. Hosps.*, 442 F.2d 634, 639 (8th Cir.

1971) ("when the causal relation issue is not one within the common knowledge of laymen,

causation in fact cannot be determined without expert testimony"); *Christensen v. N. States*

*Power Co.*, 25 N.W.2d 659, 660 (Minn. 1946) ("What effect, if any, the electricity would have is

a matter of which this court cannot take judicial notice, for the simple reason that it is not a

matter of common knowledge.").  Without expert testimony to guide the jury in determining how

Judge McKenna's rulings in *AMA* might affect the settlement value of the *Malchow* claims, the

jury would simply be left to speculate, and juries may not return verdicts based on speculation.

*b. United's Substitute "Experts"*

As noted, United seems to imply, but does not actually argue, that a lay jury is capable of reading and digesting Judge McKenna's summary-judgment and Rule 12(b)(6) orders and using them to assess the settlement value of *Malchow*.  Probably because that proposition is a nonstarter, United also tries a variety of methods to press Judge McKenna (or this Court) into service as a de facto expert witness on its behalf — but again, without actually acknowledging what it is doing.

For example, United seeks to turn Judge McKenna into an expert on the settlement value of the *Malchow* claims by treating the rulings that he issued in *AMA* as though those rulings were fully binding and applicable in *Malchow*.  As United would have it, because the settling parties chose to implement the Settlement by folding *Malchow* into *AMA*, *Malchow* became the same case as *AMA*, and Judge McKenna's rulings dismissing most of the ERISA claims in *AMA* somehow became legally binding in *Malchow*.

United never actually explains how this could be so (and, not incidentally, it would be easy for a lay jury to become confused on this point).  Instead, United treats it as an established fact.  United is plainly incorrect.  Judge McKenna's rulings on the motions to dismiss and for summary judgment came long before the *Malchow* putative class came before him via the settlement-approval process.  The fact that the parties chose — as a procedural vehicle for implementing the Settlement — to fold all of the claims and putative class members into a single settlement to be submitted to Judge McKenna did not somehow render Judge McKenna's early rulings on substantive motions retroactively applicable to the *Malchow* claims.

Of course, sometimes separate cases are consolidated before a single judge, in which case the judge may apply his previous rulings to all of the claims in the newly consolidated case. That is not what happened with respect to *AMA* and *Malchow*, however.  Judge Hochberg never transferred *Malchow* to Judge McKenna, and Judge McKenna never had authority to dismiss or grant summary judgment on any of the *Malchow* claims.  Throughout the settlement-approval process, *Malchow* remained pending before Judge Hochberg.  Indeed, Judge Hochberg initially refused to stay *Malchow* even after the Settlement was executed, and the *Malchow* parties continued to litigate before Judge Hochberg while Judge McKenna considered whether to preliminarily approve the Settlement.

Judge McKenna's only authority with respect to *Malchow* was to decide whether to approve a global settlement that included the *Malchow* claims.  If Judge McKenna did not approve the Settlement, Judge Hochberg would continue to preside over *Malchow*.  For that reason, the settlement value of *Malchow* had a lot to do with how a reasonable person would predict that Judge Hochberg would rule in *Malchow*, and had almost nothing to do with how Judge McKenna had ruled in *AMA*.  This would be readily apparent to a lawyer who understands civil procedure, the legal process, the class-action mechanism, and the scope of a judge's authority — but not readily apparent to a lay juror.

United's other attempt to draft Judge McKenna into service as its expert witness regarding the settlement value of the *Malchow* claims involves using Judge McKenna's settlement-approval opinions as evidence of the strength of those claims.  This is a bit closer to the mark, as Judge McKenna's settlement-approval opinions at least had a legal impact on the *Malchow* putative class.  The problem with this attempt — and, more generally, with United's

use of post-Settlement materials to prove allocation — is that Judge McKenna's settlement-approval orders and other post-Settlement materials are not admissible for the purpose to which United intends to put them.  The Court addresses this problem below, in the context of discussing United's lack of admissible evidence.

Finally, at oral argument United suggested that it is the Court's job to instruct the jury as to the legal merits of the underlying claims in *AMA* and *Malchow*.  ECF No. 1533 at 101-03.  The Court disagrees.  It is the Court's role to instruct the jury as to the law that applies to United's coverage claims in *this* case.  But it is not the Court's job to provide expert testimony about how a reasonable party in United's position at the time of the Settlement would have evaluated the legal merits of the plaintiffs' claims in *AMA* or *Malchow*.  That is what United retained — or at least should have retained — an expert to do.  *See Nodaway Valley Bank*, 916 F.2d at 1365-66 (noting that the legal expert opined as to the legal theories of recovery in the underlying case and the respective liability of the underlying defendants).

## c.  Lack of Admissible Evidence

The corner into which United has painted itself has become very small.  United cannot introduce evidence of its contemporaneous evaluation of the merits of the *AMA* and *Malchow* claims — or its subjective allocation of the Settlement between those claims — because of its invocation of the attorney-client privilege and work-product doctrine.  United cannot introduce expert testimony regarding allocation because its one and only expert did not evaluate the *Malchow* claim.  And United cannot hand the jurors the summary-judgment and Rule 12(b)(6) rulings issued by Judge McKenna in *AMA* and ask the jurors to use those materials to make their

own assessment of the settlement value of *Malchow* because that is beyond the capabilities of a lay jury.

In a last-gasp effort to find a way to get its allocation case to a jury, United proposes two final methods of proof.  Neither of these methods will work, however, because neither has sufficient evidentiary support.

### i.  First Method

In the first method, United intends to show that Judge McKenna found that the Settlement was reasonable in light of the weakness of the ERISA claims asserted in both *AMA* and *Malchow*.  United argues that a jury can combine Judge McKenna's "testimony" that the ERISA claims were weak with Halverson's testimony that the antitrust claims were strong and find that only a small portion of the Settlement should be allocated to the ERISA claims asserted in *Malchow*.

The problem with this method is that it relies on hearsay.  United proposes to use Judge McKenna's assertions about the weakness of the *Malchow* claims and the reasonableness of the Settlement to prove the truth of those assertions — that is, to prove that the *Malchow* claims were weak and that the Settlement was reasonable.  Such use of Judge McKenna's assertions is plainly barred by the hearsay rule.  *See* Fed. R. Evid. 801(c); *United States v. Boulware*, 384 F.3d 794, 806 (9th Cir. 2004) ("A prior judgment is therefore hearsay to the extent that it is offered to prove the truth of the matters asserted in the judgment."); *United States v. Vega*, 676 F.3d 708, 720 (8th Cir. 2012) (judgment of acquittal in prior case is hearsay); *United States v. Jeanpierre*, 636 F.3d 416, 423-24 (8th Cir. 2011) (noting that a majority of

circuits have held that judicial findings of fact are hearsay, but declining to decide whether

judicial credibility determinations are hearsay).

It is true that a judicial ruling is not hearsay if it is offered to prove its operative legal

effect.  *See Boulware*, 384 F.3d at 806 ("A prior judgment is not hearsay . . . to the extent that it

is offered as legally operative verbal conduct that determined the rights and duties of the

parties.").  Thus, United may rely on Judge McKenna's settlement-approval orders to prove that

Judge McKenna *approved* the Settlement.  But United is seeking to use Judge McKenna's orders

to prove far more than that the Settlement was approved; United seeks to use the assertions made

within those orders about the weakness of the *Malchow* claims and the reasonableness of the

Settlement to prove the truth of those assertions.  That is hearsay.

As an aside, the Court notes that, while it has accepted United's contention that

Judge McKenna asserted that the *Malchow* claims were weak, the Court does not read

Judge McKenna's orders to express much of an opinion one way or the other on the strength of

those claims.  This illustrates the problem with hearsay:  The insurers cannot cross-examine

Judge McKenna about the assertions made in his orders.  They cannot ask him what he meant to

say, and what basis he had for his statements, or why he was not persuaded by evidence or

arguments that conflicted with his statements.

An out-of-court statement is not hearsay if it is offered, not to prove the truth of the

matter asserted, but rather to show its effect on the listener.  *See United States v. Wright*, 739

F.3d 1160, 1170 (8th Cir. 2014).  For example, United could introduce assertions made by Judge

McKenna *before* United executed the Settlement to prove the impact that those assertions had on

United's subjective evaluation of the settlement value of the *AMA* and *Malchow* claims.[17]  Here, however, Judge McKenna's settlement-approval orders did not exist until *after* United had already executed the Settlement.  Because the orders would not have been available to a reasonable person in United's position at the time of the Settlement, they are not admissible on the issue of allocation.

United contends that Judge McKenna's orders are not hearsay, but rather are simply part of the record of the underlying case.  According to United, the record of the underlying case is always admissible to prove allocation.  This argument, however, ignores the *reason* why materials from the underlying case are generally admissible:  They are part of the facts and circumstances that informed the parties' decision to settle.  *Cf. Zurich Reins. (UK) Ltd.*, 613 N.W.2d at 764 ("This court considers the circumstances and events *resulting in the settlement* to determine what claims were actually settled." (emphasis added)).  Again, the Court agrees that the entire record of the underlying case — up until the point that the Settlement was executed — is admissible on the question of allocation, as that information would have been available to a reasonable person in United's position at the time of the Settlement.  But, again, Judge McKenna's settlement-approval orders were entered long after United had executed the Settlement and thus could not possibly have informed United's decision to settle.  Without Judge McKenna's settlement-approval orders, United has no evidence to show that the *Malchow* claims were weak.

---

[17]To be more precise, United could introduce such evidence if it had not blocked inquiry into its subjective evaluation during discovery.

At oral argument, United contended for the first time that, even in the absence of Judge McKenna's settlement-approval orders, the jury can infer that the *Malchow* claims were weak based on the fact that "[t]he [*Malchow*] plaintiffs themselves chose to bring their claims into *AMA*."  ECF No. 1533 at 24.  There are at least four problems with this argument:

First, United did not brief this argument, and thus the insurers had no opportunity to respond to it.  United has an unfortunate habit of springing new arguments on the Court and the insurers at oral argument.  It would be unfair to the insurers to deny their motion on the basis of such an argument.  Putting that aside, United's raising this argument for the first time at oral argument leaves the Court with no way of knowing exactly what evidence United relies on in support of this argument, other than the Settlement itself.

Second, although the Court must view the evidence in the light most favorable to United, the inference that United wants the jury to draw — that is, the inference that the *Malchow* claims were weak because the plaintiffs agreed to implement the Settlement through the procedural mechanism of asking Judge McKenna to approve it — is barely even rational, much less reasonable.  The one simply does not logically follow from the other.  That is particularly true because the plaintiffs never chose to "bring their claims into *AMA*."  As discussed above, *AMA* and *Malchow* were never consolidated, and if the Settlement had not been approved, the *Malchow* claims would have been litigated before Judge Hochberg, not Judge McKenna.  The plaintiffs never agreed to allow Judge McKenna to do anything with respect to the *Malchow* claims except decide whether to approve a global settlement that included those claims.

Third, the record suggests that it was in fact United and its subsidiaries — not the *Malchow* plaintiffs — who were eager to get the *Malchow* case in front of Judge McKenna (or at

least away from Judge Hochberg).  Only one of the five named plaintiffs in *Malchow* agreed to the Settlement, and all but one of the plaintiffs' firms strongly objected to it.  The fact that almost all of those on the plaintiffs' side wanted the *Malchow* claims to remain in front of Judge Hochberg, while United and its subsidiaries wanted to get those claims in front of Judge McKenna, refutes any suggestion that the *Malchow* plaintiffs viewed their claims as weak.[18]

And finally, as the Court has explained, United cannot rely on evidence of what the settling parties were actually thinking as they negotiated the Settlement, including their reasons for deciding to ask Judge McKenna to approve the Settlement.  Again, through its invocation of the attorney-client privilege and work-product doctrine, United has blocked the insurers from cross-examining United or its trial counsel regarding the inferences that United intends to ask the jury to draw from the fact that the settling parties decided to ask Judge McKenna to approve the Settlement.  United cannot have its cake and eat it too.

ii. Second Method

In the second method, United starts with Slottje's delta as a calculation of the maximum conceivable damages that could have been awarded in *AMA* and *Malchow*.  United then deducts various amounts until it reaches a number that it contends is attributable to the ERISA claims in *Malchow*.  United has spun out various versions of this calculation, but a representative example is as follows:  Starting with a delta of $4.76 billion, United deducts 20 percent to account for class members' copay obligations, leaving about $3.8 billion.  United then deducts 99.5 percent

---

[18]This is not the only evidence that United and its subsidiaries feared litigating the *Malchow* claims before Judge Hochberg.  Shortly after *Malchow* was assigned to Judge Hochberg, the defendants took the unusual step of seeking to have the case assigned to a different judge.  *Malchow*, No. 08-935, ECF No. 19.

of this figure to account for Judge McKenna's rulings dismissing most of the ERISA claims in *AMA*, leaving about $19 million.  Finally, United deducts 93.5 percent from this figure to account for the fact that the *Malchow* plaintiffs made up only 6.5 percent of the class.  The resulting number attributable to *Malchow* is around $1.2 million.  *See* ECF No. 1377 at 207-08; *see also* ECF No. 1359 at 14 n.3.

Again, however, United has essentially no admissible evidence to support any of this.  The delta comes from Slottje's affidavit, which was produced months *after* United executed the Settlement.  Obviously, a reasonable person in United's position could not have relied on Slottje's affidavit at the time of the Settlement.  Moreover, United relies on Slottje's affidavit as proof of the matters asserted therein — that is, as proof of the actual value of the *AMA* and *Malchow* claims.  Indeed, United presents Slottje's delta as though that calculation were an undisputed law of nature rather than a highly contested estimate about which there were many hours of conflicting testimony and heated arguments.  Just as United did with respect to Judge McKenna, United is attempting to use Slottje as an expert witness without calling him to testify, exposing him to cross-examination, and enabling the jury to assess his credibility.  United emphasizes that Judge McKenna adopted Slottje's delta during the settlement-approval process, but that only compounds the problem:  Introducing an out-of-court assertion by Judge McKenna that he agreed with an out-of-court assertion by Slottje to prove that Slottje's out-of-court assertion was true is using hearsay on top of hearsay.

United further compounds the error by applying various deductions to the delta without citing any admissible evidence to support those deductions.  United contends that class members had a 20 percent copay obligation, that Judge McKenna eliminated 99.5 percent of the ERISA

claims, and that the *Malchow* plaintiffs made up only 6.5 percent of the settlement class.  As with the delta, United presents these figures as though they were indisputable facts capable of being judicially noticed.  They are not.

There is some admissible evidence to support the 99.5 percent dismissal figure; that figure is apparently derived from Judge McKenna's summary-judgment ruling in *AMA*.  Specifically, Judge McKenna discussed evidence that, out of 9,489 claim determinations, only 135 individual claims were exhausted.  UA01105-06.  It is not clear to the Court what the 9,489 figure is supposed to represent; it seems unlikely that it represents the total number of claim determinations for a class of over 21 million people.  At any rate, these figures yield a failure-to-exhaust rate of 98.6 percent.  To reach a dismissal rate of 99.5 percent, United (apparently) then applies another 60 percent reduction on the basis of its contention — a contention supported by no admissible evidence in the record of this case — that Judge McKenna's other rulings resulted in the dismissal of 60 percent of the remaining (i.e., exhausted) claims.

At best, then, United has evidence that Judge McKenna dismissed 98.6 percent of the ERISA claims in *AMA* for failure to exhaust.  But United never explains why this figure should apply to the ERISA claims in *Malchow* — which, again, were different claims pending in a different circuit before a different judge who appeared to have a different view about exhaustion.  And even if United had such an explanation, it does not have an expert witness who can present that explanation to a jury.

### iii.  Loose Ends

As should be apparent, United essentially put all of its allocation eggs in the Halverson basket, and after the Court ruled that Halverson could not testify about allocation, United has

been casting about for an alternative way to carry its burden on allocation.  United's allocation arguments have shifted over time, and thus at any particular time it can be difficult to get a handle on exactly what United is arguing and exactly what evidence United relies on to support its argument.  For that reason, the Court has carefully reviewed all of the materials that United submitted to the Court to ensure that the Court was not missing something that would support United's allocation arguments.

In particular, in light of United's repeated allusions to testimony from the attorneys who defended the *AMA* action, the Court reviewed the few short excerpts of deposition testimony that United submitted.  That testimony reiterates the chronology of the *AMA* case, *see, e.g.*, UA0949-50; refers to statements that the deponent made at settlement-approval hearings, UA0943-44, UA0946; and indicates that United had conducted some kind of delta calculation before executing the Settlement, UA1011-16, 1020-21.  Although some of this testimony would be admissible — in particular, the testimony about what United knew before it executed the Settlement — none of this testimony fills the evidentiary gaps in United's allocation case.

Certainly, evidence of a *pre*-Settlement delta would be relevant and would not be barred as hearsay.  (It would be introduced to prove its impact on United, rather than to establish its truth.)  But the case that United has chosen to present rests on Slottje's delta, not on some other, pre-Settlement delta — perhaps because the record evidence of the alleged pre-Settlement delta is hopelessly fragmentary and incomplete.  More importantly, as the Court has already held, it is too late for United to rely on its contemporaneous settlement evaluations, given that it blocked any inquiry into those evaluations through its aggressive invocation of the attorney-client

privilege and work-product doctrine.  At bottom, then, United has no admissible evidence about how any pre-Settlement delta would have influenced a reasonable party in United's position.

To the extent that United might argue that the jury can use a pre-Settlement delta to calculate the settlement value of *AMA* and *Malchow* for itself, United again ignores the other crucial element for determining settlement value.  As the Court explained above, any delta — including a pre-Settlement delta — is merely an estimate of the most that the plaintiffs could possibly win.  But to determine settlement value, a jury must assess not only the maximum possible damages, but also the likelihood that the plaintiff will win those damages.  This Court sometimes adjudicates bizarre claims brought by pro se litigants against the United States or similar defendants seeking upwards of a trillion dollars.  The "delta" in such a case might be a trillion dollars, but the settlement value is about a trillion dollars less.

To allocate the Settlement between the *AMA* claim and the *Malchow* claim, a jury needs more than a delta; it needs evidence of how a reasonable person in United's position would have assessed the relative settlement values of the *AMA* claim and the *Malchow* claim at the time of the Settlement.  United does not have sufficient admissible evidence on that issue, and thus it cannot carry its burden on allocation.

## III.  CONCLUSION

United's predicament is entirely of its own making.  To begin, United blocked any inquiry into the contemporaneous assessments of United and its defense counsel through assertions of the attorney-client privilege and work-product doctrine.  United was entitled to make that choice, but the result of that choice is that one of the most common sources of

evidence about allocation — the testimony of the insured and its trial counsel about their subjective evaluations of the underlying case — became unavailable to United.

United also must have recognized that, without some type of "expert" testimony — either in the form of testimony from lawyers who represented United in the underlying cases or in the form of testimony from lawyers who were hired to give expert testimony in this case — no jury of lay persons could possibly allocate between *AMA* and *Malchow*.  These were not slip-and-fall cases; these were two extraordinarily complicated lawsuits that would be difficult even for lawyers to comprehend.  To quote United, allocation is "clearly . . . an expert witness issue." UA0939 at 48.

United retained an expert witness, but then, for reasons known only to United, did not ask that expert witness to evaluate one of the two lawsuits encompassed by the Settlement.  It should have been obvious to United that an expert cannot testify about how a settlement of two lawsuits should be allocated between those lawsuits without evaluating the settlement value of both lawsuits.  As the Court has explained at length, allocation by its very nature involves assessing the relative (not absolute) value of settled claims.  United's expert testified that the *AMA* claim was valuable — the equivalent of a Picasso — but he did not assess the value of the *Malchow* claim.  Without such an assessment, a jury cannot determine whether *Malchow* is the equivalent of a Van Gogh or the equivalent of a black velvet Elvis, and thus a jury cannot allocate.  Because United's litigation strategy has left it without sufficient evidence to prove what portion of the Settlement is attributable to the *AMA* claim, United cannot force the insurers to indemnify it for that portion.

The Court therefore grants the insurers' motion for summary judgment on Counts V and VI of United's second amended supplemental complaint.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      The motion of defendants Executive Risk Specialty Insurance Company, First Specialty Insurance Corporation, and Starr Excess Liability Insurance International Limited for summary judgment on Counts V and VI of the second amended supplemental complaint [ECF No. 1506] is GRANTED.

2.      Plaintiff shall take nothing from defendants Executive Risk Specialty Insurance Company, First Specialty Insurance Corporation, or Starr Excess Liability Insurance International Limited on Counts V and VI of the second amended supplemental complaint [ECF No. 556].

Dated: September 25, 2014                    s/Patrick J. Schiltz
                                            Patrick J. Schiltz
                                            United States District Judge

-49-